**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

KATHY RADTKE, ET AL.                      |
                                          |
                                          |
        Plaintiffs,                       |
                                          |
            v.                            |        Civil Case No.: 06cv02031 (EGS)
                                          |
MARIA CASCHETTA, ET AL.                   |
                                          |
        Defendants                        |
_____  |

### PLAINTIFFS'  MOTIONS FOR RECONSIDERATION OF ORDER TO SEVER

Plaintiffs Kathy Radtke and Carmen Cunningham, by and through their under-signed counsel, pursuant to FRCP Rule 60(B) hereby moves this Honorable Court to reconsider its Order granting a Defendant's Motion to Sever.  This Motion is supported by the reasons stated in the attached Memorandum of Points and Authorities, filed herewith.

Plaintiff respectfully requests that:

1) The Motion for Reconsideration be granted; and

2) For such other and further relief as the nature of the case may require.

May 30, 2007                                      Respectfully submitted,


                                          _____/s/_____
                                          S. Micah Salb, #453197
                                          Richard H. Semsker, #413886
                                          Gwenlynn Whittle D'Souza #453849
                                          Lippman, Semsker & Salb, LLC
                                          7700 Old Georgetown Road, Suite 500
                                          Bethesda, Maryland  20814
                                          (301) 656-6905 / (301) 656-6906 (fax)

                                          Attorneys for Plaintiffs

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD  20814
Tel. (301) 656-6905
Fax (301) 656-6906

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
KATHY RADTKE, ET AL.                              |
                                                  |
          Plaintiffs,                             |
                                                  |
                    v.                            |        Civil Case No.: 06cv02031 (EGS)
                                                  |
MARIA CASCHETTA, ET AL.                           |
                                                  |
          Defendants                              |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTIONS TO RECONSIDER ORDER TO SEVER**

Plaintiffs Kathy Radtke and Carmen Cunningham, by and through their under-signed counsel, hereby moves this Honorable Court to reconsider its Order of May 15, 2007 to sever the cases for the following reasons:

**I. FACTS.**

Plaintiff Kathy Radtke and Carmen Cunningham have brought a claim against Defendant Maria Caschetta, who is the sole owner of Advanta Medical Solutions, LLC (hereinafter "Advanta"). Complaint, ¶ 8. Advanta is incorporated in the State of Maryland and is registered to do business in the District of Columbia. Complaint, ¶ 10.

Advanta is a subcontractor and joint venture partner of LifeCare Management Partners (hereinafter "LifeCare") . Advanta holds itself out as a business partner for coding and government services with LifeCare Management Partners. See Exh. 1, http://www.advantamedicalsolutions.com/about.htm. and Exh. 2, GAO Decision.

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Plaintiffs have sued Defendants LifeCare and Advanta.  LifeCare is incorporated in the Commonwealth of Virginia and is registered to do business in the District of Columbia. Complaint, ¶ 9.

Defendants Caschetta, LifeCare, and Advanta operated medical record coding businesses which hired employees and contracted them out to perform medical record coding at the sites of various clients.  Complaint, ¶ 11.

Plaintiff Kathy Radtke was interviewed by Defendant Caschetta, and offered the choice of working at either Defendant Advanta or Defendant Lifecare in November 2004 as a medical records coder.  Complaint, ¶ 12 and Exh. 3, Radtke Affidavit ¶ _____.  Plaintiff Radtke chose to work at Advanta.  As a medical records coder, Plaintiff Radtke was required to report to the Pentagon in Arlington, Virginia, every morning to provide approximately four hours of medical record coding services on a Walter Reed Contract.  Complaint at ¶ 13; Exh. 3, Radtke Affidavit ¶ _____. Plaintiff Radtke was then required by Defendants Caschetta and Advanta to travel between one and two hours to her afternoon work site, which was Kaiser Permanente, located in Kensington, Maryland. *Id.* at ¶ 14.  Plaintiff Radtke was required by Defendants Caschetta and Advanta to work at least four hours at the Kaiser site daily. *Id.* at ¶ 15.

Plaintiff Radtke's schedule was set by Defendant Caschetta.  Although required to travel during her normal workday, and although the travel time forced Plaintiff Radtke to be engaged in work activities regularly exceeding nine hours per day and forty-five to fifty hours per week, Plaintiff Radtke was never compensated for her time worked over forty hours per week. Complaint, ¶ 16.  Nor was Plaintiff Radtke at any time reimbursed for her travel expenses. *Id.*  Furthermore,

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Plaintiff Radtke was required to work several federal holidays. *Id.* at ¶ 17. Plaintiff Radtke was never paid overtime or holiday pay for these services. *Id.*

Plaintiff Carmen Cunningham was hired by Defendants Caschetta, Advanta, and LifeCare in November 2002 as a medical records coder. Complaint, ¶ 18 and Exh. 4, Cunningham Affidavit ¶_____. Plaintiff Carmen Cunningham's entered into a written agreement with Advanta. Exh. 4, Cunningham Affidavit ¶_____. Plaintiff Carmen Cunningham, however, received paychecks and health insurance through LifeCare. Exh. 4, Cunningham Affidavit ¶_____. Plaintiff Cunningham was assigned by Defendants Caschetta to work at the Walter Reed Army Medical Center. *Id.* at ¶ 19.

Plaintiff Cunningham's schedule was set by Defendant Caschetta. Plaintiff Cunningham was regularly required to work forty-one to fifty-five hours per week. *Id.* at ¶ 20. At no time was Plaintiff Cunningham compensated at an overtime rate for her work performed in excess of forty hours per week. *Id.* Furthermore, Plaintiff Cunningham was regularly required to work certain holidays. *Id.* at ¶ 21. At no time was Plaintiff Cunningham paid overtime or holiday pay for the services she was required to perform on those days. *Id.*

Both Plaintiffs suffered a loss of wages and benefits and suffered emotional distress as a result of the Defendants' failure to pay them the wages that they earned. Complaint, ¶ 22.

## II. ARGUMENT.

Consideration of the Fair Labor Standards Act definition of a joint employer is essential prior to an Order of Severance.

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

### C.     The Plaintiffs' Claims Are Properly Joined Under Rule 20(a).

### 1.     The Fair Labor Standards Act

Under the Fair Labor Standards Act (FLSA), even when an employee is paid by two separate corporations, those corporations may be considered "joint employers" for purposes of compliance with overtime requirements.  Specifically,

> if the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of [the Fair Labor Standards] Act.  In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including <u>overtime provisions</u>, with respect to the entire employment for the particular workweek.

29 C.F.R. § 791.2(a) (Emphasis added).

As with all other aspects of the FLSA, "joint employment" is construed liberally in order to effectuate the broad remedial purposes of the FLSA.  <u>Benshoof v. City of Virginia Beach</u>, 180 F.3d 136, 140 (4th Cir. 1999) (quoting <u>Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123</u>, 321 U.S. 590, 597 (1944).  The FLSA defines "employ" broadly as "to suffer or permit to work."  The FLSA broadens "the meaning of 'employee' to cover some who might not qualify as such under a strict application of traditional agency law principles." *Id.*  Joint employment, by regulation,  includes instances :

> Where the employee performs work which simultaneously benefits two or more employers such as when one employer acts, directly or indirectly, in the interest of the other employer in relation to the employee; or the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).

- 4 -

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

The Defendants next move this Court to sever the Plaintiffs' claims on the ground that the claims purportedly do not arise out of the same transaction, occurrence, or series of transactions or occurrences, as is required by Federal Rule of Civil Procedure 20(a).  *See* <u>Def's Mot. to Sever Claims</u> (Docket No. 4).  However, the Plaintiffs' case is properly joined under Rule 20(a) because of the commonality of the circumstances giving rise to the Plaintiffs' claims, and it is logical, cost-effective, and fair to the Defendants to bring a single case.

