**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KATHY RADTKE, ET AL. | |
| Plaintiffs, | |
| v. | Civil Case No.: 06cv02031 (EGS) |
| MARIA CASCHETTA, ET AL. | |
| Defendants | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Kathy Radtke and Carmen Cunningham, by and through their under-signed counsel, pursuant to Federal Rule of Civil Procedure 56, hereby move this Honorable Court for summary judgment on Defendants' Counterclaim. This Motion is supported by the reasons stated in the attached Memorandum of Points and Authorities, filed herewith.

WHEREFORE, Plaintiff respectfully requests that:

(1) The Motion for Summary Judgment be granted; and

(2) The Court grant such other and further relief as the nature of the case may require.

July 1, 2008

Respectfully submitted,

_____/s/_____
S. Micah Salb, #453197
Gwenlynn Whittle D'Souza #453849
Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, Maryland 20814
(301) 656-6905 / (301) 656-6906 (fax)

Attorneys for Plaintiffs

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
KATHY RADTKE, ET AL.                     |
                                         |
            Plaintiffs,                  |
                                         |
v.                                       |        Civil Case No.: 06cv02031 (EGS)
                                         |
MARIA CASCHETTA, ET AL.                  |
                                         |
            Defendants                   |
_____|

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Kathy Radtke and Carmen Cunningham, by and through their under-signed

counsel, hereby move for summary judgment on Defendants' Counterclaim for the following

reasons:

I.  STATEMENT OF FACTS.

A.      The Parties' Employment Relationships.

Defendants[1] LifeCare Management Partners (hereafter "LifeCare") and Advanta Medical

Solutions, LLC (hereafter "Advanta") operated medical record coding businesses, which hired

employees and contracted them out to perform medical record coding at the sites of various clients.

See Amended Answer to Complaint, ¶ 11. Defendants Maria Caschetta, Advanta, and LifeCare have

_____

[1] In order to avoid unnecessary confusion and wordiness, the Plaintiffs Kathy Radtke and Carmen
Cunningham refer to themselves in this pleading as the "Plaintiffs" and refer to the Defendants LifeCare
Management Partners, Advanta Medical Solutions, LLC, and Maria Caschetta as the "Defendants," even
though the parties are, for purposes of this counter-claim, counter-defendants and counter-plaintiffs,
respectively.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

brought a counter-claim against the Plaintiffs in this suit alleging that both Plaintiffs violated a Non-Competition Agreement.  *See* Defendants' Answer and Counterclaims (hereinafter the "Counterclaim Against Radtke") (Docket. No. 13); Defendants' First Amended Answer to Cunningham Complaint (hereinafter the "Amended Answer to Complaint") (Docket No. 17); and Counterclaims Against Cunningham (hereafter "Amended Counterclaim Against Cunningham") (Docket No. 17).

The Defendants contend that on October 27, 2004, Ms. Radtke entered into an agreement with Advanta in which she purportedly agreed:

> Not to solicit or enter the employ of any of Advanta's clients (or their agents, such as other companies providing services to Advanta clients) where they have provided services or where Advanta has an existing contract during that period while you have been in the employ of Advanta for a period of one year after termination of employ with Advanta.

*See* Counterclaim Against Radtke, p. 1.

During discovery, Defendants provided a single document, dated October 27, 2004, which purports to be the Non-Competition Agreement at issue.  *See* Radtke Agreement,[2] dated October 27, 2004, attached hereto as Exhibit 1.  Notably missing from the agreement is any identification of Lifecare or Ms. Caschetta as parties, although Ms. Caschetta signed as President of Advanta.

The Defendants further contend that Ms. Cunningham entered into an agreement with Lifecare on November 28, 2002, in which she purportedly agreed:

> Not to solicit or enter the employ of any of LIFECARE or Advanta clients (or their agents, such as other companies providing services to LIFECARE or Advanta clients) where they have provided services or where Advanta has an existing contract

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

---

[2] Plaintiffs do not concede the documents reflects an agreement of the Parties, but for the purposes of this motion, which details the evidence in the light most favorable to the Defendants, identifies it as such.

during that period while you have been in the employ of Advanta for a period of one year after termination of employ with LIFECARE.

*See* <u>Counterclaim Against Cunningham</u>, ¶ 1 and Cunningham Agreement[3] attached hereto as Exhibit 2. The Cunningham agreement does not identify Ms. Caschetta personally as a party, although she is the signatory on the agreement as President of Advanta. The document fails to specifically identify Lifecare as a party to the agreement. *See* Cunningham Agreement, Exh. 2.

Both agreements lack a choice of law provision. However, the agreements recite Maryland addresses for both the Defendants and the Plaintiffs, indicating that the contracts were tendered in and accepted in Maryland. Additionally, the agreements reference an understanding that the State of Maryland is an "Employment at Will" state. *See* Radtke Agreement, Exh. 1, and Cunningham Agreement, Exh. 2.

**B.    Loss of Walter Reed Contract**

On November 21, 2005, the Government Accountability Office (GAO) issued a Decision in the Matter of Lifecare Management Partners, File No. B-297078, B-297078.2. *See* GAO Decision, attached hereto as Exhibit 3. The GAO found that Lifecare submitted a bid in the amount of $24,138,510 and Wright Solutions submitted a bid in the amount of $12,869,512 for the Walter Reed Contract. The GAO found that on July 21, 2005, the contracting officer determined Wrights Solutions' proposal represented the best value for the government and that the contract to Wright Solutions had a period of performance commencing on August 22, 2005.

---

[3] *See* Footnote 2.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

### C.    Cessation of Employment

The Defendants admit that Ms. Radtke terminated her employment with Advanta on or about January 2006. *See* Counterclaim Against Radtke, ¶ 2. The Defendants also admit that Ms. Cunningham terminated her employment with Lifecare on January 6, 2006. *See* Counterclaim against Cunningham, ¶ 2.

