UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| KATHY RADTKE, ET AL. | |
| Plaintiffs, | |
| v. | Civil Case No.: 06cv02031 (EGS) |
| MARIA CASCHETTA, ET AL. | |
| Defendants | |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Kathy Radtke and Carmen Cunningham, by and through their under-signed counsel, hereby moves this Honorable Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all matters before this Court.  This Motion is supported by the reasons stated in the attached Memorandum of Points and Authorities, filed herewith.


January 8, 2010                                    Respectfully submitted,


                                                   _____/s/ S. Micah Salb_____
                                                   S. Micah Salb, #453197
                                                   Lippman, Semsker & Salb, LLC
                                                   7979 Old Georgetown Road, Suite 1100
                                                   Bethesda, Maryland  20814
                                                   (301) 656-6905 / (301) 656-6906 (fax)

                                                   Attorney for Plaintiffs

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel. (301) 656-6905
Fax (301) 656-6906

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| KATHY RADTKE, ET AL. |
| |
| Plaintiffs, |
| |
| v. |
| |
| MARIA CASCHETTA, ET AL. |
| |
| Defendants |

Civil Case No.: 06cv02031 (EGS)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Kathy Radtke and Carmen Cunningham,  by and through their under-signed counsel, hereby move for summary judgment for the following reasons:

## I.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE.

**The Parties' Employment Relationships.**

1. Defendants LifeCare Management Partners (hereinafter "LifeCare") and Advanta Medical Solutions, LLC (hereinafter "Advanta") operated medical record coding businesses, which hired employees and contracted them out to perform medical record coding at the sites of various clients.  *See* Def's Answer to Amended Complaint ¶ 11.

2. Advanta is a limited liability company with its principal place of business in Maryland.  *See* Caschetta Dep., p. 121, attached hereto as Exhibit 1.  Defendant Maria Caschetta is the president of Advanta.  Caschetta Dep., Exh. 1, p. 6.

3. Lifecare Management Partners is a District of Columbia General Partnership.  *See* Molina Dep., p. 36, attached here to as Exhibit 2.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

4.      Lifecare won a contract with the Walter Reed Army Medical Center in 2002 to provide medical records coding. *See* Molina Dep., Exh. 2, p. 29; Caschetta Dep., Exh. 1, p. 66. Advanta is a business partner of Lifecare and functioned as the primary subcontractor on that contract.  Molina Dep., Exh. 2, p. 23; Caschetta Dep., Exh. 1, p. 75.  Plaintiffs Radtke and Cunningham worked for the Defendants on that contract.  Caschetta Dep., Exh. 1, pp. 63-65; Caschetta letter to Cunningham, dated November 28, 2002, attached hereto as Exhibit 3 (hereinafter "November 28 Caschetta letter to Cunningham").

5.      Advanta separately has a contract to provide medical records coding services to Kaiser Permanente in Rockville, Maryland. Caschetta Dep., Exh. 1, p. 156. Both Kathy Radtke and Carmen Cunningham were paid to provide medical records coding to Kaiser under this contract. *See* Caschetta Dep., Exh. 1, pp. 61-62 (Cunningham), pp. 63-65 (Radtke).

6.      Advanta was responsible for staffing and managing all medical records coding contracts and personnel related to the Walter Reed contract not only for its own employees but also for Lifecare's employees.  *See* November 28 Caschetta letter to Cunningham, Exh. 3; Caschetta Dep., Exh. 1, p. 66-67, 75.

7.      Advanta recruited and hired the medical records coders for the Walter Reed contract for employees of both Advanta and Lifecare.  *See* Caschetta Dep., Exh. 1, p. 75; Caschetta email to Kwan, dated September 28, 2002, attached hereto as Exhibit 4; November 28 Caschetta letter to Cunningham, Exh. 3; (offering Ms. Cunningham a position with LifeCare).

8.      Defendant Caschetta set the pay rates for employees of both Advanta and Lifecare coders on the Walter Reed contract. *See* Caschetta email to Wyant, dated August 31, 2004, attached hereto as Exhibit 5.

- 2 -

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

9.     Advanta had the express right to terminate Lifecare employees.  *See* November 28 Caschetta letter to Cunningham, Exh. 3.

10.    Both Defendants Lifecare and Advanta are employers within the meaning of the Fair Labor Standards Act.  *See* Def's Answer to Amended Complaint ¶ 5, 6.

**Ms. Radtke's Work for the Defendants.**

11.    Defendant Caschetta offered Plaintiff Kathy Radtke employment with Advanta as a Coding Consultant in October 2004.  *See* Def's Answer to Amended Complaint ¶ 12; Caschetta letter to Radtke, dated October 27, 2004, attached hereto as Exhibit 6.   She had been recruited by Warren Kwan, an Advanta employee.  Caschetta Dep., Exh. 1, pp. 150-51; email exchange Kwan and Radtke, dated November 19, 2004, attached hereto as Exhibit 7; email thread Warren [Kwan] to Pamela Mizrahi, dated October 25, 2004, attached hereto as Exhibit 8.

12.    Kathy Radtke was employed by Advanta as a medical records coder from October 27, 2004, until December 31, 2005.  *See* Caschetta letter to Radtke, dated October 27, 2004, Exh. 6; Caschetta letter to Radtke, dated December 7, 2004, attached hereto as Exhibit 9; email exchange Radtke to Kwan dated December 23-28, 2005, attached hereto as Exhibit 10.

13.    Ms. Radtke worked as a medical records coder for Lifecare at the Pentagon on the Walter Reed Army Medical Center Contract.  *See* Caschetta Dep., Exh. 1, pp. 63-65; Def's Answer to Amended Complaint ¶ 13.

14.    Defendant Caschetta later arranged for Ms. Radtke to work half days at the Pentagon and half days at Kaiser Permanente, located in Maryland.  *See* Caschetta Dep., Exh. 1, pp. 150-51; email thread between Radtke and Kwan, dated June 17, 2005, attached hereto as Exhibit 11.  She

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

began working at Kaiser starting June 27, 2005. *See* Kreyenbuhl email to Roland and Kwan, dated June 27, 2005, attached hereto as Exhibit 12 (stating "Kathy Radtke will be working at the Pentagon in the am and Kaiser in the pm from today forward").

15.     Ms. Radtke's primary duty at the Pentagon was providing medical records coding services, which included checking the records for the primary care clinic at the Pentagon and coding those records. *See* <u>Plaintiff Kathy Radtke's Response to Interrogatories of Defendant Lifecare</u>, No. 5, attached hereto as Exhibit 13. When instructed by her supervisors, Ms. Radtke occasionally met with doctors to help them reconcile their documentation with the approved coding manual. *See* <u>Radtke's Interrogatory Responses No. 10</u>, Exh. 13; email exchange, Radtke and Caschetta, dated March 22, 2005, attached hereto as Exhibit 14. In addition, on one occasion, Ms. Radtke helped her supervisor at the Pentagon with preparing standardized documentation. *See* email exchange Radtke to Captain Harris, USAF, dated November 8-14, 2005, attached hereto as Exhibit 15.

16.     According to the Defendants, Ms. Radtke spent 100% of her time providing medical records coding services. *See* Plaintiff Kathy Radtke's Response to Interrogatories of Defendant Lifecare, No. 5, Exh. 13; *see also* Radtke Timesheets, attached hereto as Exhibit 16 (illustrating spending approximately 70% of her time directly providing medical records coding and spending additional time in directly related work, such as copying).

17.     Although Ms. Radtke's work at the Pentagon was solitary work, it was supervised by both Advanta and Pentagon (civilian and military) personnel. *See* Radtke email to Erica Kreyenbuhl, dated January 11, 2005, attached hereto as Exhibit 17; Radtke email to Kwan, dated January 12, 2005, attached hereto as Exhibit 18; Radtke email to Kreyenbuhl, dated March 9, 2005, attached hereto as Exhibit 19; email thread between Radtke and Kwan, dated April 29, 2005 through

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

May 3, 2005, attached hereto as Exhibit 20. At the Pentagon Ms. Radtke reported to Major Pamela Franklin and her replacement Captain Green, while her immediate supervisor at Advanta/Lifecare was Diana Brown, to whom she mailed her production sheets; Earl Van Dine approved and signed Ms. Radtke's time-sheets. Warren Kwan handled Ms. Radtke's day-to-day assignments. Erica Kreyenbuhl was the "coding supervisor" to whom Ms. Radtke directed most questions, augmented by Pam Mizrahi. *See* <u>Radtke Interrogatory Responses, No. 7</u>, Exh. 13.

18. Similarly, Ms. Radtke's primary duty at Kaiser Permanente was providing medical coding services, which included coding records from a remote Kaiser location for third-party and workers compensation. <u>Radtke Interrogatory Responses, No. 5</u>, Exh. 13.

19. Ms. Radtke was supervised at Kaiser Permanente by Helene Lamana of Kaiser Permanente, as well as Maria Caschetta of Advanta. <u>Radtke Interrogatory Responses, No. 5</u>, Exh. 13.

20. Kathy Radtke spent almost all of her time on medical records coding at Kaiser Permanente. Plaintiff Kathy Radtke's Response to Interrogatories of Defendant Lifecare, No. 5, Exh. 13.

### Ms. Cunningham's Work for the Defendants.

21. Ms. Caschetta hired Carmen Cunningham to work as a medical records coder on the Walter Reed Army Medical Center Contract. *See* November 28 Caschetta letter to Cunningham, Exh. 3; Def's Answer to Amended Complaint ¶ 16. Even though Ms. Caschetta was the owner of Advanta, she hired Ms. Cunningham to work for Lifecare. <u>Id</u>. Ms. Cunningham worked as a medical records coder for Lifecare from November 28, 2002, through March 31, 2005. *See*

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

November 28 Caschetta letter to Cunningham, Exh. 3; Email exchange Mizrahi and Caschetta, dated April 4, 2005, attached hereto as Exhibit 21.

22.     Although employed by LifeCare, Cunningham reported to and was supervised by Warren Kwan, Director of Federal Operations for Advanta. *See* November 28 Caschetta letter to Cunningham, Exh. 3.  She reported directly to Diana Brown, the on-site coordinator of the Lifecare/Advanta contract at Walter Reed Army Medical Center.  Id.; Caschetta Dep., Exh. 1, pp. 147-150 (Diana Brown); 150-51 (Warren Kwan).  Katherine Mendez was the "principal point of contact" at LifeCare for Carmen Cunningham. *See* November 28 Caschetta letter to Cunningham, Exh. 3.

