**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KATHY RADTKE, *et al.*,         )
                                 )
      **Plaintiffs,**         )
                                 )
        **v.**               )     **Civil Action No. 06-2031 (JMF)**
                                 )
MARIA CASCHETTA, *et al.*,     )
                                 )
      **Defendants.**       )

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court for all purposes. Currently pending for resolution is

<u>Defendants' Renewed Motion for Judgment as a Matter of Law, Motion for a New Trial and</u>

<u>Motion to Alter or Amend the Judgment</u> [#176]. For the reasons stated below, defendants'

motion will be granted in part and denied in part.

**BACKGROUND**

Plaintiffs Kathy Radtke and Carmen Cunningham were medical records coders who

brought suit for unpaid overtime pay. <u>See</u> <u>Amended Complaint</u> [#50] at 5-6. Radtke worked for

defendant Advanta Consulting, LLC., as a contractor at both the Pentagon and Kaiser

Permanente, and Cunningham worked for defendant Lifecare Management Partners as a

contractor at Walter Reed Medical Center (she was later employed by Advanta as an independent

contractor at Kaiser Permanente). <u>Id.</u> Plaintiffs brought suit under the Maryland Wage and Hour

Law, Maryland Labor and Employment Article § 3-403, *et seq.*, the Maryland Wage Payment

and Collection Law, Maryland Labor and Employment Article § 3-507.2, the Fair Labor

Standards Act ("FLSA"), 29 U.S.C § 201, *et seq.*, and common law breach of contract.[1] <u>Id.</u> at 6-

---

[1] All references to the United States Code are to the electronic versions that appear in Westlaw or Lexis.

10. Although the defendants conceded that they never paid Radtke and Cunningham any overtime pay, they maintained that both plaintiffs were exempt from the requirement to pay overtime under both the administrative and professional exemptions as defined in 29 C.F.R. § 541.200 and 29 C.F.R. § 541.300, respectively.[2] See Defendants' Pretrial Statement [#112] at 2.

This Court held a bifurcated jury trial. At the conclusion of the first phase of the trial, which addressed the applicability of the administrative and professional exemptions, the jury returned a verdict that the plaintiffs were not exempt. See Verdict Form for Plaintiff Kathy Radtke [#143]; Verdict Form for Plaintiff Carmen Cunningham [#144]. As a result, the defendants were liable to the plaintiffs for unpaid overtime. Based on the jury's verdict after the second phase of the trial, which addressed matters unrelated to the exemptions, the Court entered judgment in the amount of $5,114.62 for plaintiff Radtke and $729.67 for plaintiff Cunningham. See Judgment [#163]. The Court declined to award liquidated damages, but it did award prejudgment interest. See Omnibus Post-Trial Order [#160] at 3-5, 8-9; Prejudgment Interest Order [#162].

In the pending motion, the defendants seek three forms of relief. First, the defendants ask that the Court, notwithstanding the jury verdict, enter judgment for the defendants on the issue of whether the plaintiffs were exempt under the administrative and professional exemptions. [#176] at 2. Second, the defendants ask that the Court grant them a new trial on the applicability of these exemptions. Id. at 13. Finally, the defendants ask that the Court amend the judgment to allow Lifecare to recover costs against Radtke and Advanta to recover costs against Cunningham. Id. at 16.

---

[2] These definitions are also incorporated into the relevant Maryland exceptions. See Code of Maryland Regulations 09.12.41.01 ("'Administrative capacity' has the meaning stated in 29 CFR §541.200 et seq.") and 09.12.41.17 ("'Professional capacity' has the meaning stated in 29 CFR §541.300 et seq.").

**DISCUSSION**

I.      **Legal Standards**

Federal Rule of Civil Procedure 50(a) provides that, "[i]f a party has been fully heard on

an issue during a jury trial and the court finds that a reasonable jury would not have a legally

sufficient evidentiary basis to find for the jury on that issue," the court may grant a motion for

judgment as a matter of law against that party on that issue. Rule 50(b) allows the movant to

renew that motion after the jury has rendered a verdict. Fed. R. Civ. P. 50(b). If granted, the

court may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct the entry of

judgment as a matter of law. Id.