Rule 20(a) permits defendants to be joined in a single suit when plaintiffs can show that the complained-of events arise out of the same transaction, occurrence, or series of transactions or occurrences.[1]  This requirement, known as the "transactional test," has been interpreted to mean that "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence."  <u>M.K. v. Tenet</u>, 216 F.R.D. 133 (D.D.C. 2002); <u>Mosley v. Gen. Motors Corp.</u>, 497 F.2d 1330, 133 (8th Cir. 1974).

There is, apparently, no single test used to determine when causes of action can be joined under Rule 20, but instead courts take a case-by-case approach.  Wright et al., <u>Federal Practice and Procedure</u> § 1653.  As one court described it, "there can be no hard and fast rule, and . . . the approach must be a general one of whether there are enough ultimate factual concurrences that it would be fair to the parties to require them to defend jointly [the several claims] against them. . . ."  <u>Eastern Fireproofing Co. v. U.S. Gypsum Co.</u>,160 F.Supp. 580, 581 (D.Mass. 1958).  It is clear that there are ample concurrences here to warrant a single suit.

---

[1] The Defendant's motion claims that the Plaintiffs' claims do not arise out of the same transaction or series of transactions, and so the Plaintiffs need not address any other requirement of Rule 20(a).

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Using the "logically related" standard of <u>M.K. v. Tenet</u> and the "factual concurrences" standard of *Eastern Fireproofing*, it is clear that the events which give rise to these claims are properly joined under Rule 20(a).  First, both Plaintiffs were employed by the same Defendant, Maria Caschetta.  <u>Complaint</u>, ¶¶ 12, 18; 29 U.S.C. § 203(d) ("Employer" defined pursuant to Fair Labor Standards Act to include any person acting directly or indirectly in the interest of an employer in relation to an employee); *see* <u>Donovan v. Agnew</u>, 712 F.2d 1509, 1514 (1st Cir. 1983); *see also* <u>Int'l Bhd. of Painters and Allied Trades Union v. George A. Kracher, Inc.</u>, 856 F.2d 1546, 1548 (D.C. Cir. 1988).  As such, the claims by Ms. Radtke and Ms. Cunningham share a common employer.

Second, Ms. Caschetta's shared control of the two malfeasing companies demonstrates a logical relationship between the claims.  Third, both Plaintiffs performed the same task for the Defendants — medical record coding.  <u>Complaint</u>, ¶¶ 13, 18.  Fourth, both Plaintiffs suffered the same sorts of damages — lost wages and benefits for failure to pay overtime as well as emotional distress damages.  *See M.K.*, 216 F.R.D. at 142 (finding that similar measure of damages constitutes a logical relationship between claims).

Finally, and most importantly, Ms. Caschetta and the Defendant companies engaged in the same consistent pattern of failing to pay minimum wages as required by the Fair Labor Standards Act as to both Plaintiffs.  Notwithstanding the enigmatic reference to the contrary in the Defendants' motion, both Plaintiffs bring suit under 29 U.S.C. § 206.  Defendants often failed to pay the Plaintiffs at all for the work they performed and paid them only partially and in an untimely manner when they did pay the Plaintiffs.  <u>Complaint</u>, ¶ 30.  This pattern of avoiding overtime and holiday pay requirements by the Defendants against the Plaintiffs is "logically

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 6 -

related" as "a series of transactions or occurrences" that establishes an overall pattern of policies and practices" aimed at denying employee rights to the plaintiffs. <u>Mosley v. Gen. Motors Corp.</u>, 497 F.2d at 1331, 1333. Therefore, this Court should regard as "arising out of the same transaction, occurrence or series of transactions or occurrences" consistent with Rule 20(a).

In adjudicating the Defendants' motion to sever, this Court should consider the waste of judicial resources that would be caused by a severing of the actions. "On a final note, in denying the defendants' motion to sever, the court defers to the policy underlying Rule 20 which is to promote trial convenience, expedite the final determination of disputes, and prevent multiple lawsuits." *Mosley*, 497 F.2d at 1332. As Wright & Miller note,

> The transaction and common-question requirements prescribed by Rule 20(a) are not rigid tests. They are flexible concepts used by the courts to implement the purpose of Rule 20 and therefore are to be read as broadly as possible whenever doing so is likely to promote judicial economy.

Wright et al., <u>Federal Practice and Procedure</u> § 1653.

Indeed, this Court must "entertain[] the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, and remedies is strongly encouraged." <u>United Mine Workers of Amer. v. Gibbs</u>, 383 U.S. 715, 724 (1966). No prejudice accrues to the Defendants by having the causes heard together; to the contrary, a single litigation is far less expensive and avoids duplicative discovery. *See M.K.*, 216 F.R.D. at 143 (holding, "In accordance with *Gibbs*, the court believes that the joinder or non-severance of the six existing

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

plaintiffs and their new claims under Rule 20(a) will promote trial convenience, expedite the

final resolution of disputes, and act to prevent multiple lawsuits, extra expense to the parties, and

loss of time to the court and the litigants in this case.").

Therefore, because the Plaintiffs can show multiple facts which demonstrate that their

claims arise out of the same transaction or occurrence, and because it would grossly inefficient to

sever the claims, creating duplicative litigation, this Court should deny the Defendants' motion.


May 30, 2007                                      Respectfully submitted,


                                                  _____/s/_____

                                                  S. Micah Salb, #453197

                                                  Richard H. Semsker, #413886

                                                  Gwenlynn Whittle D'Souza#453849

                                                  Lippman, Semsker & Salb, LLC

                                                  7700 Old Georgetown Road, Suite 500

                                                  Bethesda, Maryland  20814

                                                  (301) 656-6905 / (301) 656-6906 (fax)


                                                  Attorneys for Plaintiffs

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

KATHY RADTKE, ET AL.          |

                                |

      Plaintiffs,            |

                                |

             v.               |       Civil Case No.: 06cv02031 (EGS)

                                |

MARIA CASCHETTA, ET AL.      |

                                |

      Defendants          |

_____

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS TO RECONSIDER ORDER TO SEVER

Plaintiffs Kathy Radtke and Carmen Cunningham, by and through their under-signed counsel, hereby move this Honorable Court to reconsider its Order of May 15, 2007, severing the above-referenced case with additional facts and legal authority as follows:

### I.  PRELIMINARY STATEMENT.

Plaintiffs Kathy Radtke and Carmen Cunningham brought an action against Defendants Maria Caschetta, LifeCare Management Partners (hereinafter "LifeCare"), and Advanta Medical Solutions, LLC (hereinafter "Advanta").  After Defendants filed a Motion to Sever the Claims of Plaintiffs under Rule 21, Plaintiffs, in their Opposition to Defendant's Motion to Compel Arbitration, Sever, For Change of Jurisdiction, For Change of Venue, and For More Definite Statement (hereinafter the "Plaintiffs' Opposition"), argued that the Fair Labor Standards Acts (hereinafter the "FLSA") defines an "employer" to include not merely the actual corporate entity which provides employment but also any person acting directly or indirectly in the interest of an employer in relation to an employee."  *See* Plaintiffs' Opposition.

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Defendants, in their Reply, conceded to Plaintiff's legal definition of "employer" by failing to cite any legal authority. Defendants' made factual assertions about the relationship of Ms. Caschetta and LifeCare, however, to which a response is not normally permitted.

In its Memorandum Opinion, the Court, without applying the broad definition of an employer provided under FLSA, found that "Caschetta is not related to LifeCare in any way, and thus did not employ Cunningham." *See* Memorandum Opinion, dated May 15, 2007. Because this finding runs contrary to both the facts of this case and the well-settled law governing FLSA claims, this Court should reconsider its decision.