## II. LEGAL STANDARDS.

The factual assertions outlined above all have solid record support. A moving party is entitled to summary judgment only if the evidence it proffers is so one-sided that a rational fact finder could only conclude that the moving party must prevail. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Waterhouse v. District of Columbia, 298 F.2d 989, 991 (D.C. Cir. 2002).

## III. ARGUMENT.

### A.    Because Defendants Caschetta and Lifecare Are Not Parties to the Agreements, Summary Judgment Is Warranted.

The Defendants contend that Ms. Radtke entered into an agreement with Advanta. Their pleadings, however, indicate that they intend to raise a claim not only by Advanta but also by Ms. Caschetta and/or by Lifecare as against Ms. Radtke. However, by the explicit language of the Radtke employment agreement, neither Ms. Caschetta nor Lifecare were parties to the agreement. *See* Radtke agreement, Exh. 1. Since neither Caschetta nor Lifecare was a party, neither can demonstrate a violation of a non-competition agreement. Therefore, summary judgment is warranted against Ms. Caschetta and Lifecare as to their claim against Ms. Radtke.

- 4 -

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

The Defendants further contend that Ms. Cunningham entered into an agreement with Lifecare, in which she purportedly agreed "not to solicit or enter the employ of any of LIFECARE or Advanta clients. . . ." <u>Counterclaim Against Cunningham</u>, ¶ 1. Since Ms. Caschetta was not a party to the Cunningham contract, she cannot demonstrate a violation of a non-competition agreement. Therefore, summary judgment is warranted against Ms. Caschetta as to her claim against Ms. Cunningham.

**B.    Both Agreements Not to Compete are Unenforceable Because Each Seeks A Restraint Beyond a Legitimate Business Interest.**

Agreements not to compete are not enforceable unless the employer states a protectible interest. More specifically, Maryland Courts will enforce non-compete clauses only when the terms are "reasonable in light of the interests of the employer, the employee, and the general public." <u>Labor Ready, Inc. v. Abis</u>, 767 A.2d 936, 942 (2001). Maryland Courts consider three factors in determining a covenant's reasonableness:

> (1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant. . . . <u>It is well-recognized that "skills acquired by an employee during his or her employment do not warrant enforcement of a covenant not to compete.</u>

*Abis*, *quoting* <u>Copier Specialists, Inc. v. Gillen</u>, 887 P.2d 919, 920 (Wash. App. 1995) (*citing, inter alia*, <u>Silver v. Goldberger</u>, 188 A.2d 155, 158 (1963)) (Emphasis Added).

The Defendants have never articulated in this litigation or preceding it what interest they seeks to protect through enforcement of these agreements not to compete. Of course, the burden is on a party seeking to enforce restrictive covenant not to compete in employment contract to establish

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 5 -

its reasonableness. *See*, *e.g.*, <u>American Hot Rod Ass'n, Inc. v. Carrier</u>, 500 F.2d 1269, 1277

(C.A.N.C. 1974); <u>Arrow Chemical Corp. v. Pugh</u>, 490 S.W.2d 628, 632 (Tex.Civ.App. 1972); <u>Scott</u>

<u>v. General Iron & Welding Co.</u>, 171 Conn. 132, 139, 368 A.2d 111 (1976); <u>Armstrong v. Cape</u>

<u>Girardeau Physician Associates</u>, 49 S.W.3d 821 (Mo.App. 2001).[4]

  Though the Defendants have articulated no protectible interest, the Plaintiffs can surmise that

the Defendants contend that the skills and knowledge of coding gained by the Plaintiffs during their

employ by the Defendants are the interests that the Defendants seek to protect.  Specifically, it

appears that the Defendants contend that the Plaintiffs have gained knowledge related to methods

of medical coding as a result of their employment by the Defendants.[5]

  Any such claim must fail.  First of all, the Defendants have no proprietary interest in the

information contained in the coding manuals, because they are published by third-parties.  *See*

Radtke Answer to Interrogatory No. 10, attached hereto as part of Exhibit 4, noting use of coding

manuals.  *See* Summary of Experience of Carmen Cunningham, attached hereto as Exhibit 5, noting

use of the following manuals:   <u>International Classification of Diseases</u>, Version 9, Clinical

Modification (ICD-9-CM ), <u>Current Procedural Termination</u>, 4th Edition (CPT-4), and Healthcare

Common Procedure Coding System (HCPCS) Level II codes.  None of these coding manuals,

germane to the insurance industry, contain proprietary information of the Defendants.

  In fact, the Defendants have insisted throughout this litigation that the Plaintiffs are

independent contractors, and as such they would bring with them to the workplace their own

---

[4] Though counsel have identified no Maryland or D.C. case addressing this point, the caselaw from other jurisdictions appears to indicate uniformly that the burden of proof lies with the party seeking to enforce the covenant not to compete.

[5] The Defendants have never asserted that this case involves customer lists, proprietary methods of work, business goodwill, or other interests which employers seek to protect present.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 6 -

knowledge of coding.  While the Defendants are wrong in their assertion that the Plaintiffs are

independent contractors, it is true that the Plaintiffs have largely learned medical coding from third-

party sources, such as through formal education and training related to coding manuals.  *See*

Summary of Experience of Carmen Cunningham, Exh. 5, and Press Release by American Academy

of Professional Coders for Kathy Radtke, attached hereto as Exhibit 6, noting her proficiency in

using the following manuals: ICD-9-CM, CPT-4, and HCPCS.

Secondly, as a matter of law, any alleged training of Plaintiffs on coding procedures is

insufficient to warrant enforcement of a non-compete.  Generally, skills acquired through training

by an employer cannot support enforcement of an agreement not to compete.  *Abis*, 767 A.2d at 942

("In other words, the training that Abis received during his tenure at Labor Ready, "without more,

does not warrant enforcement of the covenant not to compete.")  Such a restraint is greater than is

necessary to protect the employer's business, especially where, as here, the Plaintiffs had

information relating to insurance industry coding prior to beginning employment.  Thus, the

Defendants have no protectible interest, and therefore they cannot gain enforcement the purported

covenants not to compete against the Plaintiffs.  Therefore, summary judgment must be granted the

Counterclaim of breach of a non-competition agreement.