23.     Defendant Maria Caschetta for Advanta Medical Solutions formed a contract with Ms. Cunningham on October 15, 2003, for medical records coding. *See* Consulting Agreement between Advanta Medical Solutions, LLC and Carmen Cunningham, RHIT, dated October 15, 2003, attached hereto as Exhibit 22.  Under this agreement Ms. Cunningham also worked for Advanta at Kaiser Permanente from Spring 2003 to Spring 2004 under the supervision of Maria Caschetta. *See* Consulting Invoices and 1099s, attached hereto as Exhibit 23;  Caschetta Dep., Exh. 1, p. 65; Plaintiff Carmen Cunningham's Answers to Defendant Caschetta's Interrogatories No. 7, attached hereto as Exhibit 24.  She additionally worked on the Kaiser contract in Spring 2005.  Caschetta Dep., Exh. 1, p.65; Caschetta email to Hesser and Wyant, dated April 3, 3005, attached hereto as Exhibit 25; Mizrahi email to Cunningham, dated April 8, 2005, attached hereto as Exhibit 26.

24.     Ms. Cunningham's primary duty at the Walter Reed Army Medical Center was providing medical records coding services.  She coded outpatient medical record encounters, with an emphasis on third-party encounters, entered data for all completed encounters and provided

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

productivity reports for her work to Advanta.  Cunningham's Interrogatory Responses, attached hereto as Exhibit 27; Affidavit of Carmen Cunningham, attached hereto as Exhibit 28.

25.     Ms. Cunningham's timesheets for WRAMC reflect that she spent about 40 hours per week on average providing medical coding services or about 85% on average.  *See* Exh. 1, Caschetta Dep., pp. 177-78; Cunningham Timesheets, attached hereto as Exhibit 29; *see also* Plaintiff Carmen Cunningham's Answers to Defendant Caschetta's Interrogatories No. 7, Exh. 24.

26.     Ms. Cunningham's direct supervisors at Walter Reed were Diana Brown and Earl Van Dine.  Erica Kryenbuhl and Monita Turpin audited Ms. Cunningham's coding work.  Maria Caschetta supervised Ms. Cunningham and, in particular, directed all interactions with the Walter Reed command; she also reviewed and approved Ms. Cunningham's timesheets.   Cunningham Interrogatory Responses No. 7, Exh. 27; Collection of 10 Emails Related to Audit of Cunningham Time Records, March 2003-March 2005, attached hereto as Exhibit 30.

**Facts Related to the Work Done by Medical Records Coders.**

27.     According to the U.S. Department of Labor, medical records coders translate medical diagnoses and procedures into codes which are used for reimbursement from insurance companies.  *See* DOL Letter FLSA2005-35, dated October 3, 2005, attached hereto for the convenience of the Court as Exhibit 31.

28.     Medical records coders are required to be certified by one of the professional organizations that grant certificates for medical records coding.  *See* DOL Letter FLSA2005-35, Exh. 31.  For example, the Walter Reed Contract required that medical coders on the contract be

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

certified by one of several listed credentialing organizations.  Contract, p. 4, attached hereto as Exhibit 37.

29.     Ms. Radtke was a Certified Professional Coder, which she earned by successfully passing a national certification examination after approximately six months of on-line study.  See certificate from the American Academy of Professional Coders of Certified Professional Coder status, attached hereto as Exhibit 32.  In order to gain a CPC certification, one must have an Associate's degree (or equivalent) and achieve a successful score on the certification exam.  *See* American Academy of Professional Coders stated requirements at http://www.aapc.com/certification/cpc.aspx (accessed 1/3/2010), attached hereto as Exhibit 33.

30.     Ms. Cunningham was certified as a Registered Health Information Technologist (RHIT) by the American Health Information Management Association (AHIMA).  *See* Advanta Medical Solutions Release, attached hereto as Exhibit 34.  Similar to the CPC certification, in order to gain an RHIT certification, one must have academic credits at an Associate's degree level and achieve a successful score on the certification exam.    *See* American Health Information Management Association stated requirements at http://www.ahima.org/certification/rhit-/requirements.aspx (accessed 1/3/2010), attached hereto as Exhibit 35.

31.     As medical records coders, the Plaintiffs applied standardized codes to describe medical diagnoses and procedures using specific standards described in the coding manual.  *See* Affidavit of Carmen Cunningham, Ex. 28; Affidavit of Kathy Radtke, attached hereto as Exhibit 36; Contract p. 3, attached hereto as Exhibit 37.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6905

**Facts Related to Ms. Radtke's Travel Time.**

32.     From June 27, 2005, until Decmber 30, 2005, Ms. Radtke was required by Advanta to work partial days at the Pentagon in Virginia and partial days in Maryland at Kaiser Permanente. *See* Exh. 12, Kreyenbuhl email to Roland and Kwan, dated June 27, 2005 (stating "Kathy Radtke will be working at the Pentagon in the am and Kaiser in the pm from today forward"); collected email correspondence regarding Ms. Radtke at Kaiser Permanente, attached hereto as Exhibit 38.

33.     Kathy Radtke traveled between her two work-sites by Metro train and was uncompensated for this expense. *See* Exh. 11, email exchange between Radtke and Kwan, dated June 17, 2005; Caschetta Dep., Exh. 1, pp. 58-61.  The travel between work sites took between one and one-and-a-half hours each work day.  Plaintiff's Radtke's Answers to Defendant Caschetta's Interrogatories No. 5, attached hereto as Exhibit 39.

34.     On occasion, Kathy Radtke was instructed to divide her time between Walter Reed in Washington D.C., the Pentagon in Virginia, and Kaiser Permanente in Maryland.  *See* Email exchange between Radtke and Kreyenbuhl, copied to Maria Caschetta, dated June 30, 2005, attached hereto as Exhibit 40.

35.     Kathy Radtke was required to provide medical records coding services for four hours per day at the Pentagon.  *See* Capt. Eugene Harris II email to Radtke, dated November 29, 2005, attached hereto as Exhibit 41.   She also worked four hours per day at Kaiser Permanente. Plaintiff's Answers to Defendant Caschetta's Interrogatories No. 4, Exh. 39.

36.     There is no dispute that Kathy Radtke was not permitted to record time spent traveling between the worksite at the Pentagon in Virginia and the worksite at Kaiser Permanente in Maryland.  Caschetta Dep., Exh. 1, pp. 58-61.

37.    Advanta never paid Ms. Radtke for the time spent traveling between work sites. Caschetta Dep., Exh. 1, pp. 58-61.

38.    Advanta never reimbursed Ms. Radtke for the expense of traveling between the two work sites.    Plaintiff Radtke's Answers to Defendant Caschetta's Interrogatories 9, Exh. 39.


**Wages Paid to the Plaintiffs.**

39.    Both Kathy Radtke and Carmen Cunningham were given employment contracts that stated their wages as a "bi-weekly salary." November 28 Caschetta letter to Cunningham, Exh. 3; Exh. 21, Caschetta letter to Radtke, dated December 7, 2004, Exh. 9.

40.    Neither Plaintiff was paid a fixed bi-weekly salary. Affidavit of Kathy Radtke, Exh. 36; Affidavit of Carmen Cunningham, Exh. 28.    Instead, their wages varied each pay period depending on how many hours each worked within the applicable two-week period. *See* email exchange between Mendez and Mizrahi, dated September 10, 2004, attached hereto as Exhibit 42.

41.    In fact, the wages received by the Plaintiffs corresponded exactly to the hours which the Plaintiffs reported as having worked (after being vetted and approved by Ms. Caschetta) multiplied by each Plaintiff's hourly rate of pay. *See* Radtke Time Records, Exh. 16; Radtke Pay Records, attached hereto as Exhibit 43; Cunningham Time Records, Exh. 29; Cunningham Pay Records, attached hereto as Exhibit 44.

42.    Each Plaintiff was required to submit  weekly time sheets which recorded the hours worked. *See* Molina Dep., Exh. 2, p. 182; Mendez Interoffice Memo to Cunningham, dated November 25, 2002, attached hereto as Exhibit 45. Ms. Radtke submitted her timesheets to Pamela Mizrahi at Advanta. *See* Collected Emails Summarizing Audit of Radtke's Time Records, attached

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

hereto as Exhibit 46.  Ms. Cunningham submitted them to both Pamela Mizrahi and Kathy Mendez

at Lifecare.   Collection of 10 Emails Related to Audit of Cunningham Time Records, March

2003-March 2005, Exh. 30.

43.    Medical records coders for Lifecare and Advanta were required to provide a detailed

record of their time worked, separately identifying time spent performing different tasks, such as

coding medical procedures, verifying provider-submitted codes, entering data, coordinating or

copying materials, meetings, etc.  *See* Radtke timesheets, Exh. 16.

44.    Timesheets were carefully reviewed by Mizrahi and Caschetta, and coders were

challenged on the time they reported if inconsistencies were discovered.  *See*, *e.g.*, Exh. 46,

Collected Emails Summarizing Audit of Radtke's Time Records; Exh. 38, Collected Emails

Summarizing Audit of Cunningham Time Records, including email exchange Mendez (Lifecare)

and Mizrahi (Advanta), dated March 1-3, 2003 (confirming corrected hours on timesheet); email

Mizrahi to Cunningham (copied to KVBMendez), dated April 13, 2004 (challenging recorded time

and production and requiring review and resubmittal); email Mizrahi to Cunningham, dated January

17, 2005 (challenging submitted time and production record and requiring resubmittal);email

Mizrahi to Cunningham, dated February 14, 2005 (requesting clarification of weekly time

submission and challenging amount of time assigned to training).

45.    Advanta/Lifecare had put into place three different checks and balances to monitor

the hours coders worked at Walter Reed Army Medical Center.  On arrival and departure, Ms.

Caschetta was required to send electronically daily productivity sheets to Maria Caschetta, Diana

Brown, and Dorothy Hesser.  Cunningham Affidavit, Exh. 28;  Collected emails of the electronic

notification of arrival/departure, attached hereto as Exhibit 47.

- 11 -

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

46.     Advanta/Lifecare required Ms. Caschetta to sign a log book daily upon arrival and departure from work.  The log book was located in Diana Brown's office on the 7th floor of the Walter Reed Medical Center.  See Cunningham Affidavit, Exh. 28.

47.     Advanta/Lifecare also required Ms. Caschetta to electronically submit a bi-weekly time sheet to Diana Brown, Maria Caschetta, and Dorothy Hesser.  See Cunningham Affidavit, Exh. 28; Collection of Emails auditing time records of Carmen Cunningham; Exhibit 30; Timesheets of Carmen Cunningham (reflecting the signature of Maria Caschetta and, in many cases, detailed handwritten changes and comments), Exh. 29.

48.     A similar system was in place at the Pentagon.  Ms. Radtke was also required to submit electronically a bi-weekly timesheet to Maria Caschetta.  Affidavit of Radtke, Exh. 36.