The "standard for granting summary judgment 'mirrors' the standard for judgment as a

matter of law, such that 'the inquiry under each is the same.'" Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 150 (2000) (quoting Anderson v. Liberty Lobby, 447 U.S. 242, 250-

51 (1986)). The court must review all the evidence in the record, "draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or weigh the

evidence." Reeves, 530 U.S. at 150-51. Summary judgment before trial, and therefore judgment

as a matter of law, should be granted "unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249 (citation omitted).

In Anderson, the Supreme Court stated:

> Petitioners suggest, and we agree, that this standard mirrors the standard for a
> directed verdict of Federal Rule of Civil Procedure 50(a) which is that the trial
> judge must direct a verdict if, under the governing law, there can be but one
> reasonable conclusion as to verdict. If reasonable minds could differ as to the
> import of the evidence, however, a verdict should not be directed.

Id. at 250-51 (citations omitted).

There must, however, be sufficient evidence for a jury to return its verdict. Since at least 1872, the Supreme Court has rejected the idea that "if there what was called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury," and it has instead required a greater amount of evidence of a factual dispute. Anderson, 477 U.S. at 251 (citing Schuylkill and Dauphin Imp. Co. v. Munson, 81 U.S. 442, 448 (1871)). Instead, the standard is whether there is any evidence, presented by the party with the burden of proof, "upon which a jury could properly proceed to find a verdict for the party producing it." Schuylkill, 81 U.S. at 448. Thus, summary judgment should be granted only if the evidence would require a directed verdict for the moving party, but "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. Accord Muldrow ex rel. Estate of Muldrow v. Re–Direct, Inc., 493 F.3d 160, 165 (D.C. Cir. 2007) (citation omitted) ("Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in the plaintiff's favor.").

By contrast, the standard under Rule 59(a)(1)(A), which permits a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court" is somewhat different from the standard under Rule 50. Fed. R. Civ. P. 59(a)(1)(A). "A district court is entitled to find that an award is unsupported by the evidence and thus that a motion for a new trial under Rule 59 should be granted, even if there was enough evidence in the record to justify sending the issue to the jury in the first instance (a finding that would require a denial of a motion for judgment as a matter of law under Rule 50)." Smart Mktg. Group, Inc. v. Publ'ns Int'l Ltd., 624 F.3d 824, 832 (7th Cir. 2010) citing Charles Alan Wright &

Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2531, at 65-67 (2d ed. 1995). Thus, the standard for a Rule 59 motion is actually less "onerous" than for a Rule 50 motion. <u>Nyman v. Fed. Deposit Ins. Corp.</u>, 967 F. Supp. 1562, 1569 (D.D.C. 1997).

But, as Professor Steven Gensler explains, "[i]t must be emphasized, however, that a mere disagreement with the jury's verdict is not sufficient to order a new trial. Rather, the verdict must be against the clear weight of the evidence. To meet this standard, the trial court must find that no rational jury could have reached the result based on the evidence presented." Steven S. Gensler, <u>1 Federal Rules of Civil Procedure,</u> Rules and Commentary Rule 59 (2013) citing <u>Galvan v. Norberg</u>, 678 F.3d 581, 588-89 (7th Cir. 2012) and <u>Armisted v. State Farm Mut. Auto. Ins. Co.</u>, 675 F.3d 989, 995 (6th Cir. 2012). Accordingly, courts should grant Rule 59 motions "only where the court is convinced the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'" <u>Nyman</u>, 967 F. Supp. at 1569 (quoting <u>Sedgwick v. Giant Food, Inc.</u>, 110 F.R.D. 175, 176 (D.D.C. 1986)); <u>see</u> <u>Long v. Howard Univ.</u>, 512 F.Supp.2d 1, 6 (D.D.C. 2007). The disposition of a motion for new trial is "entrusted to the sound discretion of the trial court." <u>Grogan v. Gen. Maint. Serv. Co.</u>, 763 F.2d 444, 447 (D.C. Cir. 1985) (citing <u>Allied Chem. Corp. v. Daiflon, Inc.</u>, 449 U.S. 33, 36 (1980)).