Ironically, each Defendant now alleges in its Counterclaim that Plaintiff Cunningham signed an agreement not to compete that benefitted both LifeCare and Advanta. Defendants' Counterclaim, ¶ 1. Thus, it is clear that the information previously supplied by the Defendants contending that there is no relationship between the two employers appears not to be accurate. Reconsideration is, thus, plainly warranted. Plaintiff requests that the Court reconsider not only whether Defendants were a common employer, but also whether Defendants were a joint employer for FLSA purposes.

## II. FACTS.

Defendants Caschetta, LifeCare, and Advanta operated medical record coding businesses which hired employees and contracted them out to perform medical record coding at the sites of various clients. Complaint, ¶ 11. Advanta is a joint venture partner of LifeCare Management Partners. *See* http://www.advantamedicalsolutions.com/about.htm (May 17, 2007) (hereinafter "Advanta Webpage"), attached hereto as Exhibit 1; GAO Decision dated January 28, 2004, attached hereto as Exhibit 2. Advanta, at its own website, holds itself out as a business partner of LifeCare

- 2 -

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Management Partners.  *See* Advanta Webpage, Exh. 1.  In fact, the GAO has explicitly found that LifeCare Management Partners and Advanta Medical Solutions, LLC, have engaged in a joint venture in at least one other case.  *See* GAO Decision, Exh. 2.

Plaintiff Kathy Radtke was interviewed for a position as a medical records coder by Defendant Maria Caschetta.   Complaint, ¶ 12; Radtke Affidavit ¶ 2, attached hereto as Exhibit 3. She was offered the choice of working at either Advanta or LifeCare in November 2004.  *Id.*  Ms. Radtke chose to work at Advanta.  Radtke Affidavit ¶ 3, Exh. 3.  As a medical records coder, between November 2004 and mid-June 2005, Ms. Radtke was required by Ms. Cashetta and Advanta to report to the Pentagon in Arlington, Virginia, every morning to provide full-time medical record coding services on the Walter Reed contract, which sometimes exceeded 40 hours a week. Radtke Affidavit ¶4, Exh. 3-5.  Any pay she received for holiday work was at her regular rate.  *Id.*

Between mid-June 2005 and December 2005, Ms. Radtke was required to report to the Pentagon in Arlington, Virginia, every morning to provide approximately four hours of medical record coding services on a Walter Reed Contract.  Complaint ¶ 13; Radtke Affidavit, ¶4-5, Exh. 3.  Ms. Radtke was then required by Ms. Caschetta and Advanta to travel between one and two hours to her afternoon work site, which was Kaiser Permanente, located in Rockville, Maryland. Complaint ¶ 14.  Ms. Radtke was required by Ms. Caschetta and Advanta to work at least four hours at the Kaiser site daily.  *Id.*  at ¶ 15.

Ms.  Radtke's schedule was set by Defendant Caschetta.  Although required to travel during her normal workday, and although the travel time meant that Ms. Radtke was engaged in work activities regularly exceeding nine hours per day and forty-five to fifty hours per week, Ms. Radtke was never compensated for her time worked over forty hours per week.  Complaint ¶ 16.  Nor was

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 3 -

Ms. Radtke at any time reimbursed for her travel expenses. *Id*. Furthermore, Ms. Radtke was required to work several federal holidays. *Id*. at ¶ 17. Ms. Radtke was never paid overtime or holiday pay for these services. *Id*.

Plaintiff Carmen Cunningham was interviewed by Ms. Caschetta in or around November 2002. *See* Cunningham Affidavit, ¶ 2, attached hereto as Exhibit 4. Ms. Cunningham was hired by Ms. Caschetta, Advanta, and LifeCare in November 2002 as a medical records coder. Complaint ¶ 18; Cunningham Affidavit, ¶3, Exh. 4. After Ms. Cunningham was hired by Advanta, Ms. Cunningham received paychecks and health insurance through LifeCare. *See* Cunningham Affidavit, ¶¶4-5, Exh. 4. Ms. Cunningham received her work assignments from Ms. Caschetta, who assigned her to work at the Walter Reed Army Medical Center. Complaint ¶ 19. Defendants now allege that Ms. Cunningham entered into a noncompete agreement which benefitted both Lifecare and Advanta. Defendant's Counterclaim Against Plaintiff Cunningham[1] ¶ 1.

Ms. Cunningham's schedule was set by Ms. Caschetta. Ms. Cunningham was regularly required to work forty-one to fifty-five hours per week. *Id*. at ¶ 20. At no time was Ms. Cunningham compensated at an overtime rate for her work performed in excess of forty hours per week. *Id*. Furthermore, Ms. Cunningham was regularly required to work certain holidays. *Id*. at ¶ 21. At no time was Ms. Cunningham paid overtime or holiday pay for the services she was required to perform on those days. *Id.*

### III. ARGUMENT.

---

[1] Purportedly, this is a separate contract of employment from the written agreement which Ms. Cunningham signed in 2003.

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

**A.     This Court's Finding That Ms. Caschetta Was Not Directly Related to LifeCare Does Not Resolve the Motion to Sever Because Resolution of That Motion Requires Application of the FLSA's Definitions of "Employer" and "Joint Employer."**

In determining whether there were events that arise out of a series of occurrences or transactions under Rule 20(a), the Court considered whether Ms. Cunningham had a common employer. *See* Memorandum Opinion, dated May 15, 2007.  Although the Plaintiffs had supplied the proper legal framework for the analysis of what is an employer, which was not disputed by the Defendants, the Court did not adhere to the relevant law.  *See* Defendants' Motion to Sever, Plaintiffs' Opposition, and Defendants' Reply.   The Court, without applying the broad FLSA definition of an employer, found that "Cashetta is not related to LifeCare in any way, and thus did not employ Cunningham." *See* Memorandum Opinion, dated May 15, 2007.

An "employer" is defined by the Fair Labor Standards Act to include any person acting directly or indirectly in the interest of an employer in relation to an employee.  29 U.S.C. § 203(d); *see* Donovan v. Agnew, 712 F.2d 1509, 1514 (1st Cir. 1983); *see also* Int'l Bhd. of Painters and Allied Trades Union v. George A. Kracher, Inc., 856 F.2d 1546, 1548 (D.C. Cir. 1988) as cited in Plaintiffs' Opposition.  Furthermore, the FLSA defines "employ" broadly as "to suffer or permit to work."   The FLSA broadens "the meaning of 'employee' to cover some [workers] who might not qualify as such under a strict application of traditional agency law principles." Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944).

Additionally, under the FLSA, two separate companies may be considered "joint employers" for purposes of compliance with overtime requirements.  29 C.F.R. § 791.2(a).  As with all other aspects of the FLSA, "joint employment" is construed liberally in order to effectuate the broad

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 5 -

remedial purposes of the FLSA. <u>Benshoof v. City of Virginia Beach</u>, 180 F.3d 136, 140 (4th Cir. 1999). Specifically,

> if the facts establish that the employee is employed jointly by two or more employers, i.e., <u>that employment by one is not completely disassociated from employment by the other employer(s)</u>, all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of [the Fair Labor Standards] Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including <u>overtime provisions</u>, with respect to the entire employment for the particular workweek.

29 C.F.R. § 791.2(a) (emphasis added).

Joint employment, by regulation, includes instances :

> Where the employee performs work which simultaneously benefits two or more employers such as when one employer acts, directly or indirectly, in the interest of the other employer in relation to the employee; or the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because <u>one employer controls, is controlled by, or is under common control with the other employer</u>.