## C.    More Importantly, The Defendants Have Failed to Prove Damages for the Purported Breach.

In order to recover for a breach of a non-compete clause which has been found to be

reasonable, the Defendants must prove that they suffered damages proximately caused by the

purported breach of the agreement not to compete.  *Abis*, 767 A.2d at 942; *Silver*, 188 A.2d at 158.

Proof of an actual financial loss is an essential elements of the claim.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Here, however, the Defendants cannot prove that they suffered damages. The Defendants lost the Walter Reed contract in July 2005 — long before the Plaintiffs went to work for any of the Defendants' competitors in January 2006. *See* GAO Decision, Exh. 3. *See* Radtke Answer to Interrogatory No. 4 attached hereto as part of Exhibit 4 and Cunningham Answer to Interrogatory No. 4, attached hereto as part of Exhibit 7. Thus, the fact that Ms. Radtke and Ms. Cunningham went to work for a competitor was not a contributing factor to any financial loss incurred by the Defendants. According to the GAO report, the Defendants lost the contract due to a lower bid. Therefore, summary judgment must be granted against all Defendants because none of them incurred any financial loss due to the actions of either Plaintiff.

## IV.  **CONCLUSION.**

For these reasons, Summary Judgement is warranted on the Counter-Plaintiff's claim of violation of a non-competition agreement.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

July 1, 2008

Respectfully submitted,

_____/s/_____

S. Micah Salb, #453197
Gwenlynn Whittle D'Souza #453849
Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, Maryland  20814
(301) 656-6905 / (301) 656-6906 (fax)

Attorneys for Plaintiffs

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 9 -

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|
KATHY RADTKE, ET AL.                    |
                                        |
            Plaintiffs,                 |
                                        |
v.                                      |        Civil Case No.: 06cv02031 (EGS)
                                        |
MARIA CASCHETTA, ET AL.                 |
                                        |
            Defendants                  |
_____|


**MOTION TO FILE EXHIBITS UNDER SEAL**

   Plaintiffs, Carmen Cunningham and Kathy Radtke, pursuant to Local Rule 5.1(j),

respectfully submits this Motion to file under seal Exhibit 1 - Purported Agreement of Kathy Radtke,

Exhibit 2- Purported Agreement of Carmen Cunningham, Exhibit 5 - Summary of Experience of

Carmen Cunningham, and Exhibit 6 -  Press Release by American Academy of Professional Coders

for Kathy Radtke, with the Clerk's Office in paper format so that it may be placed under seal.  These

documents are the subject of a pending motion for Protective Order.  I certify that I will file and

serve paper copies of the documents identified above.

   WHEREFORE, Plaintiff respectfully requests that:

(1) The Motion be granted; and

(2) The Court grant such other and further relief as the nature of the case may require.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel. (301) 656-6905
Fax (301) 656-6906

July 1, 2008

Respectfully submitted,

_____/s/_____

S. Micah Salb, #453197
Gwenlynn Whittle D'Souza #453849
Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, Maryland  20814
(301) 656-6905 / (301) 656-6906 (fax)

Attorneys for Plaintiffs

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel. (301) 656-6905
Fax (301) 656-6906



**G A O**
Accountability • Integrity • Reliability

United States Government Accountability Office
Washington, DC 20548

**Comptroller General**
**of the United States**

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:**   Lifecare Management Partners

**File:**   B-297078; B-297078.2

**Date:**   November 21, 2005

Janine S. Benton, Esq., H. Scott Johnson, Jr., Esq., Seth C. Berenzweig, Esq., Heather A. James, Esq., and Sarah T. Zaffina, Esq., Albo & Oblon, L.L.P., for the protester.
Capt. Joseph V. Fratarcangeli, Department of the Army, for the agency.
Louis A. Chiarella, Esq., and Christine S. Melody, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

**DIGEST**

1. Protest that agency improperly relaxed solicitation's requirement that offerors be able to commence contract performance by the start date by delaying the start date is denied where the agency decision to alter the contract start date was based upon delays in contract award, including an agency-level protest filed by the protester.

2. Protest of agency's technical evaluation is denied where record shows evaluation was reasonable and consistent with evaluation criteria; mere disagreement with agency's evaluation is insufficient to show it was unreasonable.

3. Protest filed with Government Accountability Office is untimely where filed more than 10 days after protester became aware of initial adverse agency action on agency-level protest.

**DECISION**

Lifecare Management Partners protests the award of a contract to Wright Solutions, Inc. under request for proposals (RFP) No. W91YTZ-05-R-0004, issued by the North Atlantic Regional Contracting Office, Department of the Army, for certified medical record coding services at the Walter Reed Army Medical Center (WRAMC), located in Washington, District of Columbia. Lifecare argues that various agency actions, including the evaluation of Wright's proposal, were unreasonable, and that the resulting award decision was improper.

We deny the protests in part and dismiss them in part.

Exhibit 3

## BACKGROUND

The RFP, issued on May 4, 2005, contemplated the award of a fixed-price, indefinite-delivery/indefinite-quantity contract for a base year with four 1-year options to provide certified medical record coding services. The solicitation established three evaluation factors: technical; past performance; and price.[1] RFP at 26. The RFP also informed offerors that the technical factor was more important than either the past performance or price factors, which were of equal importance. Id. at 27. Award was to be made to the responsible offeror whose proposal was determined to be "most advantageous" to the government, all factors considered. Id. at 26.

Seven offerors, including Wright and the incumbent Lifecare, submitted proposals by the May 20 closing date. Agency Report (AR), Tab 10, Source Selection Decision, at 2. The contracting officer determined that five offerors were within the competitive range. The Army then received individual oral presentations from the offerors in the competitive range.[2] An agency technical evaluation panel (TEP) evaluated offerors' written proposals and oral presentations using an adjectival rating system: excellent, good, satisfactory, marginal, or unsatisfactory for the technical evaluation factor; and good/low risk, satisfactory/medium risk, unsatisfactory/high risk, and neutral/ unknown performance risk for the past performance evaluation factor. Concurrent with the technical evaluation, the agency separately evaluated offerors' prices and calculated an overall evaluated cost to the government for each offeror.