49.     No time worked was in any instance recorded as overtime.  Lifecare Interoffice memo from Katherine Mendez to Carmen Cunningham, dated November 25, 2002, attached hereto as Exhibit 45; *see* Radtke timesheets, Exh. 16; Cunningham Timesheets, Exh. 29.

50.     Timesheets were signed by the employee and by Maria Caschetta.  Radtke timesheets, Exh. 16; Cunningham Timesheets, Exh. 29.

51.     Maria Caschetta's signature appears on numerous time sheets for Carmen Cunningham in which the hours worked exceeds 40.  Cunningham Timesheets, Exh. 29.

52.     No overtime compensation was ever paid to either Carmen Cunningham or Kathy Radtke for hours worked in excess of 40 hours per week, even though the time in excess of 40 hours was authorized by Ms. Caschetta.  *See* Radtke Pay Records, Exh. 43; Cunningham Pay Records, Exh. 44.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

53.     Joe Molina is a Harvard-trained attorney with more than 35 years of experience in Government contracting.  Molina Dep., Exh. 2, pp. 8, 12.

54.     Mr. Molina claims to be very familiar with the requirements the federal government imposes on contractors with respect to employee pay.  Molina Dep., Exh. 2, p. 11.

55.     Joe Molina was personally responsible for the contract at Walter Reed. Molina Dep., Exh. 2, pp. 44-45.

56.     Maria Caschetta claims more than 20 years of experience in Government contracting. Caschetta Dep., Exh. 1, p. 26.

57.     Maria Caschetta has experience with performing analyses to determine if particular positions are exempt or not under the FLSA.  Caschetta Dep., Exh. 1, 12, 16.

58.     Ms. Cashchetta has had occasion to consult experts to help in the determination of whether an employee was properly treated as exempt under the FLSA or not.  Caschetta Dep., Exh. 1, pp. 19-20.

59.     Lifecare specifically sought to assure that coders were treated as exempt under the Walter Reed contract, without providing sufficient information to evaluate the possible exemption and without seeking advisement from the Department of Labor.  *See* Mendez letter to MEDCOM CONTRACTING CENTER-NA re: DADA 15-02-R-00006, attached hereto as Exhibit 49.

60.     Although Mr. Molina admits that he consults labor lawyers on matters having to do with the FLSA (Molina dep., Exh. 2, p. 12), he asserts that he made an independent judgment that he coders on the Walter Reed Contract were exempt without consulting counsel (Molina dep., Exh. 2, p. 114).

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel.  (301) 656-6905
Fax (301) 656-6906

61.     The Contract that was issued required compliance with the FLSA among other federal wage and hour laws.  See Contract, Exh. 37, p. 19.

## II.  LEGAL STANDARDS.

The factual assertions outlined above all have solid record support.  A moving party is entitled to summary judgment only if the evidence it proffers is so one-sided that a rational fact finder could only conclude that the moving party must prevail.  *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Waterhouse v. District of Columbia, 298 F.2d 989, 991 (D.C. Cir. 2002).

## III.  ARGUMENT.

**A.     Plaintiffs Are Entitled to Summary Judgment Because the Defendants' Own Records Demonstrate That They Failed to Pay Plaintiffs "Time and a Half" for Work in Excess of Forty Hours per Week.**

It is well-known that under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, an employee must be paid overtime.[1]   29 U.S.C. § 207(a)(1).   Under the law, she must receive compensation "for a workweek longer than forty hours" at a rate "not less than one and one-half times the regular rate at which he [sic] is employed."  Id.; 29 C.F.R. § 778.107.  This overtime pay may not be contractually waived, although employers are free to negotiate a higher rate of pay for work in excess of forty hours per week either individually or as part of a labor negotiation. 29 C.F.R. § 541.4.

_____

[1] FLSA overtime rules do not apply to "exempt" employees.  29 U.S.C. § 551.01.  As explained in Part B, below, the Plaintiffs were not exempt from FLSA's overtime provisions.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel.  (301) 656-6905
Fax (301) 656-6906

The "regular rate" of pay that provides the basis for calculating overtime compensation is an hourly rate determined from the hourly rate actually paid to the employee for the normal (non-overtime) workweek.  29 C.F.R. § 778.108 (citing <u>Waller v. Youngerman-Reynolds Hardwood Co.</u>, 325 U.S. 419, 424 (1945)).  As the Supreme Court explained in *Youngerman*:

> [T]he regular rate refers to the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed . . . .  As long as the minimum hourly rates established by Section 6 [of the FLSA] are respected, the employer and employee are free to establish this regular rate at any point and in any manner they see fit. . . .  * * *  The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments.  It is not an arbitrary label chosen by the parties; it is an actual fact.  Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary "regular rate" in the wage contracts.

*Walling,* 325 U.S. at 424-25 (citations omitted).  If an employee's weekly pay is calculated on an hourly basis, that rate of pay provides the basis as well for calculating over-time.  29 C.F.R. § 110.  Salaried employees are also entitled to receive overtime, the amount of which is calculated by dividing the weekly salary by the expected hours in a regular (non-overtime) workweek.  29 C.F.R. § 778.113.

The FLSA requires that travel time between worksites within a workday be compensated.  29 C.F.R. § 785.38.  "Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."  <u>Id.</u>; <u>Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America</u>, 25 U.S. 161, 164 (1945).

Employers who withhold overtime compensation under the FLSA are liable to employees for the unpaid overtime compensation plus liquidated damages in an amount equal to the unpaid compensation, as well as attorney's fees and costs.  29 U.S.C. § 216(b).  If an employer has been

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

previously convicted for an offense under the FLSA, she or he may be liable for fines and imprisonment as well.  29 U.S.C. § 216(a).

The Maryland Wage and Hour Law (hereinafter "Md. W&H Law") follows the FLSA in requiring overtime compensation at 1.5 times the regular rate of pay.  Maryland Code, Labor and Employment § 3-415.  As with the FLSA, this rule may not be waived contractually.  Maryland Code, Labor & Employment §§ 3-404(1) and 427(c).  Under the Maryland Wage Payment and Collection Law (hereinafter "MWPCL"), if the Court finds that the Defendants withheld the Plaintiffs' wages (including overtime compensation) not as a result of a *bona fide* dispute, the Court may award up to three times the wage together with reasonable attorney's fees and costs.  Maryland Code, Labor and Employment § 507.1.

Time sheets and pay records provided by the Defendants show that during many weeks both Plaintiffs worked more than forty hours in a week, but were not compensated at overtime rates for those excess hours, as required by both the FLSA and the Md. W&H Law.  *See* Exh. 16, Radtke Time Records; Exh. 43; Radtke Pay Records; Exh. 29, Cunningham Time Records; Exh. 44, Cunningham Pay Records.

To establish an overtime claim, an employee bringing suit for overtime wages under the FLSA bears the burden of proving that he performed work for which he was not properly compensated.  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946), superseded by statute on other grounds as stated in Carter v. Panama Canal Co., 463 F.2d 1289, 1293 (D.C.Cir. 1972).  Generally, an employee can satisfy her burden of proof by relying on the employer's records of the employee's work hours and wages.  *Anderson*, 328 U.S. at 687.  In this regard, FLSA requires all employers subject to the FLSA to "make, keep, and preserve such records of the persons

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

employed by him and of the wages, hours, and other conditions and practices of employment maintained by him. . . ." as are required by the Administrator of the Wage and Hour Division of the Department of Labor.  29 U.S.C. § 211(c).  Among other records required to be maintained, Section 211(c) explicitly demands that an employer create and preserve records of the hours worked by its employees and the wages paid to those employees.

> 1.    **The Evidence in this Case Demonstrates That the Defendants Have Improperly Failed to Pay Overtime.**

In this case, the Defendants have produced time sheets which identify the hours worked by the Plaintiffs as well as payroll records which identify the wages paid to the Plaintiffs.  These records demonstrate the Plaintiffs' entitlement to overtime compensation and the Defendants' failure to pay.  The Plaintiffs' damages are computed by analyzing the Plaintiff's time sheets and the actual amount they were paid for bi-weekly pay periods.  *See* Calculation of Damages suffered by Kathy Radtke attached hereto as Exhibit 50; Calculation of Damages Suffered by Carmen Cunningham attached hereto as Exhibit 51.

In addition to their failure to pay overtime, the Defendants also failed to pay Ms. Radtke for her travel time between worksites.  While the timesheets do not reflect the amount of travel time, because Ms. Radtke was not allowed to report it, the travel time between worksites was approximately 1.5 hours each day that she worked at both the Pentagon in Virginia and Kaiser Permanente in Maryland.  Radtke Affidavit, Exh. 36.  Ms. Caschetta asked that Ms. Radtke to take on both assignments.  Caschetta dep. p. 61.  Ms. Caschetta, in fact, initially asked Ms. Radtke to work a full day at the Pentagon and follow that with a half day (four hours) at Kaiser, but Ms. Radtke found that impossible to manage and so refused.  Exh. 11, email thread between Radtke and

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel. (301) 656-6905
Fax (301) 656-6906

Kwan, dated June 17, 2005. Ms. Radtke worked a total of 140 days at both the Pentagon and Kaiser, which have been wholly uncompensated[2]. Radtke Timesheets, Exh. 16. The addition of travel time to the weekly time records of Kathy Radtke increase significantly the number of weeks she worked more than forty hours and enlarge the damages she suffered by the non-payment of wages.

As an illustration of the damages calculation used, Ms. Radtke's total time worked between June 18, 2005 and July 1, 2005 totaled 101 hours. See Exhibit 50 at column named "Date for Each Week as Reported in Time Sheets...." at rows 6/18/05 and 6/25/05. The total hours worked for the bi-weekly pay period at Kaiser Permanente was 60 hours. Id. at column named "Hours Worked in Time Sheets (Kaiser Permanente)". Travel time between the Pentagon and Kaiser Permanente that was unpaid totaled 10 hours for that pay period. Id. at column named "Hours Transit between Assignments." Finally, the total hours reported on the time sheets from the Pentagon were 31 hours. Id. at column named "Hours Reported on Time Sheets (Pentagon)."

The 101 total hours worked for that pay period should be subtracted from 80 hours, which represents two regular (i.e., non-overtime) work weeks. Id. at column named "Overtime Unpaid at Time and a Half." The 21 extra hours represent overtime hours that Ms. Radtke worked for that pay period.[3]

---

[2] Uncompensated also was the cost of traveling by Metro between the work locations plus the parking cost at the Metro parking lot was $10-11 per day, or at least $1,400. Plaintiff Kathy Radtke's Response to Interrogatories of Defendant Caschetta, No. 9, Exh. 39.

[3] Though it does not directly affect the calculation of unpaid wages, the chart illustrates that eleven hours of that overtime was paid at the reported regular rate while ten hours (representing her travel time between work sites) was not paid at all. *See* Exhibit 50 at column named "Overtime Paid at Reported Regular Rate."