Having reviewed the evidence in this case, the Court concludes that there was sufficient evidence in the form of the plaintiffs' testimony as to the nature of their duties and responsibilities to permit a jury to conclude that the defendants had not met their burden of proving that the pertinent exemptions were applicable. To the contrary, this case presented a pristine example of how a genuine issue of material fact emerges from all the evidence, requiring its resolution by the jury. Furthermore, in accordance with Rule 59, for the same reason, the

jury's verdict cannot possibly be described as irrational or unreasonable. Again, the facts elicited by both sides presented a classic factual issue for the jury that was for it and it alone to decide.

## II.     Analysis

### A.     Renewed Motion for Judgment As a Matter of Law

#### 1.     Administrative Exemption

In reaching its verdict as to whether the administrative exemption applied, the jury had to answer three questions: 1) what was each plaintiff's "primary duty"? 2) was each plaintiff's "primary duty [] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"? and 3) did each plaintiff's "primary duty include[] the exercise of discretion and independent judgment with respect to matters of significance"? Trial Tr. Day 3 at 85 (referencing 29 CFR § 541.200(a)).[3]

##### a.     Plaintiff Radtke

###### i.     Primary Duty

The jury heard substantial evidence about Radtke's various duties, which suggested that she engaged in two main activities: coding medical records and training physicians in coding. The defendants' briefing now focuses only on the latter, highlighting Radtke's role in training physicians and her work creating a "super-bill," which codified typical diagnoses and procedures so that practitioners could more easily find an appropriate code. [#176-1] at 8-9. Caschetta testified that Radtke's job at the Pentagon required the ability to both "code the complex cases on behalf of the providers" and "teach the providers how to do this for themselves"; to Caschetta, "[t]hat was the primary duty of that position." Trial Tr. Day 2 at 35; see also id. at 38. When

---

[3] The threshold question is ordinarily whether the plaintiff was compensated on a salary basis. See 29 CFR § 541.200(a)(1). However, the Court ruled prior to trial that the plaintiffs had already conceded that they were paid on a salary basis, so it was not at issue during the trial.

Radtke was at Kaiser Permanente, Caschetta viewed her job as "focusing on the specific types of services that she coded, but she also had to interact with their administrator . . . to determine what other things she needed to do." Id. at 38. Radtke testified that she received "a cartload of charts every day, and within those charts were the encounters" that she coded. Trial Tr. Day 2 at 184. She also performed quality control to ensure that the doctors had not made coding errors. Id. Radtke downplayed the time spent training doctors, indicating that each session "was like a meeting" and that only a few physicians were interested in learning coding. Id. at 186.

The dispute about what was Radtke's primary duty therefore boils down to whether medical coding or the training of physicians in how to code was her primary duty. A review of her timesheets, which were admitted into evidence, show that in any given week she spent between 60% and 100% of her time doing medical records coding. See JEX 7.[4] The pertinent regulation provides: "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Although time "is not the sole test," the "major emphasis is on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Here, Radtke testified that she spent most of her day engaged in medical records coding. When looked at in its entirety, there was certainly sufficient evidence to permit the jury to conclude that medical coding was her primary duty and that the administrative exemption did not apply.

### ii.    Relation to Management or General Business Operations

The next question for the jury was whether Radtke's medical records coding was "directly related to the management or general business operations of the employer or

---

[4] These same timesheets also include entries for training. As Radtke testified, those training entries recorded instances both where she was training physicians and where she was herself being trained. See Trial Tr. Day 2 at 187.

employer's customers." 29 C.F.R. § 541.200(a)(2). Analysis of this issue is irrelevant, however, because it was reasonable for the jury to conclude that the defendants failed to prove the final prong required for the administrative exemption.