29 C.F.R. § 791.2(b) (emphasis added).

Under the broad FLSA definition of employer, each Defendant — Ms. Caschetta, LifeCare, and Advanta — was an employer. Ms. Caschetta, LifeCare, and Advanta were joint employers because each Defendant simultaneously benefitted from Ms. Cunningham and Ms. Radtke's work, particularly on the Walter Reed Contract. *See* Cunningham Affidavit ¶¶ 3-5; *see also* Radtke Affidavit ¶¶ 2-4 and <u>Complaint</u> ¶ 19.

Furthermore, no Defendant was completely disassociated from the other. <u>The Defendants allege in their Counterclaim that Ms. Cunningham entered into a non-compete that benefitted both Advanta and Lifecare</u>. <u>Counterclaim</u>, ¶ 1. At times, Advanta was in common control with LifeCare as a joint venture partner. *See* GAO decision. Advanta as a subcontractor was controlled by

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

LifeCare. *See* Advanta Webpage. Maria Caschetta routinely acted directly or indirectly in the interest of Lifecare and Advanta. She interviewed applicants for both LifeCare and Advanta. *See* Radtke Affidavit ¶2; *see also* Cunningham Affidavit ¶¶ 2-5. She offered positions for both LifeCare and Advanta. *Id*. She scheduled workers for both LifeCare and Advanta. *See* <u>Complaint</u> ¶¶ 13-21. Thus, Ms. Cashetta, Advanta, and LifeCare each were employers of Ms. Cunningham and Ms. Radtke.

The question for the Court to consider in reconsideration is not whether the Defendants were common employers, but rather whether they were joint employers. It is clear based on the facts of this case and the broad FLSA definition of employer that Ms. Caschetta, LifeCare and Advanta were joint employers of Ms. Cunningham and Ms. Radtke.

**B.      The Actions taken by joint employers Ms. Caschetta, Advanta, and LifeCare resulted in a series of transactions or occurrences involving the failure to pay minimum and overtime wages to Ms. Cunningham and Ms. Radtke.**

Rule 20(a) permits defendants to be joined in a single suit when plaintiffs can show that the complained-of events arise out of a series of transactions or occurrences. This requirement, known as the "transactional test," has been interpreted to mean that "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." <u>M.K. v. Tenet</u>, 216 F.R.D. 133 (D.D.C. 2002); <u>Mosley v. Gen. Motors Corp.</u>, 497 F.2d 1330, 133 (8th Cir. 1974).

The principal facts of this case are:

•      As noted above, both Plaintiffs were employed — as that term is defined for FLSA purposes — by each defendant as joint employers.

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- •    Even the Defendants allege that Ms. Cunningham entered into a non-compete which benefitted Ms. Cunningham and Ms. Radtke.  <u>Defendants' Counterclaim</u> ¶ 1.

- •    Ms. Radtke and Ms. Cunningham performed the same task for the Defendants — medical record coding under the same government contract for Walter Reed.  <u>Complaint</u> ¶¶ 13, 18; *see* Radtke Affidavit ¶ 4-5.

- •    Both Plaintiffs suffered the same sorts of damages — lost wages and benefits for failure to pay overtime as well as emotional distress damages. <u>Complaint</u> ¶ 30;  *see* Radtke Affidavit ¶¶ 4-5.

This pattern of avoiding overtime and holiday pay requirements by the Defendants against the Plaintiffs is "logically related" as "a series of transactions or occurrences" that establishes an overall pattern of policies and practices" aimed at denying employee rights to the plaintiffs. *Mosley*, 497 F.2d at 1331, 1333.

Therefore, this Court should regard the facts of this case as arising out of the same series of transactions or occurrences consistent with Rule 20(a) for the purposes of joinder because the Plaintiffs share  joint employers, performed the same tasks, and suffered the same violations of law and subsequent losses.

### IV. CONCLUSION

In light of the additional facts and legal authority provided, reconsideration of the <u>Memorandum Opinion</u> dated May 15, 2007  is warranted, particularly as to whether Defendants are joint employers for FLSA purposes.  If there is any dispute in the facts on the motion to sever, discovery on the matters should be permitted.

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

May 30, 2007                                    Respectfully submitted,


                                               _____/s/_____
                                               S. Micah Salb, #453197
                                               Richard H. Semsker, #413886
                                               Gwenlynn Whittle D'Souza, #453849
                                               Lippman, Semsker & Salb, LLC
                                               7700 Old Georgetown Road, Suite 500
                                               Bethesda, Maryland 20814
                                               (301) 656-6905 / (301) 656-6906 (fax)

                                               Attorneys for Plaintiffs

**Lippman, Semsker & Salb, LLC**
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

# Exhibit 1



**ADVANTA**
Medical Solutions, LLC                                    Values. Execution. Results.

→ HOME
→ ABOUT US
→ SERVICES
→ CAREERS
→ NEWS & EVENTS
→ CONTACT US

# ABOUT US

Advanta has a long history of performance and innovation in the healthcare industry. After being spun off from DynCorp's AdvanceMed Corporation, a leading provider of healthcare information solutions to the Federal Government and the healthcare industry, Advanta has been able to achieve double digit revenue growth every year since inception.

## Customers

Today Advanta's customers include organizations in both the private and public sectors. Advanta's relationships with Department of Health and Human Services, Department of the Army, major corporations as well as dozens of private hospitals across the nation allow it to build and operate an impressive network of coders, case managers, and other medical, legal, financial, and information technology professionals.

## Top Leadership

Advanta is being led by top executives with a total of over 100 years of experience in the healthcare and government fields. Advanta's managers and affiliates include former executives and other professionals from Dyncorp, CSC, IRS, CareFirst of Maryland, Blue Cross and Blue Shield Association, Social Security Administration, and WorldCom, just to name a few.

## Affiliations

Advanta is a joint venture partner in the Worker's Compensation Review Center and Livanta, LLC. Advanta's business partners for coding and government services include LifeCare Management Partners and Avisis.

Home | About Us | Services | Careers | News & Events | Contact Us

Copyright © 2004 Advanta Medical Solutions, LLC. All rights reserved.

# Exhibit 2



**G A O**
Accountability • Integrity • Reliability

United States General Accounting Office
Washington, DC 20548

**Comptroller General
of the United States**

DOCUMENT FOR PUBLIC RELEASE

The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:**   Base Technologies, Inc.

**File:**        B-293061.2; B-293061.3

**Date:**        January 28, 2004

L. James D'Agostino, Esq., Richard L. Moorhouse, Esq., Leigh T. Hansson, Esq., and Natalia W. Geren, Esq., Reed Smith, for the protester.
Michael D. Harbart, Esq., Department of Treasury, for the agency.
Sharon L. Larkin, Esq., and James A. Spangenberg, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

**DIGEST**

1. Agency's consideration of key personnel's lack of law enforcement, and limited years of, experience was proper, where these matters were reasonably encompassed within the solicitation's evaluation criteria and related to the solicitation's requirements.

2. During discussions, an offeror need not be told of all weaknesses that would enable it to achieve maximum evaluation score.

3. Agency may consider the references of one joint venture partner in evaluating a joint venture offeror's past performance where they are reasonably predictive of performance of the joint venture entity.

4. Agency's scoring of past performance was reasonable and consistent with the solicitation's evaluation criteria; protester's argument that agency failed to follow scoring scheme set forth in agency's internal evaluation plan does not provide a valid basis for protest.

## DECISION

Base Technologies, Inc. (BTI) protests the award of a contract to Lifecare-Advanta Joint Venture[1] (LAJV) under request for proposals (RFP) No. BPD-03-R-0010, issued by the Bureau of Public Debt, Department of Treasury, for financial crimes investigative services. BTI contends the agency conducted a flawed evaluation of both offerors' proposals, and held inadequate discussions with BTI.

We deny the protests.