After completion of its evaluation, the TEP provided the contracting officer with its consensus evaluation ratings of offerors' proposals, including those of Lifecare and Wright, which were as follows:

---

[1] The solicitation also set forth various evaluation subfactors of equal importance to each other within each prime evaluation factor. RFP at 26-27. The technical evaluation subfactors were: technical capability; organizational experience; and personnel qualifications. Id. at 26.

[2] The RFP established that the oral presentations, including copies of slides used to support the oral presentations, would be considered part of the offeror's proposal. RFP at 24. The agency also prepared audiotape recordings of each offeror's oral presentation.

B-297078; B-297078.2

Radtke 0018

| Factor | Lifecare | Wright |
|---|---|---|
| Technical (Overall) | Excellent | Excellent |
| Technical Capability | Excellent | Excellent |
| Organizational Experience | Excellent | Good |
| Personnel Qualifications | Excellent | Excellent |
| Past Performance | Good/Low Risk | Good/Low Risk |
| Evaluated Price | $24,138,510 | $12,869,512 |

Id. at 4, 11-14.

On July 21, after having reviewed the evaluation ratings and findings, the contracting officer determined that Wright's proposal, which was lowest-priced among offerors with equivalent technical and past performance ratings, represented the best value to the government.[3] Id. at 16.

The agency provided Wright as well as all unsuccessful offerors with notice of its award determination on August 1.[4] AR, Sept. 21, 2005, at 3; Lifecare Protest, Aug. 19, 2005, at 5-6. On August 5, the Army provided Lifecare with a postaward debriefing. At the debriefing Lifecare questioned, among other things, Wright's ability to successfully perform the contract and comply with the Service Contract Act prevailing wage determination at the awarded contract price. Subsequent to the Lifecare debriefing, the agency issued an amendment to the solicitation. RFP amend. 0002. The amendment stated that the solicitation was being re-opened in order to clarify the pricing unit for various contract line items (i.e., "hours," and not "records").[5] The agency informed offerors that the response date for the submission of price clarifications was August 9, at 4 p.m.

---

[3] The Army determined that another offeror's proposal, whose price was lower than that of Wright with equivalent technical and past performance ratings, was ineligible for award because it had failed to provide prices for all contract line items. Id. at 14.

[4] The record indicates that the Army did not actually issue a contract to Wright at the time of the August 1 award determination.

[5] Based upon the Lifecare debriefing, the Army concluded that offerors did not have a common understanding of the solicitation's intended pricing unit, and that seeking price clarifications was necessary in order to put all offerors on an equal plane for price evaluation purposes. AR, Sept. 21, 2005, at 3; Tab 16, Agency-Level Protest Denial, at 1.

B-297078; B-297078.2

Radtke 0019

On August 9, Lifecare did not provide the Army with a price clarification in response to the amended RFP;[6] however, Lifecare did file an agency-level protest challenging the solicitation amendment.[7] AR, Tab 15, Lifecare Agency-Level Protest. Despite Lifecare's protest, the agency proceeded with the procurement and received price clarifications from other offerors as scheduled. On August 17, the contracting officer denied Lifecare's protest. AR, Tab 16, Agency-Level Protest Denial. On August 18, based upon its evaluation of offerors' price clarifications, the agency again selected Wright for award. AR, Tab 17, Source Selection Decision Addendum. On August 22, Lifecare protested to our Office.[8]

ANALYSIS

Lifecare's protests raise numerous issues that can be grouped into three categories. First, Lifecare alleges that the Army improperly relaxed the solicitation requirements in favor of Wright. Second, Lifecare contends that the Army's evaluation of Wright's proposal was flawed. Third, Lifecare alleges that the agency's conduct during the course of the solicitation was in various ways improper. Although we do not here specifically address all of Lifecare's arguments about the evaluation of proposals and other agency actions, we have fully considered all of them and find that they afford no basis to sustain the protest of the selection decision here.

<u>Relaxation of Requirements</u>

Lifecare first protests that the Army improperly relaxed material requirements of the solicitation for Wright. Specifically, Lifecare alleges that although the RFP required offerors to have sufficient accredited personnel to commence contract performance on the August 15 start date, the agency delayed the start date until September 1 for the benefit of Wright. The protester also alleges that its incumbent personnel were solicited by Wright after the August 1 initial award decision as evidence that the awardee did not have adequate personnel to perform the contract. The protester argues that by not requiring Wright to have adequate personnel on hand to

---

[6] The record reflects that Lifecare's original price proposal had been based upon the intended pricing unit (<u>i.e.</u>, hours). AR, Tab 15, Lifecare Agency-Level Protest, at 3-4; Tab 17, Source Selection Decision Addendum, at 1.

[7] Lifecare argued that Amendment 0002 was defective insofar as it failed to correct the following alleged improprieties: (1) the agency's tortious interference with Lifecare's employee contracts; and (2) Wright's defective prices and the agency's defective price evaluation. AR, Tab 15, Lifecare Agency-Level Protest, at 3-6.

[8] Lifecare's protest to our Office was delivered by e-mail on August 19 after 5:30 p.m., and thus is considered filed on August 22, the next business day. <u>See</u> 4 C.F.R. § 21.0(g) (2005).

Radtke 0020

commence performance by the contract start date, and by altering the contract start date for Wright's benefit, the agency failed to treat all offerors equally.