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Ms. Radtke was entitled to be paid for her first 80 hours of work in a two-week period multiplied at the reported regular rate of $20.67 per hour.[4]  She was also entitled to be paid for her 21 hours of overtime multiplied by the reported regular rate then multiplied by 1.5 to arrive at the overtime pay due.  See Exhibit 50 at column named, "Calculation of What Pay Should Be."  The total amount that Kathy Radtke should have been paid for the June 18, 2005 and July 1, 2005 pay period was $2,304.71.  Id.  Ms. Radtke's total *actual* pay reported by the pay register for that pay period was $1,881.24.  See Exhibit 50 at column named "Total Paid."   Thus, the Defendants underpaid Ms. Radtke by $423.47 for that pay period.

Based on this straight-forward calculation, no reasonable jury could fail to find that Ms. Radtke's total unpaid wages were $5,224.20.

Based on this straight-forward calculation, no reasonable jury could fail to find that Ms. Cunningham's total unpaid wages were $11,057.00.

In addition, Ms. Radtke's unpaid travel expenses were $1,140.00.

### 2.    The Defendants' Contention That the Timesheets Might Not Be Accurate Does Not Help Them.

The timesheets speak for themselves.  Nevertheless, during the discovery of this case the Defendants have attacked the timesheets, arguing that the timesheets might not be accurate and contending that the employee themselves were solely responsible for the accuracy of the time records.

---

[4] The Plaintiffs were both paid based on an hourly rate.  Kathy Radtke's pay records identify her pay rate as $20.6730 per hour.  Carmen Cunningham's pay records identify her pay rate as $29.66 per hour, which later increased.  While the Defendants' contracts with the Plaintiffs state the wages in the form of an annual "salary," there is no reference in the pay records to a salary (though the hourly rates that the Plaintiffs received correlate to the annual amount reflected in the contract).

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel.  (301) 656-6905
Fax (301) 656-6906

However, their assertion that the timesheets might not be accurate is insufficient to avoid liability.  First, as a matter of law, employees who have not been properly compensated are not required to recreate with precision the record of hours worked which their employer — in violation of law — failed to keep. *See Mt. Clemens*, 328 U.S. at 687.  Instead, the burden shifts to the employer to provide evidence of the precise number of hours worked, or alternatively, the employer may provide evidence demonstrating that the plaintiff's estimate was unreasonable.

Here, the Defendants' argument fails because they are unable to provide evidence of the precise amount of work actually performed.  Pursuant to <u>Anderson v. Mt. Clemens Pottery Co.</u>, if the plaintiffs present persuasive evidence of the hours worked (as was done here), the employer must provide precise records that prove the actual number of hour worked if it wishes to overcome the plaintiff's evidence.

As explained in <u>Marshall v. Gerwill, Inc.</u>, 495 F.Supp. 744, 750 (D.Md. 1980),

> The burden in FLSA cases such as this is reasonably clear.  Where the employer's records are "inaccurate or inadequate," we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. . . .  It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.  <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-88 (1946).

*Accord* <u>Chao v. Self Pride, Inc.</u>, 232 Fed.Appx. 280 (4th Cir. 2007) (where Defendant in FLSA litigation could not produce contemporaneous time records, District Court properly calculated damages as a matter of just and reasonable inference).

- 20 -

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Here, the Defendants cannot meet their burden.  They offer no evidence of the hours actually worked by the Plaintiffs.

Moreover, not only do the Defendants' assertions appear on their face to be *post hoc* assertions, they are plainly belied by overwhelming evidence to the contrary.  Advanta and contracting officials at Walter Reed imposed a careful set of procedures, described by Carmen Cunningham in her affidavit but confirmed by emails, that were calculated to ensure the accuracy of the reports.  Exh. 28, Cunningham Affidavit; *see* Exh. 47 (emails confirming arrival/departure). Administrators carefully scrutinized time reports and required that they be substantiated by corresponding figures for medical records coded.  Emails reflect this scrutiny; the timesheets, carefully initialed by administrators, reflect corrections to the record.  Finally, the time records on their face bear the evidence that the records were accepted: Defendant Maria Caschetta signed each bi-weekly timesheet.  Exh. 30, Collection of 10 Emails Related to Audit of Cunningham Time Records, March 2003-March 2005. Exh. 46, Collected Emails Summarizing Audit of Radtke's Time Records.

**B.     As Medical Records Coders, the Plaintiffs Are Not Exempt from the Overtime Wage Provisions of the FLSA.**

The Defendants's own records demonstrate that they did not pay overtime compensation to the Plaintiffs.  In fact, the Defendants have admitted under oath and in pleadings that they did not pay overtime compensation to the medical coders in their employ, including Plaintiffs Radtke and Cunningham.  Exh. 1, Caschetta Dep., pp. 59-62; Exh. 2, Molina Dep., pp. 20-21, 112-13.  As a defense, however, they assert that Kathy Radtke and Carmen Cunningham were exempt employees under the FLSA.  Def's Answer to Amended Complaint.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6905

An employee is presumed to be covered by the FLSA; the burden of proving an exemption is on the Defendant.  As this Court explained,

> The FLSA exempts from its coverage several categories of employees.  See 29 U.S.C. § 213.  These exemptions are treated as affirmative defenses to liability under the Act, which means that the defendant-employer has the burden of proving that the exemption applies to the plaintiff-employee.

Hunter v. Sprint Corp., 453 F.Supp.2d 44 (D.D.C. 2006); *see also* 29 U.S.C. § 216.  Furthermore, exemptions from the FLSA are to be narrowly construed against the employer in order that Congress's goal of affording broad protection for workers may be realized.  Corning Glass Works v. Brennan, 417 U.S. 188, 196097 (1974); *see also* Mitchell v. Ky. Fin. Co., 359 U.S. 290, 295 (1959).

There really is no doubt but that medical records coders are *not* exempt from the FLSA.  After all, the U.S. Department of Labor has issued an opinion in which it explicitly concluded that "Medical Coders are not exempt from the minimum wage and overtime requirements of the FLSA."  *See* Exh. 31, DOL Letter FLSA2005-35, dated October 3, 2005. ("This opinion is issued as an official ruling of the Wage and Hour Division.") (emph. added).

The Defendants have claimed during the discovery of this case that Ms. Radtke and Ms. Cunningham were exempt employees under either the administrative or the "learned professional exemption."  Molina Dep., Exh. 2, pp. 129-32.  In order to prove that one or both of these exemptions apply, the Defendants must meet their burden of proving that the claimed exemption satisfies three tests set forth by regulation for determining whether a claimed exemption applies.  The Defendants must show that Plaintiffs' pay passes the Salary Level Test (29 C.F.R. § 541.600),[5]

---

[5] Because the Salary Level Test requires only that an employee earn at least $450 per week, the Plaintiffs satisfy that test and if that test were the sole basis of determining exemption, the Plaintiffs would be exempt.  However, they are not exempt because they do not satisfy the other two tests.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

the Salary Basis Test (29 C.F.R. § 541.602), and the Job Duties Test (29 C.F.R. § 541.300(c) as to

the administrative exemption; 29 C.F.R. § 541.300(d) as to the learned professional exemption).

The Defendants appear to base their assertion in part on their contention that they offered

salaries to both Plaintiffs, not hourly wages, when the Plaintiffs were hired.  Exh. 1, Caschetta Dep.,

p. 21.  The evidence, however, as described above, demonstrates that the Plaintiffs were actually

paid on an hourly basis.  Actual compensation governs, not some pre-employment denomination of

the method of compensation.

More importantly, the Defendants' assertion of exemption cannot survive the Salary Basis

or Job Duties tests for exemption set out in the regulations.


1.      **The Claimed Exemption Fails the Salary Basis Test.**

The Salary Basis Test (29 C.F.R. § 541.602) aims to determine whether the employees are

paid on a salary basis rather than an hourly rate.  <u>Aaron v. City of Wichita</u>, 54 F.3d 652, 657-58

(10th Cir. 1995).  Under 29 C.F.R. § 541.118(a), an employee is compensated on a salary basis if

"under his employment agreement he regularly receives each pay period . . . a predetermined amount

constituting all or part of his compensation, which amount is not subject to reduction because of

variations in the quality or quantity of the work performed."

The evidence here shows that the Plaintiffs were never paid a predetermined amount of

compensation each pay period. 29 C.F.R. § 541.602(a).  Instead, their bi-weekly compensation was

calculated as a multiple of hours worked times hourly rate.  Their compensation varied as the

number of hours they worked in a pay period varied.  Nor were the Plaintiffs paid a contractually-

promised bi-weekly "salary" for those weeks during which they performed work for fewer than forty

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

hours.  The evidence, from the records provided by Defendants themselves, is that the Plaintiffs were paid on an hourly basis and not a salary basis.  For that reason alone, their contention that Plaintiffs were exempt must fail.

       **2.**        **The Claimed Exemption Fails the Duties Test.**

        **a.**       **The Plaintiffs' Primary Duty Was Medical Records Coding.**

The Defendants' contention that Ms. Radtke and Ms. Cunningham were exempt employees must also fail the Duties test.  To qualify for either the administrative or learned professional exemption under the FLSA, "an employee's 'primary duty' must be the performance of exempt work."  29 C.F.R. § 541.700.  The implementing regulations go on to define "primary duty" as "the principal, main, major or most important duty that the employee performs."  Id.  And the Regulations explain that the primary duty is determined by considering the amount of time spent performing exempt work and the employee's relative freedom from direct supervision.  Id.

Medical records coders translate medical diagnoses and procedures into codes used for reimbursement from insurance companies.  *See* Exh. 31, DOL Letter FLSA2005-35, dated October 3, 2005. The Department of Labor has issued a letter in which it concluded that "Medical Coders are not exempt from the minimum wage and overtime requirements of the FLSA."  Id.

The work that medical records coders do is solitary.  *See* Exh. 36, Radtke Affidavit; Exh. 28, Cunningham Afd., ¶ 11.  Each coder reviews medical records and codes them to the industry specification.  Id. at ¶ 10.  For convenience, the coding is often performed on the site of the hospital or clinic, as it was at Walter Reed or the Pentagon.  More and more, however, the job has in many cases become one that is performed by coders working on-line from home.  *See* Exh. 31, DOL letter,

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

FLSA2005-35, dated October 3, 2005.  Supervision is provided, often at a distance, by supervisors who audit the work of coders to determine accuracy of coders' work against industry standards. Exh. 48, Caschetta email to Cunningham, dated March 4, 2005; Exh. 7, Contract, p. 5.