### iii.    Discretion and Independent Judgment

The final question posed to the jury was whether Radtke's primary duty included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Caschetta testified that Radtke exercised discretion "in that she had to determine what cases needed to be reviewed by her versus by the doctors. She had to determine what areas they required education and training. She had to determine how to go about capturing the information that was necessary, and when and how to communicate with the administrative officials at the institution." Trial Tr. Day 2 at 37. This testimony is reflected in defendants' briefing, which argues that the discretion and independent judgment were exercised when she "determine[d] what cases needed to be reviewed by her versus by the doctors . . . determine[d] [in] what areas the doctors required education and training . . .  determine[d] when and how to communicate with the administrative officials . . . [and] develop[ed] her own training and education materials for the physician providers." [#176-1] at 9. However, because Radtke's primary duty was medical records coding, the only relevant inquiry is whether she exercised sufficient discretion in determining which cases to review with the doctors.

Radtke downplayed her discretion, saying that she had to match the coding information done by the physicians "with the information in the [coding] book and make sure that the documentation that the doctor had written actually matched everything in the system, in accordance [with] our book." Trial Tr. Day 2 at 184. Thus, Radtke suggested that her coding duties consisted of understanding which procedure the doctor actually performed and

determining which appropriate code from a coding book reflected the procedure. Although Joseph Molina testified that coding is "more than just opening a book," Trial Tr. Day 1 at 110, Radtke indicated that she only had to understand whether the physician's documentation reflected the coding; if it did not, she "had to make changes and inform[] [the doctors] of the changes." Trial Tr. Day 2 at 187. In Radtke's view, there was no discretion: if the code was inappropriate, it had to be changed.

The jury received lengthy instructions on what constituted the "exercise of discretion and independent judgment with respect to matters of significance." <u>See</u> Trial Tr. Day 3 at 87-89. The instructions explained all of the factors present in 29 C.F.R. § 541.202—which are too numerous to reproduce here. Radtke testified that, as a medical records coder, she did not exercise any discretion substantially affecting business operations and that she did not exercise discretion and judgment beyond "the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). In fact, Radtke testified to precisely the opposite. <u>See</u> Trial Tr. Day 2 at 184. There was therefore sufficient evidence presented to the jury in that testimony for it to determine that Radtke did not exercise "discretion and independent judgment with respect to matters of significance."

### b.      Plaintiff Cunningham

### i.      Primary Duty

The jury heard testimony from three individuals—Cunningham, Caschetta, and Joseph Molina, the owner of Lifecare—about Cunningham's duties while she worked for Lifecare. Molina testified that Cunningham was specifically hired to help Walter Reed's medical coding system "move [] from what they were doing to what the commercial industry practice was." Trial Tr. Day 1 at 109-10. In Molina's view, Cunningham accomplished this job not by being a mere

medical records coder, but by helping craft a new system and training the physicians in how to use it. See id. at 151 ("She was the one responsible in essence for starting the transition from Walter Reed to—the way they had been doing business to the new way that business was going to be conducted.") Caschetta echoed this position in her testimony; although Cunningham did do medical records coding based on a standardized book, "[t]he essence of her job was to be a senior coder, and in that capacity as a consultant to the hospital and to provide those related administrative services." Trial Tr. Day 2 at 15.

In her testimony, Cunningham described her work as "captur[ing] a medical record from the department in which [she] was responsible for coding" and then she would then translate that record "into a numeric code and put that on a form." Trial Tr. Day 2 at 120-21. She also engaged in "validation" and quality control, which involved "reviewing the documentation in the medical record" to ensure that the codes she entered were accurate. Id. When the defendants introduced into evidence three of Cunningham's resumes that listed her duties as supervising other coders, performing quality control review, providing training and support, and doing medical coding, DEX 6-8, Cunningham maintained that coding was her primary duty. Cunningham testified that, in her resumes, she used the term "supervise" broadly and that she was "the point of contact for coders coming on-site" to help them become acclimated. Trial Tr. Day 2 at 124. While she did have other tasks, she consistently testified at trial that coding was her primary duty.