The Financial Crimes Investigative Network (FinCEN) provides intelligence and analytical support to the international, federal, state, and local law enforcement and regulatory communities. It provides analytical case reports to investigators using state-of-the-art technology, in-house analysts, and various data sources to uncover potential criminal relationships. The FinCEN has a continuing requirement for on-site support related to these investigative services, which BTI currently provides under a contract set to expire shortly.

The RFP, issued as a small business set-aside, sought a contractor to provide on-site support for the FinCEN in five program areas: case management, the USA Patriot Act, the commercial database program, the gateway program, and the pro-active targeting program. As stated in the RFP, case management support involves researching three classes of information--commercially available data (e.g., ChoicePoint, Lexis-Nexis, and Dun & Bradstreet databases), financial information (e.g., Bank Secrecy Act reports and Department of Treasury databases), and law enforcement information (e.g., FinCEN past cases, and databases from the Departments of Treasury, Justice, and Defense)--and involves such tasks as mail processing and telephone coverage, management of case information, and target information processing. USA Patriot Act support requires services related to an information-sharing service between law enforcement and financial and regulatory communities with respect to the investigation of financial crimes, money laundering, and terrorist activities, and includes such tasks as research (which was noted in the RFP as the "highest priority" to the FinCEN and the agencies supported by the FinCEN), case opening and closing, maintenance of financial institutions' points of contact and e-mail address logs, returning results to the requestor, and archiving cases. Commercial database system and gateway system support requires answering requests for user identifications and passwords, maintaining logs and files of user access accounts, conducting database searches, and responding to requests concerning the gateway process. Pro-active targeting program support involves

---

[1] LAJV is a joint venture formed specifically to respond to this RFP. The joint venture partners are LifeCare Management Partners and Advanta Medical Solutions, LLC.

B-293061.2; B-293061.3

using artificial intelligence technology to locate unusual or questionable financial activity in various reports and financial records, and requires the contractor to conduct research, organize data, and process the results in the reports. RFP § C.2.

The RFP contemplated the award of a "labor-hour, performance-based contract" for a base year with four 1-year options, with a minimum value of $1,000 and a maximum value of $20 million. RFP §§ B.3, B.4, F.2.

The RFP provided that award would be made to the offeror whose proposal presented the "best overall value" to the government, considering past performance, technical merit, and price. Technical merit was said to be more important than past performance, and technical merit and past performance combined were said to be approximately equal to price. The technical merit factor included five subfactors, listed in descending order of importance: infrastructure, key personnel, hiring and retention plan, transition and succession plan, and sample reports. RFP §§ M.2, M.5.

For the infrastructure subfactor, the RFP provided that the agency would evaluate "[t]he Offeror's ability and infrastructure to manage the requirements of this contract and deliver the services described in the performance work statement (Case Management, USA PATRIOT Act, Gateway, Commercial Database, and Pro-Active Targeting) . . . within sixty days of award." This subfactor also addressed requirements for security clearances, stating that

> [t]he Government expects that the key personnel will start working on the contract as soon as their clearances are granted or on the effective date of award, whichever occurs later. The Contractor shall be able to provide at least 25% [of] the staff (excluding key personnel), with the appropriate adjudicated backgrounds within 15 business days after the effective date of the contract, 50% within 30 days, 75% within 45 days, and 90-100% within 60 days.

RFP amend. 0003, § M.5.b(1).

For the key personnel subfactor, the RFP provided that the agency would consider "[t]he qualifications of the Offeror's key employees (defined at [section] H.3), which also includes their current security level clearance."[2] RFP amend. 0002, § M.5.b(2).

---

[2] Section H.3, titled "Reassignment and Replacement of Key Contractor Personnel," permits the agency to require a contractor to replace key personnel who are "objectionable" to the government. This clause does not define qualifications for the key personnel, but does identify the key personnel positions to be evaluated (project managers, supervisors, and senior data retrieval specialists); the position descriptions for these positions are listed elsewhere in the RFP.

The RFP specified that past performance would be evaluated for performance on "similar products or services . . . focus[ing] on information that demonstrates quality of performance relative to the size and complexity of the procurement under consideration." The RFP further stated that "[a]n offeror with no past performance information will receive a neutral rating (i.e., the rating will not add to or detract from its rating)." RFP § M.5.a.

The RFP provided offerors with the expected staffing levels and the estimated annual hours per labor category, which offerors were to use in developing their evaluated prices. The RFP stated that price would be evaluated, for the base and option years, by multiplying the estimated number of hours per labor category (provided in the RFP) by the proposed hourly rates (provided by the offerors), and totaling these products to calculate the offeror's annual evaluated prices.

Six proposals were submitted in response to the solicitation. Three proposals, including BTI's and LAJV's, were found to be in the competitive range and discussions were conducted with these offerors.

According to BTI, during discussions, BTI was informed of weaknesses in the qualifications of four of its key personnel: that one lacked law enforcement experience, one was not "management material," and two others lacked the "capability" to perform their positions.[3] Hearing Transcript (Tr.) at 33-38. The record shows that BTI was also informed of weaknesses with its transition and succession plan, and was encouraged to reduce its price. BTI was also advised of adverse past performance concerning three of its contracts, including its incumbent contract.

In its final proposal revision (FPR), BTI replaced one of its key personnel, but retained the other three, asserting that their qualifications were compliant with the RFP requirements. BTI also affirmed its belief that its transition and succession plan satisfied the RFP requirements, although it did not provide the additional detail requested by the agency, and stated that it would not be lowering its price. BTI explained its performance under the three prior contracts and objected to the inclusion of two of the negative references, including a recent incumbent contract reference.

During discussions, LAJV was informed of weaknesses in its transition and succession plan, asked to explain how it would achieve the necessary security clearances for its employees, and encouraged to reduce its price. LAJV specifically addressed these concerns in its FPR and also reduced its price.

---

[3] Although the parties dispute what was said during discussions, for purposes of this decision, we accept the protester's recitation of events.

B-293061.2; B-293061.3

The final evaluation scores for both offerors were as follows:[4]

|  | | BTI | LAJV |
|---|---|---|---|
| Technical Merit | | | |
| | Infrastructure (35 pts.) | 35 | 35 |
| | Key Personnel (30 pts.)[5] | 20 | 20 |
| | Hiring & Retention Plan (25 pts.) | 25 | 25 |
| | Transition & Succession Plan (20 pts.) | 10 | 20 |
| | Report Samples (15 pts.) | 15 | 15 |
| Past Performance | | | |
| | References (75 pts.)[6] | 72 | 75 |
| | Relevance (25 pts.)[7] | 25 | 15 |
| Total Score (technical + past performance) | | 202 | 205 |
| Price | | $15,854,126.20 | $15,009,062.20 |

---

[4] The evaluation plan, which was not disclosed to the offerors, provided that each proposal could receive a maximum of 225 points:  125 points for technical merit and 100 points for past performance.

[5] To receive the maximum 30-point score for key personnel, the evaluation plan stated that all designated key personnel had to have "extensive experience, and demonstrated knowledge in law enforcement, regulatory, financial or relevant programs."  Fewer points were awarded if only some of the key personnel had such experience (e.g., 20 points if only the project managers and at least three key personnel had the requisite experience, 10 points if only the project managers had the experience, and 0 points if none of the key personnel had the experience).  AR, Tab 16, Evaluation Plan, at 6.

[6] References were asked to evaluate quality, timeliness, cost control, problem resolution, and customer service, which were worth 15 points each.