It is a fundamental principle of government procurement that competition must be conducted on an equal basis, that is, offerors must be treated equally and be provided with a common basis for the preparation of their proposals. Continental RPVs, B-292768.2, B-292768.3, Dec. 11, 2003, 2004 CPD ¶ 56 at 8; Systems Mgmt., Inc.; Qualimetrics, Inc., B-287032.3, B-287032.4, Apr. 16, 2001, 2001 CPD ¶ 85 at 8. Our Office will sustain a protest that an agency improperly relaxed its requirements for the awardee where the protester establishes a reasonable possibility that it was prejudiced by the agency's actions. Datastream Sys., Inc. B-291653, Jan. 24, 2003, 2003 CPD ¶ 30 at 6. We find that the Army did not improperly relax the solicitation requirements for the benefit of Wright.

The RFP as originally issued established a base period of performance commencing on June 1. RFP at 3. The solicitation also required that, with regard to an offeror's medical record coding personnel, the "Contractor shall provide copies of credentials and a resume to include three years of current coding experience within the last five years for all personnel prior to assignment at WRAMC." RFP § C.1.1.6.

The Army did not complete its award determination here by the June 1 contract start date. As a result, the agency modified its incumbent contract with Lifecare and extended the end date of performance from May 31 until August 31. AR, Tab 9, Contract No. W91YTZ-05-P-0060, Mod. P0005, at 1. Additionally, on August 5, when amending the solicitation here in order to clarify offerors' prices, the Army changed the contract start date to Monday, August 15.[9] RFP amend. 0002, at 2. In denying Lifecare's agency-level protest of the amended solicitation on August 17, the agency stated that the start date for the new contract would be "on or about 1 September."[10] AR, Tab 16, Agency-Level Protest Denial, at 1. In fact, the contract issued to Wright on Friday, August 19, had a period of performance commencing on Monday, August 22. AR, Tab 18, Contract to Wright, at 1, 15.

We find Lifecare's argument that the agency improperly relaxed material solicitation requirements for the awardee to be without merit. First, as the protester itself acknowledges, the solicitation did not require that the successful offeror have all of its employees on hand prior to contract award, Lifecare's Comments, Oct. 3, 2005, at 5; rather, the RFP requirements mandated only that the awardee have sufficient

---

[9] It is unclear when Wright was to commence performance as a result of the August 1 initial award determination, as no contract was actually issued to the awardee at this time, and the RFP's original start date of June 1 had passed.

[10] The agency also noted that it was relying upon incumbent Lifecare to fulfill the terms of its modified contract, which had an end date of August 31. Id.

B-297078; B-297078.2

Radtke 0021

accredited medical coding personnel to begin performance by the contract start date.[11] Second, the record reflects that the agency had a valid reason for altering the August 15 contract start date, namely, delays in the contract award process.

As set forth above, given that it was required to reevaluate offerors' clarified prices and resolve Lifecare's agency-level protest, the Army did not make its final award decision until August 18 and did not issue a contract to Wright until August 19. In light thereof, we fail to see, and the protester fails to explain, how Wright or any other offeror could have begun contract performance on August 15. Moreover, notwithstanding the agency's statement that the start date would be "on or about" September 1, the actual contract start date was August 22, the first business day after the Army issued the contract to Wright--a fact which Lifecare ignores. In sum, we find that there was a reasonable basis for the agency's decision to extend the start date for commencement of contract performance; it was not done to improperly relax the requirements for the awardee. See Military Waste Mgmt., Inc., B-240769.3, Feb. 7, 1991, 91-1 CPD ¶ 135 at 3. Lifecare, the incumbent contractor, cannot protest the solicitation, delay the agency's ability to award a contract, and then reasonably argue that any alteration of the planned contract start date constitutes a relaxation of the requirements in favor of the new awardee.

<u>Evaluation of Wright's Proposal</u>

Lifecare also protests that the agency's evaluation of Wright's technical proposal was unreasonable. Specifically, Lifecare alleges that the Army overlooked the deficiency in Wright's proposal with regard to the solicitation requirement concerning the designation of a site manager.[12] Lifecare also contends that the agency ignored other

---

[11] Whether Wright may have solicited Lifecare's incumbent personnel after the initial award decision and prior to the contract start date, as Lifecare alleges, is therefore irrelevant to our determination here. Moreover, we note that it is neither unusual nor inherently improper for an awardee to recruit and hire personnel previously employed by an incumbent contractor.

[12] As a preliminary matter, we note that the protester alleges that the agency should have rejected Wright's proposal as "nonresponsive." The record is clear, however, that the solicitation here employed negotiated procedures pursuant to Federal Acquisition Regulation (FAR) Part 15. Accordingly, the protester's references to "nonresponsiveness" are inappropriate (and its reliance upon FAR Part 14 and our decisions in sealed bidding procurements is misplaced), since this concept is not applicable to negotiated procurements. See Marshall-Putnam Soil & Water Conservation Dist., B-289949, B-289949.2, May 29, 2002, 2002 CPD ¶ 90 at 4-5. We interpret Lifecare's protest as contending that Wright's proposal should have been rejected as technically unacceptable because the firm's offer allegedly did not comply with the RFP requirements. Accordingly, we analyze the protester's contention by the standards applicable to negotiated procurements.

B-297078; B-297078.2

Radtke 0022

significant, material deficiencies in Wright's proposal that were identified by the TEP when performing its evaluation. The protester argues that the agency's flawed evaluation process resulted in the improper selection of Wright for contract award.

In reviewing an agency's evaluation, we will not reevaluate technical proposals; instead, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the solicitation's stated evaluation criteria and procurement statutes and regulations. Urban-Meridian Joint Venture, B-287168, B-287168.2, May 7, 2001, 2001 CPD ¶ 91 at 2. An offeror's mere disagreement with the agency's evaluation is not sufficient to render the evaluation unreasonable. Ben-Mar Enters., Inc., B-295781, Apr. 7, 2005, 2005 CPD ¶ 68 at 7. Our review of the record here finds the agency's evaluation of Wright's proposal to be unobjectionable.

The RFP stated, in relevant part:

> The Contractor shall designate a Site Manager. The Site Manager shall be responsible for the performance of the work activities of all contracted coding staff. . . . The Contractor shall designate this individual in writing to the Contracting Officer Representative (COR) and the Contracting Officer before the contract start date.