From the records which the Defendants have provided, it is perfectly clear that the primary duty performed by the Plaintiffs was medical records coding because the Defendants' timesheets require the coders to specifically note the actual activities they perform.  On the Advanta timesheets on which Ms. Radtke recorded the work she performed, these categories were provided to encompass the duties for which she would be paid: "Coding" (with the explanatory, "hours coding & verifying providers") and "Data Entry" and "Auditing (with the explanatory, "hours auditing providers") each require a "record count" to accompany (and verify) the time record.  There are also categories for "Developing" ("hours templates, superbills etc."), "Training" ("Training prov. sep. from audit"), "Training" ("hours in training, orientation"), "Adm" ("hours coord, copying, etc."), "Meeting," "Checking" ("hours verifying coders"), "Downtime."  The same categories obtain on the Lifecare timesheet on which Carmen Cunningham recorded her time records.

Kathy Radtke was hired as a medical coder by Advanta Medical Solutions.  Exh. 9.  Ms. Radtke spends the substantial part of her work day coding or entering medical records, verifying the records or coding.  Exh. 36, Radtke Affidavit.  As a confirmation to the time spent coding, she provided for each day the number of records coded.  Failure to supply this number was the occasion for a swift email from an administrator at Advanta requiring the missing records.  On a limited number of occasions and for a very limited time, relative to her total time working as a medical coder, Ms. Radtke worked with representatives of Advanta's clients to develop a "superbill" or to work to regularize coding procedures.

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Both as a medical coder at the Pentagon and at Kaiser Permanente, Kathy Radtke was supervised by Advanta administrators Warren Kwan, Diana Brown, Erica Kryen, and Maria Caschetta. Exh. 46. She was also supervised by on-site client coordinators. Her work was solitary, but it was never without close, multiple-layered, supervision.

Carmen Cunningham was hired as a "senior medical coder" by Maria Caschetta at Advanta, but was officially an employee of Lifecare. She too spent the substantial part of her work day coding or entering medical records, verifying the records or coding. Exh. 1, Caschetta Dep. As a confirmation to the time spent coding, she provided for each day the number of records coded. Her work was supervised both for its performance (emails regarding record keeping) and quality (email regarding quality checks).

### b.    The Plaintiffs Do Not Satisfy the Duty Test as to the Administrative Exemption.

The Defendants have contended that Ms. Cunningham exercised authority as an administrative employee and so is exempt.[6]  An employee will meet the duties test for the administrative exemption only if the employee's primary duty is to perform office work "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a).  The regulation goes on to describe:

> To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

---

[6] The Defendants have not made the same argument as to Ms. Radtke, but this discussion illustrates that neither of them would be subject to this exemption.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Id. For a medical coder business, coding medical records would be comparable to "working on a manufacturing production line," while handling hiring, scheduling, or pay of workers would be administrative.

The Defendants' records prove that the Plaintiffs were not exempt. Kathy Radtke and Carmen Cunningham both were "workers" on the "manufacturing production line." Their hourly records show this. Even the testimony of Defendant Caschetta confirms that 85% of Ms. Cunningham's work was properly classified as medical coding. See Caschetta Dep. at pp. 177-78. To outweigh the clear evidence of the time sheets that show Ms. Cunningham engaged in medical records coding 85% of the time, Defendants have produced no evidence that either Plaintiff was "employed in a bona fide administrative capacity." FLSA § 13(a)(1); *see* 29 C.F.R. § 541.200(a).

In addition to performing work "directly related to assisting with the running or servicing of the business" as her primary duty, an employee qualifying for the administrative exemption must, as part of her primary duty, "exercise discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). It is important to note that this "exercise of discretion and independent judgment" is not in lieu of the specific duties performed in support of the business discussed above, but in addition to that requirement.

While it is clear that Ms. Cunningham, hired and paid as a "senior coder," was given some responsibility for coordinating the work of the Advanta/Lifecare coders at Walter Reed, it is equally clear that this work of coordination was not her primary duty. The detailed record of her work, hour by hour, shows that coordinating the other medical coders or even checking their work and reporting problems to supervisors was an exception to Ms. Cunningham's primary work. Ms. Cunningham spent about 85% of her time doing medical records coding according to Ms. Caschetta (Exh. 1, p.

177-78; the time records confirm that use of her time; Ms. Caschetta in sworn testimony agrees that that is a reasonable estimate.  Coding was Ms. Cunningham's primary duty.  She was a part of the "production line" at Advanta/Lifecare; she was not an administrator.

For Kathy Radtke, whose time sheets show clearly that she was engaged in coding and not administration, the Defendants' assertion that she was an exempt employee is harder to fathom. There is evidence that briefly at the Pentagon and also at Kaiser Permanente, Ms. Radtke helped Advanta's client with developing materials having to do with billing insurance companies (and so related to but not necessarily central to medical coding).  Records show, however, that she spent only *de minimus* time on such activities; they are the exception to Ms. Radtke's duties and may not define her "primary duties" for the purposes of the FLSA exemption.

<div align="center">

**c.**     **The Plaintiffs Do Not Satisfy the Duty Test as to the Learned Profession Exemption.**

</div>

Under the FLSA, an "employee employed in a bona fide professional capacity" is exempt from FLSA's overtime pay requirements.  FLSA § 13(a)(1).  The Regulations specify that an employee may be exempt as a learned professional if she meets the salary and salary basis tests (described above) *and* her primary duty is the performance of work:  (1) requiring advanced knowledge; (2) in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(a).  "Work requiring advanced knowledge" means "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work."  29 C.F.R. § 541.301(b).

<div align="center">

- 28 -

</div>

<div style="position: absolute; left: 0; transform: rotate(-90deg);">

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel.  (301) 656-6905
Fax (301) 656-6906

</div>

The Department of Labor, Wage and Hour Division, has explicitly stated that "Medical Coders are not exempt from the minimum wage and overtime requirements of the FLSA." Exh. 31, DOL Letter FLSA2005-35. The Department of Labor was unable "to give general recognition to Medical Coding as a 'profession' within the contemplation of 29 C.F.R. § § 541.300," because it concluded that (1) "the field of Medical Coding is not generally recognized by colleges and universities as a bona fide academic discipline"; (2) "the primary duty of a Medical Coder does not require 'knowledge of an advanced type'"; (3) an Associates Degree, which is required for most Medical Coder certifications, would not qualify for the learned professional curriculum; and (4) the fact that a certification is required for Medical Coders is not determinative for purposes of the learned professional exemption, unless the certification involves a prolonged course of specialized intellectual instruction. Exh. 31, DOL Letter, FLSA2005-35, dated October 3, 2005 (citing 69 Fed. Reg. 22157 (April 23, 2004)).

The Defendants have argued that even if Medical Coders as a class do not qualify for the professional exemption, Ms. Radtke and Ms. Cunningham do qualify for the exemption because of their extraordinary training and experience. The distinction is not supported by law. In <u>Young v. Cooper Cameron Corp.</u>, 586 F.3d 201 (2009), the Second Circuit concluded that a "Product Design Specialist II" who "had approximately 20 years of engineering-type experience, and [whose] work at Cameron involved complicated technical expertise and responsibility" was wrongly classified as exempt under the professional exemption because the position required no more than a high school diploma. 586 F.3d at 203.

The Regulation defines a professional as "someone [w]hose primary duty consists of the performance of [w]ork requiring knowledge of an advanced type in a field of science or learning

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

<u>customarily</u> acquired by a prolonged course of specialized intellectual instruction and study."  29

C.F.R. § 541.3(A)(1)(2002).  The *Young* Court examined the word "customarily" in that definition

and concluded:

> We therefore hold that an employee is not an exempt professional unless his work
> requires knowledge that is customarily acquired after a prolonged study.  If a job
> does not require knowledge customarily acquired by an advanced educational degree
> as for example when many employees in the position have no more than a high
> school diploma - then, regardless of the duties performed, the employee is not an
> exempt professional under the FLSA.

*Young*, 586 F.3d at 206.  Interpreting the language of the regulation, the Second Circuit concluded

that the educational requirements attach to the job and not to the individual for purposes of the

exemption.  However well-educated Ms. Radtke and Ms. Cunningham are, the determination of

whether their positions are properly classified exempt under the professional exemption rests not

on their educational attainments but on those "customarily" required for the job.

No advanced educational degree was required for the medical coder positions into which

Kathy Radtke and Carmen Cunningham were hired.  Maria Caschetta has testified under oath that

coders were required to have certificates, but not college degrees.  Exh. 1, Caschetta Dep., p. 204.

Certification as a coder requires relevant academic credits to an Associate's degree or the equivalent.

*See* Exh. 33, CPC requirements; Exh. 35, RHIT requirements.  As the preamble to the Part 541 final

rule has explained, jobs that require only an Associates or even an undergraduate degree do not

qualify for the "learned professional exemption."  See Exh. 31, DOL Letter, DOL letter.  Despite

the *post hoc* assertions of Defendants, the medical coder positions filled by Kathy Radtke and

Carmen Cunningham did not require "knowledge of an advanced type in a field of science or

learning customarily acquired by a prolonged course of specialized intellectual instruction."  29

C.F.R. § 541.300(a)(2)(I).

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 30 -

## C.    The WRAMC Contract Offers No Succor to the Defendants.

Defendant Joe Molina contends that the medical records coders working under the Walter

Reed Army Medical Center contract were exempt from the requirements of the FLSA.  Exh. 2,

Molina Dep., pp. 30-32.  He bases this assertion on a letter which his company wrote to federal

contracting authorities that accompanied Lifecare's bid for that contract in 2002.  Exh. 49, Mendez

letter to MEDCOM CONTRACTING CENTER-NA re: DADA 15-02-R-00006.  The letter asks the

government to exempt the medical records coders from the overtime requirements of the FLSA.  The

Defendants reiterate this request on multiple occasions (Exh. 2, Molina dep., p. 31), demonstrating

that they were keenly aware of the overtime pay requirement and equally keen to avoid it.

No reasonable jury could conclude that the Defendants gained an exemption from their

gambit.  First of all, they have produced no communication from the Federal Government in which

the Government *agreed* to the exemption which Lifecare requested (despite numerous requests by

the Plaintiffs for any such material).  Secondly, the basis on which the Defendants rest for its

requested exemption does not support the exemption that it sought.  Finally, such an exemption

would be impermissible under federal contracting law (as Mr. Molina, an attorney with more than

thirty years of federal contracting experience (see Exh. 2, Molina Dep., pp. 11-12), should have

known).