The resumes did raise questions about Cunningham's credibility. One of the resumes, which Cunningham prepared while she was still employed by Lifecare and working at Walter Reed, see Trial Tr. Day 2 at 127, stated that Cunningham "[s]upervise[d] a staff of 9 coders." DEX 6. When repeatedly questioned by defendants' counsel about whether she, in fact, was a supervisor, Cunningham testified that she was "told that [she] was going to supervise a staff of

nine coders [by Caschetta]." Trial Tr. Day 2, at 126. She only put on her resume that she supervised those individuals because she "was told that [she] was to supervise a staff of nine coders." Id. When pressed about what her supervisory duties were, Cunningham responded that she was "a medical coder" who "coded third-party insurance claims" and had "no authority to audit any other coder," although she did "perform[] audits of [her] own department," which she supervised Id. at 128-29.[5] When defendants' counsel asked Cunningham about several other lines on her resume—including whether she provided training or assessments and audits for specialty clinics—Cunningham indicated that she did, in a limited capacity. See id. at 131-32. However, in Cunningham's sworn deposition testimony, she unequivocally stated that she did not perform those duties; Cunningham ultimately admitted that her testimony had changed. Id. at 135.

That entire exchange, however, is irrelevant to the question before the Court. The Court "may not assess witness credibility nor weigh the evidence." Mackey v. U.S., 8 F.3d 826, 829 (D.C. Cir. 1993). Instead, the only question is whether there was "significantly probative" evidence for the jury to determine that Cunningham's primary duty was medical records coding and not supervising employees or restructuring Walter Reed's medical coding program. See Siegel v. Mazda Motor Corp., 878 F.2d 435, 437 (D.C. Cir. 1989) (citation omitted). Cunningham repeatedly testified that she was primarily a medical records coder, that she had a limited role in any changes at Walter Reed, and that she only put information on her resume about being a supervisor because she had been told that was what she would do. Trial Tr. Day 2 at 143, 161. The jury could have reasonably credited her testimony even it was substantially impeached; it was for the jury to weigh her impeachment and assess her credibility.

---

[5] This exchange led to a motion to strike "most of that"—referring to three pages of testimony—as nonresponsive because it consisted of "repeated answers without answering the question." The Court granted the motion. See Trial Tr. Day 2 at 129.

Furthermore, Cunningham can point to her timesheets as evidence consistent with her testimony that she was primarily engaged in medical records coding. A review of Cunningham's timesheets, which were entered into evidence, shows that well over 50% of her total time was spent performing medical records coding. See PEX 29; Trial Tr. Day 2 at 165. Cunningham had more variability from week to week than Radtke; for example, she spent 41.5 hours out of 43.5 total hours coding during the week of February 2, 2004, and no hours coding during the week of March 6, 2005. See PEX 29. But, taken in their entirety, she recorded most of her time in medical records coding. Caschetta testified that the defendants trusted the timesheets were accurate—in fact, the timesheets were used to seek reimbursement from the government. See Trial Tr. Day 2 at 73-74. When the evidence of Cunningham's testimony and timesheets are looked at in their entirety, there is evidence for the jury to conclude that Cunningham's primary duty was medical records coding even though her testimony that she was not a supervisor was impeached.

### ii.      Relation to Management or General Business Operations

The next question for the jury was whether Cunningham's medical records coding was "directly related to the management or general business operations of the employer or employer's customers." 29 C.F.R. § 541.200(a)(2). However, as with Radtke, this prong is largely irrelevant because it was reasonable for the jury to determine that Cunningham did not exercise discretion and independent judgment with respect to matters of significance.