[7] Under the evaluation plan, to receive the maximum score (25 points) under the relevance subfactor, an offeror's prior contracts had to be "close to or exceed the estimated size of the requirement in terms of contractor personnel furnished," have "a sufficient number of government clients to indicate an understanding of governmental contracts," and have a "mix of labor categories and work . . . comparable to what is described in the solicitation."  Fifteen points were to be awarded if the prior contracts were "close but do not match the estimated size of the requirement in terms of contractor personnel furnished, there are some governmental clients, and the mix of labor categories and work matches some of the solicitation requirements."  Ten points were to be awarded if the prior contracts were "considerably less than the estimated size of the requirement in terms of contractor personnel furnished, there are few governmental clients, and the mix of labor categories and work matches a few of the solicitation requirements."  AR, Tab 16, Evaluation Plan, at 4.

B-293061.2; B-293061.3

AR, Tab 10, Recommendation for Award, at 6-7.

The agency found that BTI's proposal warranted only 20 points under the key personnel subfactor, because "[o]ne supervisor has little management experience or training" and "[m]any of the proposed key personnel have a small amount of law enforcement, regulatory, or financial knowledge and experience." Id. at 2. The agency noted three specific examples of key personnel that lacked experience–a case management night supervisor (who assertedly lacked law enforcement experience) and two senior data retrieval specialists (who each had less than 1 year of experience performing this function)–only one of which was mentioned during discussions. Id. at 3. The agency also noted that the four individuals mentioned during discussions were "unacceptable for the proposed key personnel positions" due to performance problems under the incumbent contract, but that this was "not a factor in the evaluation." Id. at 2.

Under the transition and succession plan subfactor, BTI's proposal received less than full points because its plan was considered "weak and sketchy" and BTI did not provide additional detail in its FPR, even though these concerns were raised during discussions. Id. at 3.

With regard to past performance, the agency gave BTI's proposal full points under the relevance subfactor based solely on its incumbent contract. Id. at 1; Tr. at 211. BTI's 72 out of 75-point score under the references subfactor did not include consideration of its incumbent contract, since the report on BTI's performance under this contract had not been finalized and BTI objected to the inclusion of a negative assessment of its performance given by the most recent contracting officer's technical representative (COTR). Instead, BTI's reference scores were based on two other references provided by BTI, and two references obtained from the Contractor Performance System.[8] AR, Tab 10, Recommendation for Award, at 1-2.

LAJV's proposal received maximum scores under the infrastructure, hiring and retention plan, transition and succession plan,[9] and report sample subfactors, but received only 20 points under the key personnel subfactor because, as the agency noted, not all of LAJV's key personnel had the required security clearances or

---

[8] The evaluation record does not explain how, or even if, these two contracts are relevant to the requirements here.

[9] Under the transition and succession subfactor, LAJV's initial proposal did not receive maximum points because its plan, like BTI's, lacked detail. However, unlike BTI, it provided a more detailed plan in its FPR in response to discussions, which caused the agency to raise LAJV's score in the final evaluation.

experience.  The agency noted that although LAJV made "improvements [in its FPR in response to discussions] related to the number of personnel with security clearances and indicated it anticipates hiring some personnel from the current contract with existing security clearances," some of its key personnel still lacked "extensive experience."  Id. at 5-6.

With regard to past performance, the agency noted LAJV had no past performance as a newly formed joint venture, but evaluated the contracts determined relevant of one of the partners.  AR, Tab 15, LAJV Technical Evaluation Summary Score Sheet, at 3.  The agency gave LAJV less than the maximum points (15 of 25 points) under the relevance subfactor because "not all of the referenced contracts had work similar to [this] requirement."  However, the agency gave LAJV the maximum 75-point score under the references subfactor because the references rated LAJV's performance as "superior" in each of the five elements assessed.  AR, Tab 10, Recommendation for Award, at 5.

Based upon LAJV's higher overall score (205 points as compared to BTI's 202 points) and lower evaluated price, the agency determined that LAJV's proposal provided the best overall value and selected LAJV for award.  These protests followed.

BTI challenges the evaluation of both its and LAJV's proposals under the technical merit evaluation factor, arguing that LAJV's score should have been lower, and its score should have been higher under certain technical merit subfactors.  In reviewing protests against allegedly improper evaluations and source selection decisions, it is not our role to reevaluate proposals.  Rather, our Office examines the record to determine whether the agency's judgment was reasonable and in accord with the RFP criteria and applicable procurement statutes and regulations.  Abt Assocs., Inc., B-237060.2, Feb. 26, 1990, 90-1 CPD ¶ 223 at 4.  A protester's mere disagreement with the agency's judgment does not establish that an evaluation was unreasonable.  UNICCO Gov't Servs., Inc., B- 277658, Nov. 7, 1997, 97-2 CPD ¶ 134 at 7.

BTI first argues that LAJV's proposal should have received a lower technical score because LAJV is a new joint venture, with no Dun & Bradstreet rating or corporate experience.  Although the protester does not point to which subfactor LAJV's proposal should have been downgraded under in this regard, the corporate infrastructure subfactor appears to be the only relevant subfactor under which this information could have been assessed.  However, the record shows that, under this subfactor, the agency recognized that LAJV proposed a corporate infrastructure and staffing plan sufficient to begin delivering services within 60 days of contract award, as contemplated by this evaluation subfactor (quoted above).  AR, Tab 15, LAJV Technical Evaluation Summary Score Sheet, at 4.  Based on our review, we find the agency's judgment was reasonable.

BTI also contends that LAJV's proposal should have received a lower technical score under the infrastructure and key personnel subfactors because not all of its key personnel would have security clearances at the start of the contract.[10]  However, the RFP did not require that all of the key personnel have security clearances at the start of the contract; rather, the RFP not only contemplated that key personnel might not have clearances until after contract award, but actually provided, under the infrastructure subfactor, for performance by the key personnel to begin either the effective date of award or when security clearances were obtained, whichever is later.  As the agency was satisfied with LAJV's proposed plan to obtain security clearances in a timely fashion, it did not downgrade LAJV's proposal under this subfactor.  However, under the key personnel subfactor, where the agency evaluated the current status of the security clearances of key personnel, LAJV's proposal was assessed a weakness and received a lower score because not all of LAJV's key personnel currently possessed these clearances.  Based on our review, we find this evaluation unobjectionable, as it was reasonable and consistent with the RFP's evaluation criteria.

BTI next contends that its proposal was improperly downgraded under the key personnel subfactor because not all of its key personnel had law enforcement or years of experience.  BTI asserts that these experience requirements constituted impermissible unstated evaluation criteria.  We disagree.

In evaluating a proposal, an agency properly may take into account specific, albeit not expressly identified, matters that are logically encompassed by or related to the stated evaluation criteria.  North Am. Military Housing, LLC, B-289604, Mar. 20, 2002, 2002 CPD ¶ 69 at 5.  Here, the key personnel subfactor stated that the "qualifications" of key personnel would be qualitatively evaluated.  Given that an individual's experience is part of his or her qualifications, we believe that under this subfactor the agency could reasonably consider whether key personnel have relevant experience (in this case law enforcement experience) as well as the years of experience of these individuals.  In this regard, we note that this experience is logically related to the requirements of the RFP, which recognizes that the FinCEN's mission is to provide analytical and intelligence support to law enforcement and regulatory communities, and requires the contractor to provide support for this

---

[10] BTI also complains that none of LAJV's key personnel (who BTI asserts do not have a history of employment with either LAJV or the joint venture partners) provided commitment letters to demonstrate that LAJV could adequately staff the contract.  However, the RFP did not require offerors to submit commitment letters from its proposed personnel, and BTI similarly did not provide commitment letters.  To the extent that BTI complains that LAJV does not currently employ sufficient people to staff the contract, we note that BTI's proposal states that it also does not have a full complement of employees hired and ready to begin work at the commencement of the contract.  See AR, Tab 6, BTI's Initial Proposal, § 2.3.2, at 15.

mission, including investigative research in various law enforcement, financial, and regulatory databases to uncover potential criminal relationships. Thus, we find that the agency could properly consider the contractor's proposed key personnel's law enforcement and years of experience in its evaluation under this subfactor.[11]

BTI nevertheless complains that the agency failed to hold meaningful discussions with it concerning the lack of law enforcement and years of experience of its key personnel. Although BTI acknowledges that law enforcement and years of experience were discussed in the context of four of its key personnel, it complains that the agency failed to raise these concerns with regard to any of its other personnel, and that it was misled as to the agency's concerns and requirements. Protester's Hearing exh. 5; Tr. at 34, 38, 54-56.