RFP amend. 0001, § C.1.1.2.

Wright submitted its written proposal by the original closing date. Wright's proposal set forth the manner in which the offeror planned to perform the required medical coding services. Wright's proposal stated, with regard to its on-site management plan, that the plan would be submitted to the agency within 30 days of contract award. AR, Tab 6, Wright's Technical Proposal, at 15. Wright's written proposal did not identify the proposed site manager. The agency subsequently received individual oral presentations from the offerors. At its oral presentation, Wright's president introduced its proposed on-site project manager, who then proceeded to conduct a substantial portion of the oral presentation, including a lengthy discussion of the site manager's own experience, qualifications, and management philosophy. AR, Tab 6, Wright's Proposal, Audiotape of Oral Presentation. In its evaluation of Wright's entire proposal (i.e., both the written proposal and oral presentation), the TEP determined that the awardee had complied with the RFP requirement regarding designation of a site manager. AR, Tab 8, TEP Consensus Evaluation of Wright, at 12.

As a preliminary matter, it is not clear that the solicitation required that offerors designate their proposed site managers in their proposals. As noted above, the relevant RFP provision states only that the "contractor" is to designate a site manager to the agency "before the contract start date." Rather than clearly establishing a proposal requirement, this language suggests that the requirement was only to designate the site manager before the start of performance. See Citrus

College; KEI Pearson, Inc., B-293543 et al., Apr. 9, 2004, 2004 CPD ¶ 104 at 3. In any event, we find Lifecare's assertion that Wright failed to designate a site manager in its proposal to be factually inaccurate. The record clearly establishes that Wright's oral presentation included the designation of its site manager. The RFP also informed offerors that the agency would consider an offeror's oral presentation to be part of its proposal. Such treatment is entirely consistent with the relevant FAR provision, which provides that "oral presentations by offerors as requested by the government may substitute for, or augment, written information." FAR § 15.102. The fact that Wright's initial written proposal did not include the designation of a site manager is simply not determinative of whether Wright in fact designated a site manager in its proposal.

Lifecare also alleges that the agency ignored significant deficiencies in Wright's technical proposal that were actually identified by the TEP when performing its evaluation. Lifecare contends that all TEP members who reviewed Wright's proposal identified deficiencies in the areas of project management plan quality, allocation of personnel and resources, and organizational experience. Lifecare argues that notwithstanding these noted deficiencies, the TEP improperly rated Wright's proposal as excellent overall under the technical evaluation factor.

As set forth above, the RFP informed offerors that the technical evaluation factor was comprised of three, equally-important subfactors: technical capability; organizational experience; and personnel qualifications. In turn, the technical capability subfactor consisted of five, second-tier criteria all of equal importance, one of which was quality of the project management plan and allocation of personnel and resources. RFP at 26. When performing its evaluation, the TEP rated offerors' technical proposals by having each member individually review and assign an adjectival rating to each subfactor and criterion, as well as an overall evaluation rating. The TEP then developed consensus ratings based upon discussions among the members of the strengths and weaknesses of each proposal.

The TEP members each individually rated Wright's proposal as good under the project management plan criterion. AR, Tab 8, TEP Evaluation of Wright. The agency evaluators each found Wright to have strengths here (e.g., on-site management was extremely involved in all projects), but also believed that concerns regarding the immediately availability of Wright's on-site management and/or the timely allocation of personnel constituted weaknesses.[13] The TEP consensus evaluation also rated Wright as good under the project management plan criterion.

---

[13] While the RFP did not require the submission of an on-site management plan before the contract start date, Wright's proposal to provide the agency with a management plan within 30 days of contract award was seen by the TEP as a weakness. Likewise, the TEP identified other weaknesses in Wright's proposal under the organizational experience subfactor.

B-297078; B-297078.2

Radtke 0024

Based upon its ratings of Wright's technical proposal under each stated evaluation criterion, the TEP rated Wright's proposal as excellent as to technical capability, good as to organizational experience, excellent as to personnel qualifications, and excellent overall. Id.

We find Lifecare's assertion that the agency ignored the deficiencies which the TEP identified in its review of Wright's proposal to be without merit. The record indicates that when assigning an evaluation rating to the technical merits of Wright's proposal, the TEP properly considered all aspects of the awardee's proposal–both those aspects identified as weaknesses to which Lifecare refers, as well as the many aspects identified as strengths which Lifecare does not mention. Based upon a consideration of relative strengths and weaknesses, the TEP reasonably rated Wright's proposal as either good or excellent under each technical factor and criterion. The existence of isolated weaknesses in an otherwise favorable assessment does not preclude or make unreasonable an overall favorable evaluation rating. See Metro Mach. Corp., B-295744, B-295744.2, Apr. 21, 2005, 2005 CPD ¶ 112 at 25. Under the circumstances here, we have no basis to find the agency's evaluation unreasonable.[14]

Untimely Issues

Lifecare also protests that the Army actively attempted to hinder its participation in the solicitation by "tortiously interfering" with Lifecare's employee contracts and trying to recruit Lifecare personnel for the follow-on contract. Lifecare states that it maintains non-competition agreements with its employees who have worked at WRAMC. The protester contends that various Army procurement officials talked to Lifecare employees, both before and after the agency's initial award decision, and

---

[14] In its initial protest Lifecare also asserted that the agency failed to perform an adequate price realism determination of Wright's proposal as required by the solicitation. Protest, Aug. 19, 2005, at 10-12. The Army specifically addressed this protest issue in its report, discussing the agency's price realism evaluation of both Wright's initial and clarified price proposals, and the protester's comments offered no substantive rebuttal of the agency's position. (Lifecare argued only that the Army had not canceled its initial contract award at the time it evaluated offerors' price clarifications, a fact wholly irrelevant to whether the agency's price realism evaluation was proper.) Where, as here, an agency provides a detailed response to a protester's assertions and the protester either does not respond to the agency's position or provides a response that fails to substantively rebut the agency's position, we deem the initially-raised arguments abandoned. L-3 Communications Westwood Corp., B-295126, Jan. 19, 2005, 2005 CPD ¶ 30 at 4; Citrus College; KEI Pearson, Inc., supra, at 8 n.4. In any event, our review of the record indicates that the agency's price realism evaluation of Wright's proposal was reasonable and consistent with the stated evaluation criteria.