The Defendants' request to the Federal Government to allow the Lifecare/Advanta medical

records coders to be treated as exempt employees was significantly flawed because the Defendants

did not demonstrate an entitlement to the exemption, as explained in Part A, above.[7]  Perhaps for that

---

[7] As noted above, a professional exemption requires that a three-prong salary, salary basis, and duty test be satisfied.  The Defendants' letter requesting exemption asserts that the medical records coders are "salaried" but does not (and could not) assert that they would otherwise satisfy the three-prong exemption test. The coders are not paid a predetermined amount of compensation each pay period in which they perform

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel.  (301) 656-6905
Fax (301) 656-6906

reason, it appears to have failed to achieve its goal. <u>The Defendants have produced no answering communication from the federal contracting office that addresses directly the issue of the exempt — *vel non* — status of the medical records coders for whose work the federal government was contracting</u>. Nor does the contract itself as issued reflect an acceptance of the modification. The only evidence that the Defendants offer is their hand-written notation on the contract (and indeed it is not even clear that that notation appeared on the version of the contract which was submitted to the government). The Defendants' hand-written text on the contract asserting an exemption hardly satisfies any reasonable basis for finding that the federal government granted the requested exemption.

Nor does the basis on which the Defendants rest for their requested exemption support the exemption that they sought. Lifecare's letter requested an exemption under FAR 52.222-48 from the Service Contract Act of 1965.[8] Exh. 49. FAR 52.222-48 addresses "contracts for maintenance, calibration, and/or repair of certain . . . equipment," and requires contractors to certify that they are offering to the Government equipment or servicing of that equipment at the same price as the contractors would offer the goods or services to private bidders. Lifecare provides just this certification (Exh. 52, Lifecare Response to Invitation to Bid [unnumbered] p. 15 of 16) demonstrating that it fully understood that it was requested an exemption related to "contracts for maintenance, calibration, and/or repair of certain . . . equipment." Thus, it is puzzling that

---

any work, and in fact their compensation is reduced when warranted based on variations in the time they performed the work. Therefore, they are not "salaried." Further, the Defendants asserted in the letter that the coders are "professionals," but that conclusion is contradicted by the actual duties of the coders and by the fact that the coders' work does not require "knowledge of an advanced type . . . customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(I).

[8] The Service Contract Act incorporates the FLSA's wage and hour provisions, including overtime provisions, into work performed under federal contracts.

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

immediately following that section of the contract, and apparently based on that FAR, Lifecare

wrote, "Our full time (sic) coding and training personnel are salaried professionals (i.e., certified

coders who work independently at contractor sites) and are treated as exempt personnel." Exh. 49,

Mendez letter to MEDCOM CONTRACTING CENTER-NA re: DADA 15-02-R-00006.   The

Defendants appear to be seeking permission to treat full time coding and training personnel as

exempt employees under the professional exemption, but the FAR under which the Defendants

sought exemption simply does not authorize such exemption.

Finally, as Mr. Molina surely knows both from his legal training and his years of experience

as a federal government contractor, federal contracting law does not allow an agency to modify a

contract for a single bidder, as the Defendants were seeking.   As the definitive government

contracting treatise flatly states, "Any relaxation of the terms of the Solicitation must be extended

to all."   Cibinic & Nash, <u>Formation of Government Contracts</u> (George Washington University,

Government Contracts Program) 1998, p. 31.   Therefore, a contract bid which does not strictly

conform to the governments's request for proposals is considered non-conforming, and it should be

rejected, depending on the materiality of the nonconformity.   As the applicable regulations state,

> to be considered for award, a bid must comply in all material respects with the
> invitation for bids.   Such compliance enables bidders to stand on an equal footing
> and maintain the integrity of the sealed bidding system.

FAR 14.301(a).

Obviously, a modification of the pay basis of medical records coders employed under the

proposed contract, especially one that would release the Lifecare from any responsibility to pay

overtime compensation, would give a significant financial advantage to Lifecare as it competed for

this contract.  This would not put bidders on equal footing and would be disallowed.  *See* <u>Gibraltar</u>

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

- 33 -

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Indus., Inc., Comp. Gen. Dec. B-218537.3, 85-2 CPD ¶ 24 (permitting waiver of nonconformity because the nonconformity would not prejudice other bidders).

A company bidding on a government contract may indeed request a change to the invitation. However, the company must do so using Form 30.  If the modification is accepted, the contract is rebid and all companies bidding on the contract get the benefit of the proposed modification.  Toyo Menka Kaisha, Ltd. v. U.S., 220 CTCL 210, 219-20, 597 F.2d 1371 (2d Cir. 1979).

Thus, the scenario that Mr. Molina offers as a defense — that the hand-written notation on the contract demonstrates that the federal contracting office permitted them to classify the medical records coders as exempt under the FLSA — is simply impossible to reconcile with Federal contracting law and regulation.

**D.      Because Defendants Violated Overtime Pay Provisions Willfully and Not in Good Faith, the Plaintiffs Should Be Awarded Liquidated Damages for Three Years and Treble Damages.**

In addition to the lost wages, the Plaintiffs are entitled to liquidated damages consisting of an amount equal to the lost wages.  29 U.S.C. § 216(b).  If this Court finds that the Defendants' conduct was wilful, then the Plaintiffs can recover damages for three years (not just two), which affects only Ms. Cunningham.  Conduct is wilful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  Mclaughlin, v. Richland Shoe Company, 486 U.S. 128 (1988).

Under the Maryland Wage Payment Collection Act, the Plaintiffs are entitled to treble damages unless the Defendants can prove that they withheld the wages pursuant to a bona fide dispute.  Stevenson v. Branch Banking And Trust Corp., 861 A.2d 735 (2004).

In this case, the Defendants clearly knew that the FLSA required that they pay overtime wages and it repeatedly sought permission from the federal government to waive the overtime requirement.  *See*, *e.g.*, Mendez letter to MEDCOM CONTRACTING CENTER-NA re: DADA 15-02-R-00006, Exh. 49.  Indeed, although Mr. Molina admits that he consults labor lawyers on matters having to do with the FLSA (Molina dep., Exh. 2, p. 12), he asserts that he made an independent judgment that he coders on the Walter Reed Contract were exempt without consulting counsel (Molina dep., Exh. 2, p. 114).

Mr. Molina claims, "I believe that my handwriting clearly provides the waiver for those individuals that were performing the scope of work."  Molina dep., Exh. 2, p. 87.  However, no reasonable jury would find that hand-written notation by the Defendant itself, particularly in the face of the Defendants' repeated requests for waiver which were not met with any actual response from the government granting the waiver, to constitute a waiver.  Any reasonable jury considering this matter would find that the Defendants either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.  The Defendants knew to ask for permission to waive FLSA; one would have to utterly suspend disbelief to conclude that they did not know to look for an answer to their request.

**E.    The Defendants Violated the Plaintiff's Employment Agreement Are Liable for Breach of Contract Pursuant to Maryland Law.**

Since summary judgment in favor of the Plaintiffs is warranted under under FLSA, Maryland Wage and Hour Law, and Maryland's Wage Payment and Collection Act, summary judgment is also warranted in favor of the Plaintiff's as to their breach of contract claim.  In addition to statutory remedies, an employee has an action for common law breach of contract for grievances regarding

Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

unpaid wages.  <u>Programmer's Consortium, Inc. v. Clark</u>, 951 A.2d 919 (2008).  The Plaintiffs had

an employment agreement with Advanta and Lifecare.  The Defendant's breached that agreement

by failing to compensate the Plaintiff's properly for the time that they worked.

**F.     This Court Must Grant Summary Judgment to the Plaintiffs on the Defendants' Counter-Claim for Breach of the Agreements Not to Compete.**

The Defendant asserts that it enjoys a non-compete agreement with the Plaintiffs and has

brought a counter-claim asserting a breach of that agreement.  However, the Defendants have failed

to demonstrate that any non-compete actually exists as to both Plaintiffs.  Therefore, the Plaintiffs

are entitled to summary judgment on the Defendants' counter-claim.  Furthermore, the Plaintiffs are

also entitled to summary because the Defendants have not demonstrated that they have a protectible

interest that warrants the restraint on trade reflected by a non-compete agreement and the Defendants

have suffered no damages as a result of the Plaintiffs' purported breach.

**1.     The Defendants Cannot Demonstrate a Protectible Interest.**

Agreements not to compete are not enforceable unless the employer states a protectible

interest.  A covenant not to compete is a per se violation of public policy unless (1) the restraint on

trade is reasonable; (2) if the restraint is not larger or more extensive than was required for the

necessary protection of the business interest; and (3) "[a]fter a party has deliberately made his

contract, and received consideration therefor, it must plainly appear that it contravenes public policy

before the courts will declare it void upon that ground."  <u>Deutsch v. Barsky</u>, 795 A.2d 660,  674

(D.C. 2002).  The Court has also recognized that "where the restriction was not limited as to time

and territory, and where, by [its] term, great hardship was placed upon the employee, it would be

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

invalidated." <u>Erickson v. Hawley</u>, 12 F.2d 491, 494 (C.A.D.C 1926); *see also* <u>Labor Ready, Inc.</u>

<u>v. Abis</u>, 767 A.2d 936, 942 (2001); <u>Copier Specialists, Inc. v. Gillen</u>, 887 P.2d 919, 920 (Wash. App.

1995) (*citing, inter alia*, <u>Silver v. Goldberger</u>, 188 A,2d 155, 158 (1963)) (Emphasis Added).

The Defendants have never articulated in this litigation or preceding it what interest they

seeks to protect through enforcement of these agreements not to compete.  Of course, the burden is

on a party seeking to enforce restrictive covenant not to compete in employment contract to establish

its reasonableness. *See*, *e.g.*, <u>American Hot Rod Ass'n, Inc. v. Carrier</u>, 500 F.2d 1269, 1277

(C.A.N.C. 1974); <u>Arrow Chemical Corp. v. Pugh</u>, 490 S.W.2d 628, 632 (Tex.Civ.App. 1972); <u>Scott</u>

<u>v. General Iron & Welding Co.</u>, 171 Conn. 132, 139, 368 A.2d 111 (1976); <u>Armstrong v. Cape</u>

<u>Girardeau Physician Associates</u>, 49 S.W.3d 821 (Mo.App. 2001).[9]

Though the Defendants have articulated no protectible interest, the Plaintiffs can surmise that

the Defendants contend that the skills and knowledge of coding gained by the Plaintiffs during their

employ by the Defendants are the interests that the Defendants seek to protect.  Specifically, it

appears that the Defendants contend that the Plaintiffs have gained knowledge related to methods

of medical coding as a result of their employment by the Defendants.[10]

Any such claim must fail.  First of all, the Defendants have no proprietary interest in the

information contained in the coding manuals, because they are published by third-parties. *See e.g.*,

Radtke Answer to Interrogatory No. 10, Exh. 13, noting use of coding manuals.

[9] Though counsel have identified no Maryland or D.C. case addressing this point, the caselaw from other jurisdictions appears to indicate uniformly that the burden of proof lies with the party seeking to enforce the covenant not to compete.

[10] The Defendants have never asserted that this case involves customer lists, proprietary methods of work, business goodwill, or other interests which employers seek to protect present.