### iii.      Discretion and Independent Judgment

The final question posed to the jury was whether Cunningham's primary duty included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Defendants argue that Cunningham met this threshold because she

"help[ed] Walter Reed transition to the kind of coding that was going to make sense in the commercial world," alone decided how to perform these tasks, and she "had authority to formulate policy" in how to revise the coding system. [#176-1] at 6. All of this, however, is irrelevant because the jury could have reasonably concluded that her primary duty was medical records coding. As such, the analysis parallels that of Radtke. Cunningham testified that the only subjective part of her medical coding task was to "go back and query the provider" because she always needed to have a "clear definitive diagnosis" based on "the most accurate information at the time when [she] coded the record." Trial Tr. Day 2 at 160. Whenever she felt—in her judgment—that the records were ambiguous, she would contact the physician and seek clarification. Id.

Undoubtedly, Cunningham exercised some discretion when coding medical records. However, when compared with the factors in 29 C.F.R. § 541.202, it was reasonable for the jury to conclude that she did not exercise any sort of work substantially affecting business operations and that she did not exercise discretion and judgment beyond "the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). There was therefore sufficient evidence presented to the jury for it to determine that Cunningham was therefore not exempt under the administrative exemption.

### 2.       Professional Exemption

In reaching its verdict, the jury had to answer four questions to determine whether the professional exemption applied: 1) "what were the plaintiffs' primary duties?"; 2) "did their work require advanced knowledge?"; 3) "was their work in a field of science or learning?"; and 4) "is that knowledge customarily acquired by a prolonged course of specialized intellectual instruction?" Trial Tr. Day 3 at 89-91 (referencing 29 C.F.R. § 541.300).

As explained above, it was reasonable for the jury to conclude that medical records coding was the primary duty of both Radtke and Cunningham. The defendants' brief discusses the evidence that was presented about each plaintiff's education and experience. See [#176-1] at 11-12. That, however, misses the point. Pursuant to 29 C.F.R. § 541.301(d), the jury was instructed that:

> The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

Trial Tr. Day 3 at 91-92. The issue is not what training and experience these particular plaintiffs had. Instead, the question is whether medical records coders *in general* receive specialized academic training. Although the defendants presented significant testimony that these plaintiffs have specific skills and experience that made them desirable employees, there was no evidence presented that medical records coders generally require a "prolonged course of specialized intellectual instruction." To the contrary, Cunningham's resumes demonstrate that she had only an Associate in Applied Science degree from Prince George's Community College—a two year college degree—when she first became a coder in 1999 at Professional Billing International. See DEX 6-8 (noting that she was a "coder" in that position). As a result, the jury acted reasonably in determining that both Radtke and Cunningham were not subject to the professional exemption. The jury was able to parse the specific technical meaning of the exemption and apply it in an appropriate manner.

* * *

To support their arguments, the defendants cite, understandably, only information that favors their position even though other evidence supports the plaintiffs (and thus the reasonableness of the jury's verdict). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255; see Bowie v. Maddox, 540 F. Supp. 2d 204, 208 (D.D.C. 2008) (This Court's "role is confined to verifying that the jury's verdict was one that a reasonable jury could have reached," and it cannot assess credibility or weigh evidence in making that determination"). In some respects, this was a close case—which is why the jury ultimately found that the defendants did not act willfully and why this Court declined to award liquidated damages. Reasonable people, including reasonable juries, can disagree, but the evidence presented was certainly not so one-sided in favor of the defendants that a reasonable juror had to find in the defendants' favor on the exemption issue. The defendants had the burden of proof on these defenses, and the jury determined that the defendants failed to carry their burden. There the matter ends.