While discussions must address at least deficiencies and significant weaknesses identified in proposals, the scope and extent of discussions are largely a matter of the contracting officer's judgment. Federal Acquisition Regulation (FAR) § 15.306(d)(3); Northrop Grumman Info. Tech., Inc., B-290080 et al., June 10, 2002, 2002 CPD ¶ 136 at 6. In this regard, we review the adequacy of discussions to ensure that agencies point out weaknesses that, unless corrected, would prevent an offeror from having a reasonable chance for award. Northrop Grumman Info. Tech., Inc., supra. An agency is not required to afford offerors all-encompassing discussions, or to discuss every aspect of a proposal that receives less than the maximum score, and it is not required to advise an offeror of a weakness that is not considered significant, even if the weakness subsequently becomes a determinative factor in choosing between two closely ranked proposals. Hines Chicago Investments, LLC, B-292984, Dec. 17, 2003, 2003 CPD ¶ __ at 3-4.

Here, even assuming that the agency did not reasonably apprise BTI during discussions that its proposal would be downgraded if the proposed personnel did not have law enforcement or extensive years of experience,[12] this weakness related only to BTI's ability to achieve a maximum score under this subfactor, and did not

---

[11] BTI's proposal contained numerous references to law enforcement and financial crimes as it relates to the contractor's support of the FinCEN's mission. This evidences that BTI was aware that law enforcement experience could well be credited under the RFP.

[12] Although disputed by the protester, the agency asserts that it specifically advised the protester during discussions that lack of law enforcement experience and work experience would be considered in the evaluation. Tr. at 98, 100. As indicated above, for purposes of this decision, we do not resolve this dispute, but will accept the protester's version.

prevent BTI from having a reasonable chance for award. Thus, discussions were not required to be conducted with BTI on this point.[13]

Additionally, we find no evidence in the record that BTI was misled by the discussions as to the agency's concerns or requirements. To the contrary, according to BTI, it specifically informed the agency during discussions that it disagreed with the agency that law enforcement experience was required by the RFP and discussed with the agency the years of experience of some its personnel. Tr. at 38, 55; Protester's Hearing exh. 5; BTI's Post-Hearing Comments at 14-15.

BTI also complains that it was not "adequately advise[d]" during discussions about weaknesses in its transition and succession plan arising out of a lack of detail. Protest at 9. However, BTI does not deny that it was advised during discussions that its succession plan was "weak" or that it was requested to provide more detail. Indeed, BTI claims in its FPR that it reviewed its submitted succession plan (which consists of less than one page of text) and determined it to be compliant with the requirement of the RFP. Thus, the record shows that the agency's discussions on this point were meaningful.

BTI next contends that LAJV should have received a lower past performance score because it is a new joint venture without any prior history of past performance. BTI also complains that LAJV's past performance score was based solely on the performance history of only one of the joint venture partners.

Where an RFP requires the evaluation of offerors' past performance, an agency has the discretion to determine the scope of the offerors' performance histories to be considered, provided all proposals are evaluated on the same basis and consistent with the RFP's requirements. Honolulu Shipyard, Inc., B-291760, Feb. 11, 2003, 2003 CPD ¶ 47 at 4. The performance history of one or more of the individual joint venture partners may be considered in evaluating the past performance of the entire joint venture, so long as doing so is not expressly prohibited by the RFP. Northrop Grumman Tech. Servs., Inc.; Raytheon Tech. Servs. Co., B-291506 et al., Jan. 14, 2003, 2003 CPD ¶ 25 at 30.

Here, the RFP did not preclude consideration of a joint venture partner's past performance in lieu of performance by the joint venture entity, or require consideration of all of the partners' past performance, but instead contemplated that the agency would evaluate relevant contracts and subcontracts that are similar in nature to the requirements of the RFP.

---

[13] We note that LAJV was not afforded discussions on this issue either, even though it was assessed a similar weakness for lack of key personnel experience.

B-293061.2; B-293061.3

In its proposal, LAJV identified several prior contracts from only one of its partners, LifeCare, who was proposed to provide investigation experts and analysts, to include all of the senior project management and supervisory team and senior data retrieval specialists, and corporate resources for specialized investigation research training and Microsoft product training. The proposal explained that LifeCare's "core competencies include legal counsel, forensic accounting, auditing, assessments and reviews, investigations, data analysis, data mining, case management, and centralized operations center management." AR, Tab 8, LAJV Proposal, § 1.3. Given that the description of LifeCare's efforts encompassed most of the services required under the RFP, we find that the agency could properly consider LifeCare's performance history to be reasonably predictive of the performance of the joint venture as a whole. See Northrop Grumman Tech. Servs., Inc., supra, at 30-31.

We also find unobjectionable that the agency did not consider the past performance of LAJV's other partner, Advanta, who, according to LAJV's proposal, would be "support[ing]" the LifeCare efforts by providing staffing of data retrieval specialist and administrative support personnel. AR, Tab 8, LAJV Proposal, § 1.3. As noted above, the RFP did not require consideration of the past performance of all of the joint venture partners, and LAJV did not provide (nor was it required to provide) performance history of this partner, given the apparent lesser role that Advanta would play in performing the contract.

BTI complains, however, that, in considering the prior contracts of LifeCare, the agency inflated LAJV's scores under the relevance subfactor. BTI argues that, under the evaluation plan's scoring scheme, LAJV's proposal should have received a score of no more than 10 points (rather than the 15 points received) for relevance because the identified contracts were "considerably less" in dollar value than that which will be required under the RFP. As BTI notes, in order to receive a score of 15 points under the evaluation plan, an offeror's contracts had to be "close but do not match" the estimated size of the requirement, and contracts that were "considerably less than" the estimated size, such as LAJV's here, could receive a score of no more than 10 points.

However, where, as here, an agency's source selection evaluation plan is an internal agency guideline, not incorporated into the RFP, the failure to adhere to such a plan does not provide a valid basis for protest. Global Readiness Enters., B-284714, May 30, 2000, 2000 CPD ¶ 97 at 6. It is the evaluation scheme in the RFP, not internal agency documents, to which an agency is required to adhere in evaluating proposals and in making the source selection. Basic Contracting Servs., Inc., B-284649, May 18, 2000, 2000 CPD ¶ 120 at 11 n.2.

Here, the record demonstrates that the agency evaluated relevance in accordance with the RFP criteria–namely it considered whether the identified contracts provided the same or similar services to the RFP's requirements, focusing on the quality of performance relative to the size and complexity of the procurement under

consideration–and recognized the relative distinctions among offerors as required by the FAR, see FAR § 15.305(a)(2)(i), and these distinctions were reasonably reflected in the respective past performance scores.