B-297078; B-297078.2

Radtke 0025

questioned whether Lifecare's non-competition agreements were enforceable. Lifecare argues that the agency efforts to undermine the contractual relationship between Lifecare and its employees had the effect of hindering Lifecare's participation in the competition. The Army contends that agency officials did not interfere with the Lifecare employment agreements, or try to persuade Lifecare's employees to leave their positions with the firm.

We find this issue to be untimely. As set forth above, offerors were given until August 9 to clarify their prices in response to RFP Amendment 0002. Lifecare chose not to submit a price clarification by the revised closing date; instead, it filed a protest with the agency contending that the solicitation was defective in that it failed to remedy, among other things, the agency's interference with Lifecare's employee contracts. As noted above, despite Lifecare's protest, the Army proceeded with the procurement and received offerors' price clarifications as scheduled. On August 17, the contracting officer denied Lifecare's protest and, on August 18, the Army made a new award determination. On August 22, Lifecare protested this issue to our Office.

Where a protest initially has been filed with a contracting activity, any subsequent protest to our Office, to be considered timely under our Bid Protest Regulations, must be filed within 10 days of actual or constructive knowledge of initial adverse agency action. 4 C.F.R. § 21.2(a)(3). The term "adverse agency action" is defined in our Bid Protest Regulations to include the agency's proceeding with the receipt of proposals in the face of the protest. 4 C.F.R. § 21.0(f); Carlisle Tire & Rubber Co., B-235413, May 12, 1989, 89-1 CPD ¶ 457 at 2.[15] Thus, it is our general view that once the contracting activity proceeds with accepting offers, the protester is on notice that the contracting activity will not undertake the requested corrective action; consequently, timeliness is measured from this point rather than from the receipt of a subsequent formal denial of the agency-level protest. Scopus Optical Indus., B-238541, Feb. 23, 1990, 90-1 CPD ¶ 221 at 2.

Since Lifecare learned of the initial adverse agency action on August 9, but did not file its protest with our Office until August 22, more than 10 days later, its protest is untimely under our Bid Protest Regulations.[16] 4 C.F.R. § 21.2(a)(3). These timeliness

---

[15] In addition, the written guide describing our Office's bid protest process, which is posted on GAO's website, explicitly warns potential protesters that they "should keep in mind, however, that GAO views as adverse agency action any action that makes clear that the agency is denying the agency-level protest. Examples of adverse agency action include the agency's proceeding with . . . the receipt of proposals . . . despite the agency-level protest." Bid Protests at GAO: A Descriptive Guide (7th ed. 2003) at 12. See http://www.gao.gov/decisions/bidpro/bid/bibreg.html.

[16] Similarly, Lifecare's protest that the Army improperly considered its agency-level protest of the amended solicitation to be a confirmation of the offeror's original price, rather than suspending the procurement pending the protest's outcome as the

(continued...)

Radtke 0026

rules reflect the dual requirements of giving parties a fair opportunity to present their cases and of resolving protests expeditiously without unduly disrupting or delaying the procurement process.[17] Air Inc.–Recon., B-238220.2, Jan. 29, 1990, 90-1 CPD ¶ 129 at 2.

The protests are denied in part and dismissed in part.

Anthony H. Gamboa
General Counsel

---

(...continued)
agency should have done, is also untimely.  Lifecare was aware as of August 9 that the Army had decided not to postpone the receipt of offerors' price clarifications, notwithstanding its agency-level protest.  However, it was not until October 3–almost 2 months after this adverse agency action–that Lifecare first raised this protest issue with our Office.  Moreover, contrary to the protester's assertion, although an agency generally may not award a contract while a preaward protest is pending, an agency is not also required to suspend the closing date for the receipt of proposals or its evaluation of offerors' proposals.  See FAR § 33.103(f)(1); Ann Riley & Assocs., Ltd., B-237365, Nov. 15, 1989, 89-2 CPD ¶ 463 at 2; see also 31 U.S.C. § 3553(c) (2000); FAR § 33.104(b)(1); 4 C.F.R. § 21.6; Northwest Express Ltd., B-246431, Feb. 28, 1992, 92-1 CPD ¶ 244 at 2 n.1.

[17] In any event, our bid protest jurisdiction is limited to review of whether agencies' procurement actions complied with procurement statutes and regulations, 31 U.S.C. § 3551-3552 (2000); determining whether the agency improperly interfered with Lifecare's employee contracts is not a matter within the scope of our bid protest jurisdiction.  Further, the protester has failed to show how it was prejudiced in any manner by the alleged agency action.

B-297078; B-297078.2

Radtke 0027

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHY RADTKE, ET AL.

Plaintiffs,

v.                                          Civil Case No.: 06cv02031 (EGS)

MARIA CASCHETTA, ET AL.

Defendants.

## PLAINTIFF KATHY RADTKE'S ANSWERS
## TO DEFENDANT LIFECARE'S INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Kathy Radtke, by and through her under-signed counsel, herewith responds to Defendant Lifecare's First Set of Interrogatories. Each of the following responses is given in accordance with Plaintiff's best present recollection, information, and belief and is therefore without prejudice to Plaintiff's right to supplement her responses subject to further recall and further investigation of her records which may have escaped scrutiny.

Plaintiff's responses to the individual interrogatories propounded by Defendants are subject to, and without waiving, the following general objections, which are incorporated by reference into every response.