- 37 -

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Secondly, as a matter of law, any alleged training of Plaintiffs on coding procedures is insufficient to warrant enforcement of a non-compete.  Generally, skills acquired through training by an employer cannot support enforcement of an agreement not to compete.  *See* Labor Ready, Inc. v. Abis, 767 A.2d 936, 942 (2001)  ("In other words, the training that Abis received during his tenure at Labor Ready, "without more, does not warrant enforcement of the covenant not to compete.")  Such a restraint is greater than is necessary to protect the employer's business, especially where, as here, the Plaintiffs had information relating to insurance industry coding prior to beginning employment.  Thus, the Defendants have no protectible interest, and therefore they cannot gain enforcement the purported covenants not to compete against the Plaintiffs.  Therefore, summary judgment must be granted the Counterclaim of breach of a non-competition agreement.

**2.      More Importantly, The Defendants Have Failed to Prove Damages for the Purported Breach.**

In order to recover for a breach of a non-compete clause which has been found to be reasonable, the Defendants must prove that they suffered damages proximately caused by the purported breach of the agreement not to compete.  *Abis*, 767 A.2d at 942; *Silver*, 188 A.2d at 158.  Proof of an actual financial loss is an essential elements of the claim.

Here, however, the Defendants cannot prove that they suffered damages.  The Defendants lost the Walter Reed contract in July 2005 — long before the Plaintiffs went to work for any of the Defendants' competitors in January 2006.  *See* GAO Decision, Exh. 3. *See* Radtke Answer to Interrogatory No. 4 attached hereto as part of Exhibit 4 and Cunningham Answer to Interrogatory No. 4, attached hereto as part of Exhibit 7.  Thus, the fact that Ms. Radtke and Ms. Cunningham went to work for a competitor was not a contributing factor to any financial loss incurred by the

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Defendants.  According to the GAO report, the Defendants lost the contract due to a lower bid. Therefore, summary judgment must be granted against all Defendants because none of them incurred any financial loss due to the actions of either Plaintiff.

## IV.  <u>CONCLUSION</u>.

For these reasons, Summary Judgement is warranted for the Plaitiffs on their overtime claims and against the Defendants for the counterclaims for violation of a non-competition agreement.

January 8, 2010

Respectfully submitted,

/s/ S. Micah Salb
S. Micah Salb, #453197
Lippman, Semsker & Salb, LLC
7979 Old Georgetown Road, Suite 1100
Bethesda, Maryland  20814
(301) 656-6905 / (301) 656-6906 (fax)

Attorney for Plaintiffs

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel.  (301) 656-6905
Fax (301) 656-6906

# Exhibit
# 31



U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
Washington, DC 20210

**October 3, 2005**                                                                              **FLSA2005-35**

Dear *Name\**,

This is in response to your letter of August 27, 2002, requesting an opinion on whether the Wage and Hour Division (WHD) considers at-home Medical Coders as "professional" employees under 29 C.F.R. § 541.300 and therefore exempt from the wage requirements of the Fair Labor Standards Act (FLSA). It is our opinion that the Medical Coders are not exempt from the minimum wage and overtime requirements of the FLSA.

The Medical Coders translate medical diagnoses and procedures into codes used for reimbursement from insurance companies. The Coders analyze the patient's entire medical record to determine the appropriate code. The Coders assign and report codes in accordance with national organizational standards. Coders must maintain knowledge of current medical and pharmaceutical terminology and attend ongoing continuing education courses in order to maintain their credentials and state board certifications. The Coders must possess at least one state board certification. Your letter states that while some Coders possess a B.S. degree in Health Information Management, others possess a two year associate degree and others apparently do not possess any degree.

Please note that the Department of Labor issued revisions to 29 C.F.R. Part 541, effective August 23, 2004 (copy enclosed). The updated Part 541 regulations apply prospectively, beginning on August 23, 2004. Our response is applicable under the updated version of the regulations that clarify and make no substantive changes in the primary duty test requirements for the professional exemption.

Section 13(a)(1) of the FLSA exempts from its minimum wage and overtime provisions an employee employed in a bona fide professional capacity. The exemption is not determined based on occupational title or job classification but is granted or denied on the basis of the duties, salary and other requirements of the job of the individual employee involved. 29 C.F.R. § 541.2. Exemptions under the law are to be narrowly construed since the "exempted" individual is denied the protection of both the minimum wage and overtime pay provisions of the Act. *Arnold v. Ben Kanowsky*, Inc., 361 U.S. 388, 392 (1960).

With respect to the professional exemption, as discussed in 29 C.F.R. § 541.300 of the regulations, the term "employee employed in a bona fide...professional capacity" in section 13(a)(1) of the FLSA means

> any employee: (1) Compensated on a salary or fee basis at a rate of at least $455 per week...; (2) Whose primary duty is the performance of work (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

29 C.F.R. § 541.300(a).

The primary duty test under the learned professional exemption at § 541.301(a) includes three elements: "(1) The employee must perform work requiring advanced knowledge; (2) The advanced knowledge must be in a field of science or learning; and (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." The phrase "work requiring advanced knowledge" means "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b).


**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division
Washington, DC 20210

We are unable to give general recognition to Medical Coding as a "profession" within the contemplation of 29 C.F.R. § 541.300. At the present time it appears, based on the information available, that the field of Medical Coding is not generally recognized by colleges and universities as a bona fide academic discipline. In particular, it is the position of WHD that the primary duty of a Medical Coder does not require "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(i). "The phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." 29 C.F.R. § 541.301(d). As the preamble to the Part 541 revised final rule explained, jobs that "require only a four-year degree in any field or a two-year degree as a standard prerequisite for entrance into the field ... do not qualify for the learned professional exemption." 69 Fed. Reg. 22150 (April 23, 2004).

As further explained in the preamble to the revised final rule, "[a]ccredited curriculums and certification programs are relevant to determining exempt learned professional status to the extent they provide evidence that a prolonged course of specialized intellectual instruction has become a standard prerequisite for entrance into the occupation as required under section 541.301. Neither the identity of the certifying organization nor the mere fact that certification is required is determinative, if certification does not involve a prolonged course of specialized intellectual instruction." 69 Fed. Reg. 22157 (April 23, 2004).

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issue addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor. This opinion is issued as an official ruling of the Wage and Hour Division for purposes of the Portal-to-Portal Act, 29 U.S.C. § 259. *See* 29 C.F.R. §§ 790.17(d), 790.19; *Hultgren v. County of Lancaster*, 913 F.2d 498, 507 (8th Cir. 1990).

We trust that the above is responsive to your inquiry.

Sincerely,

Alfred B. Robinson, Jr.
Deputy Administrator

Enclosure: 29 C.F.R. Part 541

\* *Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. 552 (b)(7).*


American Academy of
Professional Coders
Upholding a Higher Standard™

Search

## Certification

Overview

CPC®

CPC-H®

CPC-P®

CIRCC®

CPMA™

Specialty Credentials

Locate Exam

Credential Verification

FAQ

Home > Certification > Certified Professional Coder (CPC®)

# Certified Professional Coder (CPC®)

A Certified Professional Coder has proven by rigorous examination and experience that they know how to code, rationales for why particular codes are used and can do so both efficiently and effectively. A CPC® can review and adjudicate coding of services, procedures and diagnoses on medical claims in the physician-office setting, thus improving the finances and operational efficiency of the practice.

## The CPC®'s abilities include:

- Proficiency in adjudicating claims for accurate medical coding for diagnoses, procedures and services in physician-based settings
- Proficiency across a wide range of services, which include evaluation and management, anesthesia, surgical services, radiology, pathology and medicine
- Sound knowledge of medical coding rules and regulations including compliance and reimbursement. A trained medical coding professional can better handle issues such as medical necessity, claims denials, bundling issues and charge capture
- Knowing how to integrate medical coding and reimbursement rule changes into a practice's reimbursement processes
- Knowledge of anatomy, physiology and medical terminology necessary to correctly code provider diagnosis and services

Which certification is right for you?
**FIND OUT NOW**

### Prepare for Exam        Locate/Schedule an Exam

**CPC® Exam     Approved Manuals     Certification Requirements     Apprentice Status**

### The CPC® Exam

- 150 multiple choice questions (proctored)
- 5 hours and 40 minutes to finish the exam
- 1 free retake

- $300.00 ($260.00 AAPC Students)
- Open code book (manuals)

The CPC® examination consists of questions regarding the correct application of CPT®, HCPCS Level II procedure and supply codes and ICD-9-CM diagnosis codes used for billing professional medical services to insurance companies. It is designed to evaluate a physician practice coder's knowledge of the following:

- Anesthesia
- Radiology
- Medicine
- Nervous
- Endocrine
- Digestive
- Urinary
- Musculoskeletal

- Evaluation and Management
- Anatomy and Physiology
- Mediastinum & Diaphragm
- Practice Management
- Male/Female Genital
- Hemic & Lymphatic
- Maternity & Delivery
- Eye & Ocular Adnexa

- ICD-9-CM
- HCPCS Level II
- Coding Guidelines
- Medical Terminology
- Pathology
- Integumentary
- Respiratory
- Laboratory



American Academy of
Professional Coders
Upholding a Higher Standard™

**Certification**

Overview

CPC®

CPC-H®

CPC-P®

CIRCC®

CPMA™

Specialty Credentials

Locate Exam

Credential Verification

FAQ

Home > Certification > Certified Professional Coder (CPC®)

# Certified Professional Coder (CPC®)

A Certified Professional Coder has proven by rigorous examination and experience that they know how to code, rationales for why particular codes are used and can do so both efficiently and effectively. A CPC® can review and adjudicate coding of services, procedures and diagnoses on medical claims in the physician-office setting, thus improving the finances and operational efficiency of the practice.

## The CPC®'s abilities include:

- Proficiency in adjudicating claims for accurate medical coding for diagnoses, procedures and services in physician-based settings
- Proficiency across a wide range of services, which include evaluation and management, anesthesia, surgical services, radiology, pathology and medicine
- Sound knowledge of medical coding rules and regulations including compliance and reimbursement. A trained medical coding professional can better handle issues such as medical necessity, claims denials, bundling issues and charge capture
- Knowing how to integrate medical coding and reimbursement rule changes into a practice's reimbursement processes
- Knowledge of anatomy, physiology and medical terminology necessary to correctly code provider diagnosis and services

Which
certification is
right for you?
**FIND OUT NOW**

### Prepare for Exam       Locate/Schedule an Exam

**CPC® Exam    Approved Manuals    Certification Requirements    Apprentice Status**

**Medical Coding Certification Requirements**

1. We recommend having an associate's degree.
2. Pay examination fee at the time of application submission.
3. Maintain current membership with the AAPC.
   a. New members must submit membership payment with examination application.
   b. Renewing members must have a current membership at the time of submission and when exam results are released.
4. Effective January 2010 all exams will be reported with exact scores and will report the top three areas of weakness

A CPC® must have at least two years medical coding experience (member's with an apprentice designation are not required two have two years medical coding experience.) Membership is required to be renewed annually and 36 Continuing Education Units (CEU's) must be submitted every two years for verification and authentication of expertise.