### B.   Motion for a New Trial

Defendants provide three arguments for why a new trial is warranted. [#176-1] at 14-15. First, during examination by her own counsel, Radtke was asked about her work at Walter Reed after she stopped working for Advanta. Trial Tr. Day 3 at 9-10. At that time, she was in the employ of non-party Wright Solutions, and she was allegedly doing medical records coding at Walter Reed as part of that employment. Id. The following exchange occurred:

[Plaintiffs' Counsel Kuntz] Q. Who were you working for?

A. A & T Systems. They were a subcontractor of Wright Solutions who was awarded the contract.

[Defendants' Counsel] MR. LESCHT: Objection. Move to strike.

THE COURT: Well, lay a foundation. I'm not sure I understand the relevance of this, counsel. This is after her employment by these Defendants.

MS. KUNTZ: Yes, it is.

THE COURT: And by a different employer.

MS. KUNTZ: It is, Your Honor.

THE COURT: Could you tie it up for me? What does it have to do with this case?

MS. KUNTZ: What it has to do with this case is that --

THE COURT: Lay your foundation through your witness, though, okay. I don't quite see the connection. Perhaps this witness can explain what the connection is.

BY MS. KUNTZ: Q. Were you doing medical coding work there?

A. Yes, I was.

Q. And were you exempt or nonexempt?

MR. LESCHT: Objection.

THE COURT: That is sustained.

THE WITNESS: Nonexempt.

THE COURT: That is sustained.

THE WITNESS: Oh, sorry. I didn't know the difference.

MR. LESCHT: Your Honor. Your Honor, may I approach?

THE COURT: I'm striking the answer. Ladies and gentlemen, this deals, apparently from what we are being told, with circumstances after the employment by these Defendants ended. So I've stricken the answer. Please disregard it. As you will learn when I give you my final instruction, if there is an objection and I sustain the objection and the witness nevertheless answers the question, the answer is stricken and you must disregard it.

MR. LESCHT: Your Honor, I have a motion to make.

Id.

Defendants then moved for judgment as a matter of law and, after a short recess, requested a mistrial and sanctions. Id. at 10-12. After hearing from counsel outside the presence of the jury, the Court denied both motions and gave the following instruction:

> THE COURT: Sorry for the interruption, ladies and gentlemen. Please be seated. Sorry for the interruption. Once again I must caution you, what has just occurred, a question is asked, there is an objection, and I sustained the objection, and the witness answers the question, you must disregard both the question and the answer as if it didn't happen. Please bear that in mind.

Id. at 21.

It is presumed that "a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant." U.S. v. Foster, 557 F.3d 650, 656 (D.C. Cir. 2009) (citing Greer v. Miller, 483 U.S. 756, 767 n.8 (1987)); see U.S. v. McLendon, 378 F.3d 1109, 1114 (D.C. Cir. 2004) ("Given the brevity of the offending testimony and the clarity of the district court's instructions, we have no reason to doubt the validity of that presumption in this case."). Neither cause for concern is present here. Defendants' contention is that Radtke irreparably prejudiced them by suggesting that she was doing the same work as a medical records coder without being exempt from the protections of the Fair Labor Standards Act. This Court is satisfied that no "miscarriage of justice" occurred as result of Radtke's statement. The testimony leading up to the inappropriate statement indicated that Radtke was doing a different job at a different location—Walter Reed, not the Pentagon—while working for a different contractor. Although she said she was a medical records coder, it was evident from the little testimony presented that she was not necessarily engaged in the same job. Thus, even if the jury ignored this Court's curative instruction, it would have easily been able to distinguish between

the work at issue in the suit and other jobs performed by Radtke. Moreover, as explained above,

there was sufficient evidence presented that would allow a jury to determine that neither

exemption applied to Radtke.

The defendants' second argument in support of a new trial is that Cunningham repeatedly

gave contradictory testimony yet this Court refused to charge the jury with a perjury instruction.