Specifically, the agency noted that BTI's incumbent contract provided the "same type of services" as required here, and gave it the maximum 25 points under the relevance subfactor.[14]  In comparison, the agency recognized that LAJV's contracts were less relevant than BTI's, which translated into a lower score of 15 points.  While the agency found several strengths regarding the relevance of LAJV's past performance, such as LAJV's "good" "general knowledge," "government contracting experience," and the fact that at least one of the contracts appeared to involve "similar type" investigative work, AR, Tab 15, LAJV Technical Evaluation Summary Score Sheet, at 2-3; Tr. at 183-85, 189, the agency also noted that not all of LAJV's referenced contracts had work similar to the RFP's requirements, specifically noting as weaknesses that a "[m]ajority of contracts provided had to do with medical services or Workers Compensation management," that LAJV lacked law enforcement experience, and that LAJV's specific knowledge of the FinCEN's processes and techniques was "sketchy."  AR, Tab 15, LAJV Technical Evaluation Summary Score Sheet, at 3; Tr. at 222.  The agency also noted in its evaluation that the joint venture was newly formed and had no record of past performance outside of its individual partners, and that the dollar values of LAJV's referenced contracts were smaller than that of the effort which will be required here.[15]  All of these evaluated factors resulted in a score of only 15 of 25 points under the relevance subfactor.

Thus, the record evidences that the agency fully recognized the relative strengths and weaknesses of these offerors in terms of whether the prior contracts provided similar services, including consideration of the size of the contracts, in a manner consistent with the RFP, and thus awarded LAJV's proposal a significantly lower score than BTI's for the relevance subfactor.  Tr. at 183-91.  BTI's argument that LAJV should have received an even lower score reflects either its attempt to impose the internal agency evaluation plan on the evaluation, which does not constitute a valid basis for protest, or its disagreement with the agency's judgment, which does not render this judgment unreasonable.  UNICCO Gov't Servs., Inc., supra, at 7.

BTI also complains that the agency misevaluated its past performance under the references subfactor, where it only received 72 of a possible 75 points.  As noted

---

[14] BTI's other contracts were smaller in dollar value than the required effort here and were for "straight" information technology services, which did not include performing the investigative support work required under the RFP.  Thus, it appears that BTI was given the benefit of the doubt in receiving a perfect score under the relevance subfactor.

[15] The dollar values of LAJV's contracts are also smaller than those identified by BTI.

above, the agency received unfavorable comments from the COTR on BTI's incumbent contract for the period of June 2002 through March 2003, and brought this to BTI's attention during discussions.  In response, BTI asserted that the negative reference should be ignored because BTI had not had an opportunity to "formally" respond (although BTI provided a written response to the negative comments in its FPR), and informed the agency of three earlier assessments of its incumbent contract performance that were more favorable.  Given BTI's objection to the consideration of the most recent past performance, which the agency reasonably believed to be the most relevant with regard to the incumbent contract, the agency did not consider any of the earlier incumbent contract performance references, either.  BTI contends that the failure to consider the earlier, more favorable references was unreasonable, arguing that this positive performance was "simply too close at hand to ignore."  Supplemental Protest at 3.

The record shows that BTI's past performance evaluation was downgraded only 3 points; thus, even assuming BTI's past performance warranted a perfect score, its total score would then be 205 points, the same score received by LAJV's proposal, and LAJV's proposal would still be in line for award based on its lower evaluated price.  Thus, BTI's was not prejudiced by the agency's past performance evaluation, even assuming BTI's protest arguments here have merit.[16]

Finally, BTI argues that the agency improperly evaluated LAJV's price.  As BTI notes, LAJV proposed five part-time management personnel at no cost to the government to support contract performance.  BTI asserts that the agency was required to, but did not, assess the impact on price or risk associated with these "free" individuals.[17]

However, as the agency explains, the five "free" individuals were not required under the RFP, nor obligated to perform under the contract, and thus pricing information was not required.  Moreover, the individuals were considered "superfluous" to the

---

[16] Competitive prejudice is necessary before we will sustain a protest; where the record does not demonstrate that the protester would have a reasonable chance of receiving award but for the agency's actions, we will not sustain a protest, even if deficiencies, such as an unequal evaluation of proposals or lack of meaningful discussions, are found.  Statistica v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

[17] BTI also asserted that the five positions were "transferred" from key personnel positions to "free" positions, thus allowing LAJV to improperly "reclassify[] employees from direct to indirect charges" and unfairly reduce its price.  BTI's Comments at 28.  However, the record shows this to be untrue, since LAJV's proposal makes clear that the five positions were, at all times, proposed at no cost to the government (that is, a "transfer" of positions did not occur), and the reductions in LAJV's FPR price were unrelated to these positions.  See Tr. at 269, 272.

contract, because the services to be performed were covered by other stated personnel, who were priced as required under the RFP using the estimated number of hours stated in the RFP.  Tr. at 262-66, 281.  The record also reflects that these "free" individuals were "irrelevant" to the evaluation and were "not a factor in recommending award."  Tr. at 263; AR, Tab 10, Recommendation for Award, at 6.  Thus, we fail to see how there was any risk to the government, or that the price of these individuals was required to be evaluated.

The protests are denied.

Anthony H. Gamboa
General Counsel

# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHY RADTKE, ET AL.

       Plaintiffs,

           v.

MARIA CASCHETTA, ET AL.

       Defendants

Civil Case No.: 06cv02031 (EGS)

## FIRST AFFIDAVIT OF KATHY RADTKE

COMES NOW, Kathy Radtke, and respectfully represents unto this Honorable Court as follows:

1.    I am over the age of 18 and of sound mind and am competent to testify to the matters stated herein. I have personal knowledge of all facts set forth herein and they are each true and correct.

2.    I was interviewed for a job as a medical records coder by Maria Caschetta. She offered me a position and provided me the choice of working at either Defendant Advanta or Defendant LifeCare in November 2004 as a medical records coder.

3.    I chose to work at Advanta because she told me that it would provide better benefits and holidays.

4.    As a medical records coder, between November 2004 and mid-June 2005, I was required by Maria Caschetta to report to the Pentagon in Arlington, Virginia, every morning to provide full-time medical record coding services on the Walter Reed contract. My work

there sometimes exceeded 40 hours a week. Any pay I received for holiday work was at my regular rate.

5.    Between mid-June 2005 and December 2005, I was required by Maria Cashetta and Advanta to report to the Walter Reed contract site at the Pentagon in Arlington, Virginia, at least four hours a day and to the Kaiser Permanente site in Rockville, Maryland at least four hours a day. I was not compensated for travel time or expenses. Any pay I received for holiday work was at my regular rate.


## VERIFICATION

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.

Date signed: 5/30/07          _Kathy A. Radtke_
                              KATHY RADTKE

# Exhibit 4

Comment [Watermark1]:

Comment [Watermark2]:

Lippman, Semsker & Salb, LLC
7700 Old Georgetown Road, Suite 500
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHY RADTKE, ET AL.

Plaintiffs,

v.                                          Civil Case No.: 06cv02031 (EGS)

MARIA CASCHETTA, ET AL.

Defendants

## FIRST AFFIDAVIT OF CARMEN CUNNINGHAM

COMES NOW, Carmen Cunningham, and respectfully represents unto this Honorable Court as follows:

1.      I am over the age of 18 and of sound mind and am competent to testify to the matters stated herein. I have personal knowledge of all facts set forth herein and they are each true and correct.

2.      I was interviewed by Maria Caschetta in or around November 2002 for a medical records coder position..

3.      I was hired by Maria Caschetta, Advanta Medical Solutions, LLC, and LifeCare Management Partners in November 2002 as a medical records coder.

4.      I understood that I worked for Advanta because when I began my employment I entered into a written agreement with Advanta Medical Solutions, Inc.

5.      I also understood that I worked for LifeCare Management Partners because I received paychecks and health insurance through LifeCare Management Partners.

6.        In addition, Maria Caschetta controlled my employment. She told me where to work and when to appear at work. She was the only regular presence at the job site, supervising all of the employees, including those who understood that they worked for LifeCare and those who understood that they worked for Advanta.

## VERIFICATION

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER ARE TRUE.

Date signed: 5/20/07         Carmen Cunningham
                             CARMEN CUNNINGHAM