A.    Plaintiff objects to each interrogatory to the extent it seeks privileged attorney-client communications, the work product of counsel, and materials prepared in anticipation and

Exhibit 4

Plaintiff objects to this request as it seeks information protected by the privileges for attorney-client communications, joint defense, and work product, and is overly broad and unduly burdensome. Subject to and without waiving these objections, Plaintiff states:

When I worked for both sites, Kaiser was not closed on Veterans Day (November 11, 2005) or Columbus Day (October 10, 2005). When I worked at Kaiser on October 10, I was paid straight time for those holiday hours at the Pentagon. I worked four hours at Kaiser on October 10, 2005 and was paid straight time. I worked eight hours at Kaiser on November 11, 2005 and was paid straight time. *See* Defendant's document production including, but not limited to, my time sheets and hourly rate of pay.

**Interrogatory No. 4:**

Excluding your employment by Defendants, describe all employment, including self-employment and employment as a contractor and/or employee, held by you from 2000 to the present, including, but not limited to, the identity of all employers, the position held, your supervisor, the primary job duties of the position, the length of time that you worked for such employers, your pay and benefits, your exempt/nonexempt status and the reason why your employment was ended.

**Answer:**

Plaintiff objects to this request as it is not reasonably calculated to lead to the discovery of admissible information, and is overly broad and unduly burdensome, and calls for a legal conclusion. Subject to and without waiving these objections, Plaintiff states:

I worked for Cardiac Associates in a number of positions, namely, biller, receptionist, and cash poster, from February 2000 to July 2001. I was a billing manager for Capitol Medical Group from July 2001 to March 2003. I worked as a temporary, through Maxim Healthcare, doing data entry for United Healthcare and as an interim team leader for the Patient Accounting Department at Prince Georges Hospital from March 2003 to November 2004. From November 2004 to December 2005, I was an outpatient coder for the Defendants. From January 2006 to present, I was employed by AT&T Systems as an inpatient coder. From June 2007 to present, I am an inpatient coder for Wright Solutions, Inc. None of my job duties are similar to those I had while in the employ of the Defendants.

I received from Advanta in the mail, coding clinics with quizzes attached to them that we could do to get our CEUs for our certification. I was simultaneously studying Health Information Management through an online program at Stephens College in Columbia, Missouri and went to seminars on the weekends. I attended non-job skill related training, including CPR classes, at the Pentagon.

**Interrogatory No. 10:**

Describe in detail all advice, education and/or training you provided while employed by Defendants.

**Answer:**

Plaintiff objects to this request to the extent it is overly broad and unduly burdensome. Subject to and without waiving these objections, Plaintiff states:

As a part of my duties at the Pentagon site, I was required to get the doctors together from time to time and help them with their documentation according to the approved coding manual. While it was referred to as "training", it was very informal and based on the coding manual guidelines. I did it approximately three times.

**Interrogatory No. 11:**

Regarding your employment with Defendants, identify the frequency of your interactions with Maria Caschetta during a typical work week, where these interactions would take place, length of the interaction, and the subject matter that these interactions would cover.

**Answer:**

Plaintiff objects to this request to the extent it is overly broad and unduly burdensome. Subject to and without waiving these objections, Plaintiff states:

Maria Caschetta would occasionally call me about assignments, but, on a weekly basis, most of my contact was with Warren Kwan. However, if I had questions about an assignment, Mr. Kwan always had to run things by Maria Caschetta.

**Interrogatory No. 12:**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATHY RADTKE, ET AL.

Plaintiffs,

v.

MARIA CASCHETTA, ET AL.

Defendants.

Civil Case No.: 06cv02031 (EGS)

## PLAINTIFF CARMEN CUNNINGHAM 'S ANSWERS TO DEFENDANT CASCHETTA'S INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Carmen Cunningham, by and through her under-signed counsel, herewith responds to Defendant Maria Caschetta's First Set of Interrogatories. Each of the following responses is given in accordance with Plaintiff's best present recollection, information, and belief and is therefore without prejudice to Plaintiff's right to supplement her responses subject to further recall and further investigation of her records which may have escaped scrutiny.

Plaintiff's responses to the individual interrogatories propounded by Defendants is subject to, and without waiving, the following general objections, which are incorporated by reference into every response.

A.    Plaintiff objects to each interrogatory to the extent it seeks privileged attorney-client communications, the work product of counsel, and materials prepared in anticipation and during the

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Exhibit 7

**Interrogatory No. 4:**

Excluding your employment by Defendants, describe all employment, including self-employment and employment as a contractor and/or employee, held by you from 2000 to the present, including, but not limited to, the identity of all employers, the position held, your supervisor, the primary job duties of the position, the length of time that you worked for such employers, your pay and benefits, your exempt/nonexempt status and the reason why your employment was ended.

**Answer:**

Plaintiff objects to this request as it is not reasonably calculated to lead to the discovery of admissible information, and is overly broad and unduly burdensome, and calls for a legal conclusion. Subject to and without waiving these objections, Plaintiff states:

In April 2005 to November 2005, I employed by Dr. Ebbs as a office manager, responsible for daily business operations and billing daily encounters. I was an nonexempt hourly wage employee. I left for a new employment opportunity.

From November 2005 to January 2006, I was employed by Vista Remote Coding as a coder. I left because I completed the contract term.

From January 2006 to Present, I was employed by Wright Solutions as a medical coder. My primary duties are as coding output and third party encounters.

**Interrogatory No. 5:**

Describe in detail the job duties you performed for Defendants and the percentage of your time that was devoted to each job duty in a typical week.

**Answer:**

On the Walter Reed Contract, my job duties entailed coding outpatient medical record encounters — with an emphasis on Third Party encounters — data entry of all completed encounters, and productivity reports to the corporate offices and Ms. Kidd. I spent approximately 85% of my time on coding, 10% on data entry, and 5% on system problems and productivity reports.

I was required to report on site by 8:30 am, and roll call was sent every morning by 8:30 to the Walter Reed command. I worked a minimum of 8.5 hours with 30 minutes for lunch. If

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 4 -