**Note:**
Each examination is separate and distinct from one another. To obtain all certifications, each examination must be taken separately and passed. Continuing Education Unit (CEU) submissions are required for all certifications. For CEU requirements please see our CEU Information page.

Copyright © 2009 American Academy of Professional Coders | 2480 South 3850 West, Suite B, Salt Lake City, Utah 84120

## Carmen Cunningham, RHIT

Ms. Cunningham has over 6 years progressive experience in the healthcare industry spanning a wide variety of settings and positions involving office management, medical reimbursement, clinical coding, compliance auditing, and education and training of providers, billers, and clinical coding personnel.  Presently, Ms. Cunningham is Senior Coder/Auditor with the team of Advanta Medical Solutions, LLC and LifeCare Management Partners. She is responsible for outpatient clinic professional services coding, auditing of clinical documentation, auditing of coding performed by providers, training of providers and coding staff, and coordinating with clinical and reimbursement staff to minimize denials of claims and establishing effective processes for appealing payment denial decisions. Work requires providing ongoing feedback to physician providers on areas for improvement with regard to documentation and coding.  She coordinates the company's coding specialists assigned to support various clinics at a large, tertiary care, teaching facility within the Department of Defense. Work requires knowledge of civilian, military, Medicare, and third-party payer billing requirements.  Ms. Cunningham worked previously as a Business Operations Financial Specialist at large teaching hospital in Washington, DC.  She was responsible for coding and reviewing documentation of inpatient, outpatient, and clinic medical records.  She audited claims for correct usage of ICD-9-CM, CPT-4, HCPCS and Revenue codes on the UB-92, analyzed patient accounts for proper charge entry and account balance, reviewed the Medicare Outpatient Code Editor and made recommendations on corrective measures for submitting a clean bill, compiled financial data of all denied claims to track and report on quantitative losses, and was responsible for monitoring, tracking, and correcting problems with CDM, APC's and physician charge tickets.  For a large professional services billing company, Ms. Cunningham served as Compliance Officer responsible for conducting internal audits and providing education to medical personnel on proper chart documentation relative to Medicare, Medicaid and Commercial Insurance billing guidelines; and coded encounters for a number of physician groups using ICD-9-CM, CPT-4 and HCPCS level II codes.  For several years, Ms. Cunningham held various positions as Office Manager, Benefits Coordinator, and Billing Specialist for dental practices and billing companies servicing a wide variety of clinical specialties.

Ms. Cunningham holds a Bachelor of Science degree from Columbia Union College in Tacoma Park, Maryland.  Her education and experience qualifies her to sit for the Certified Coding Specialist and Registered Health Information Administrator examinations administered by the American Health Information Management Association (AHIMA).  She presently is certified as a Registered Health Information Technologist with AHIMA.  She holds an Associates in Applied Sciences degree from Prince George's Community College in Lanham, MD and a Certificate in Physician Office Medical Billing.  Prior to pursing her career in health information management, Ms. Cunningham spent 2 years participating in the Nursing program at Maria College in Albany, New York.

CONFIDENTIAL

Exhibit 5

## Carmen Cunningham, RHIT

Ms. Cunningham has over 6 years progressive experience in the healthcare industry, spanning a wide variety of settings and positions involving office management, medical reimbursement, clinical coding, compliance auditing, and education and training of providers, billers, and clinical coding personnel. Presently, Ms. Cunningham is Senior Coder/Auditor with the team of Advance Medical Solutions, LLC and HillCare Management Partners. She is responsible for outpatient clinic professional services coding, auditing of clinical documentation, auditing of coding performed by providers, training of providers and coding staff, and coordinating with clinical and reimbursement staff to minimize denials of claims and establishing policies and procedures for appealing payment denial decisions. Work requires providing ongoing feedback to physician providers on areas for improvement with regard to documentation and coding. She oversees the company's coding specialists assigned to support various clinics at a large military care teaching facility within the Department of Defense. Work requires knowledge of civilian, military, Medicare and third-party payer billing requirements. Ms. Cunningham worked previously as a Business Operations Financial Specialist at a large teaching hospital in Washington, DC. She was responsible for coding and reviewing documentation of inpatient, outpatient and clinic medical records. She audited claims for correct usage of ICD-9-CM, CPT-4, HCPCS and Revenue codes on the UB-92, analyzed patient accounts for proper charge entry and account balance, reviewed the Medicare Outpatient Code Editor and made recommendations on corrective measures for submitting claims, compiled financial data of all denied claims and reason on quantitative losses, and was responsible for monitoring, tracking and correcting problems with CDM, APC's and physician charge tickets. For a large professional services billing company, Ms. Cunningham served as Compliance Officer responsible for conducting internal audits and providing education to medical personnel on proper chart documentation relative to Medicare, Medicaid and Commercial insurance billing guidelines, and coded encounters for a number of physician groups using ICD-9-CM, CPT-4 and HCPCS level II codes. For several years, Ms. Cunningham held various positions as Office Manager, Account Representative and Billing Specialist for dental practices and billing companies servicing a wide range of medical specialties.

Ms. Cunningham holds a Bachelor of Science degree from Columbia Union College in Takoma Park, Maryland. Her education and experience qualifies her to sit for the Certified Coding Specialist and Registered Health Information Administrator examinations administered by the American Health Information Management Association (AHIMA). She presently is certified as a Registered Health Information Technologist with AHIMA. She holds an Associates in Applied Sciences degree from Prince George's Community College in Lanham, MD and a Certificate in Physician Office Medical Billing. Prior to pursuing her career in health information management, Ms. Cunningham spent 2 years participating in the Nursing program at Elmira College in Elmira, New York.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

KATHY RADTKE, ET AL.                    |

          Plaintiffs,                   |

v.                                      |          Civil Case No.: 06cv02031 (EGS)

MARIA CASCHETTA, ET AL.                 |

          Defendants                    |

---

**Table of Exhibits**

*All exhibits are confidential and subject to a protective order except for those marked with an asterisk. Therefore, all exhibits other than the marked exhibits are provided under seal.*

Caschetta deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Molina deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Caschetta letter to Cunningham, dated November 28, 2002 . . . . . . . . . . . . . . . . . . . . . . . 3

Caschetta email to Kwan, dated September 28, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Caschetta email to Wyant, dated August 31, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Caschetta letter to Radtke, dated October 27, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

email exchange Kwan and Radtke, dated November 19, 2004 . . . . . . . . . . . . . . . . . . . . . . 7

email thread Warren [Kwan] to Pamela Mizrahi, dated October 25, 2004 . . . . . . . . . . . 8

Caschetta letter to Radtke, dated December 7, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

email exchange Radtke to Kwan dated December 23-28, 2005 . . . . . . . . . . . . . . . . . . . . 10

email thread between Radtke and Kwan, dated June 17, 2005 . . . . . . . . . . . . . . . . . . . . . 11

Kreyenbuhl email to Roland and Kwan, dated June 27, 2005 . . . . . . . . . . . . . . . . . . . . . 12

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906

Plaintiff Kathy Radtke's Response to Interrogatories of Defendant Lifecare . . . . . . . . . 13

email exchange, Radtke and Caschetta, dated March 22, 2005 . . . . . . . . . . . . . . . . . . . 14

email exchange Radtke to Captain Harris, USAF, dated November 8-14, 2005   . . . . . . 15

Radtke Timesheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Radtke email to  Erica Kreyenbuhl, dated January 11, 2005 . . . . . . . . . . . . . . . . . . . . . . 17

Radtke email to Kwan, dated January 12, 2005  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Radtke email to Kreyenbuhl, dated March 9, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Email thread between Radtke and Kwan, dated April 29, 2005
through May 3, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Email exchange Mizrahi and Caschetta, dated April 4, 2005 . . . . . . . . . . . . . . . . . . . . . 21

Consulting Agreement between Advanta Medical Solutions, LLC
and Carmen Cunningham, RHIT, dated October 15, 2003 . . . . . . . . . . . . . . . . . . . . . . 22

Consulting Invoices and 1099s . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Plaintiff Carmen Cunningham's Answers to Defendant
Caschetta's Interrogatories No. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Caschetta email to Hesser and Wyant, dated April 3, 3005 . . . . . . . . . . . . . . . . . . . . . . 25

Mizrahi email to Cunningham, dated April 8, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Cunningham's Interrogatory Responses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Affidavit of Carmen Cunningham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Cunningham Timesheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Collection of 10 Emails Related to Audit of Cunningham
Time Records, March 2003-March 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*DOL Letter FLSA2005-35, dated October 3, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Certificate from the American Academy of Professional Coders
of Certified Professional Coder status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*http://www.aapc.com/certification/cpc.aspx (accessed 1/3/2010) . . . . . . . . . . . . . . . . 33

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD  20814
Tel.  (301) 656-6905
Fax (301) 656-6906

Advanta Medical Solutions Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*http://www.ahima.org/certification/rhit/requirements.aspx (accessed 1/3/2010) . . . . . 35

Affidavit of Kathy Radtke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Collected email correspondence regarding Ms. Radtke at Kaiser Permanente . . . . . . . 38

Plaintiff's Radtke's Answers to Defendant Caschetta's Interrogatories No. 5 . . . . . . . . 39

Email exchange between Radtke and Kreyenbuhl,
copied to Maria Caschetta, dated June 30, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Capt. Eugene Harris II email to Radtke, dated November 29, 2005 . . . . . . . . . . . . . . . 41

Email exchange between Mendez and Mizrahi, dated September 10, 2004 . . . . . . . . . . 42

Radtke Pay Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Cunningham Pay Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Mendez Interoffice Memo to Cunningham, dated November 25, 2002 . . . . . . . . . . . . 45

Collected Emails Summarizing Audit of Radtke's Time Records . . . . . . . . . . . . . . . . . 46

Collected emails of the electronic notification of arrival/departure . . . . . . . . . . . . . . . 47

Caschetta email to Cunningham, dated March 4, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . 48

Mendez letter to MEDCOM CONTRACTING CENTER-NA
re: DADA 15-02-R-00006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Calculation of Damages suffered by Kathy Radtke . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Calculation of Damages Suffered by Carmen Cunningham . . . . . . . . . . . . . . . . . . . . . 51

*Lifecare Response to Invitation to Bid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Lippman, Semsker & Salb, LLC**
7979 Old Georgetown Road, Suite 1100
Bethesda, MD 20814
Tel. (301) 656-6905
Fax (301) 656-6906