The Court saw no reason to give such an instruction, and it still sees no reason for one to have

been given. The jury was perfectly capable of weighing Cunningham's credibility whether or not

the Court used the word perjury; jurors surely know, without the Court telling them, that lying

under oath is called perjury. There was no need to introduce that term and then run the risk that

the jury would give its utterance more significance than it deserved. Furthermore, counsel for the

defendants was proficient in highlighting her inconsistencies with her resumes and prior sworn

testimony via deposition. Finally, the Court did give the following instruction:

### IMPEACHMENT OF A PARTY BY PRIOR INCONSISTENT STATEMENTS

The testimony of a party may be discredited or impeached by showing that he/she has
previously made statements—including anything that he/she said or wrote—that are
inconsistent with his or her present courtroom testimony. It is for you to decide whether
a party made a statement on an earlier occasion and whether it was in fact inconsistent
with that party's testimony in court here.  If a party at trial has been confronted with a
prior statement that that same party made, and that prior statement is inconsistent with
his/her testimony here in court, then you may consider the prior statement when you
assess the truthfulness of the testimony he/she gave in court.  You may also treat that
prior statement as evidence in this case—that is, you may treat what the witness said in
that prior statement as evidence like any other evidence in this case.  If you believe that
any party has been discredited or impeached, then you should give his or her testimony
the weight, if any, that you judge it is fairly entitled to receive.

Trial Tr. Day 3 at 83. This instruction was sufficient to make the jury aware of its option to

discredit any inconsistent testimony and give Cunningham's testimony whatever weight it felt

appropriate.

Third, and finally, the defendants argue that a new trial is warranted because, in his opening statement, plaintiffs' counsel incorrectly stated that the defendants' burden of proof on the exemption claims was "clear and convincing evidence" even though the proper standard was preponderance of the evidence. Trial Tr. Day 1 at 84. When this was brought to the Court's attention the next day by defendants' counsel—who only sought a curative instruction (or a contempt citation) at the time, see Trial Tr. Day 2 at 4—the Court immediately made the following statement to the jury:

> Yesterday during his opening statement, Mr. Salb made a statement with reference to the burden of proof and defined it in a certain way. I told you before he began to speak that what the lawyers say in their statements to you are argument, they're not evidence. I should also point out that I will define the law for you and you must follow my instructions as to what the law is. So, I will give you instructions very explicitly about the appropriate burden of proof in this case on each issue presented.

Id. at 6. When the Court ultimately instructed the jury prior to its deliberations, it was clear that the appropriate standard was preponderance of the evidence. See Trial Tr. Day 3 at 73, 79-80. Once again, there is no indication that the jury was confused by plaintiffs' counsel's initial inappropriate statement, and the Court adequately cured the problem by clearly explaining the appropriate standard to the jury.

As a result, the defendants have failed to show either that the jury reached a "seriously erroneous result" or that failure to grant the motion would cause a "clear miscarriage of justice"—let alone both. See Nyman, 967 F. Supp. at 1569 (citations omitted). Instead, the jury appears to have weighed the evidence carefully and reached a reasonable conclusion. No new trial is warranted.

**C.** **Amending the Judgment**

The Court previously ruled that no evidence was presented showing that Lifecare employed Radtke, and her claims against it were thereby dismissed. See Trial Tr. Day 4 at 91. The jury later returned a verdict finding that Cunningham was an independent contractor of Advanta and thus not entitled to overtime pay. See Verdict Form for Plaintiff Carmen Cunningham [#154]. Neither result, however, was reflected on the Judgment [#163]. It will therefore be amended so that Lifecare may recover costs from Radtke and Advanta may recover costs from Cunningham.

**CONCLUSION**

It is, therefore, hereby **ORDERED** that defendants' Defendants' Renewed Motion for Judgment as a Matter of Law, Motion for a New Trial and Motion to Alter or Amend the Judgment [#176] is **DENIED** insofar as it seeks judgment as a matter of law; **DENIED** insofar as it seeks a new trial; and **GRANTED** insofar as it seeks to amend or alter the judgment.

**SO ORDERED.**

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE